# EXHIBIT A-1

 **CT Corporation**

**Service of Process Transmittal**
11/16/2020
CT Log Number 538594715

| | |
|---|---|
| **TO:** | Russell Burke<br>Diamond Resorts International<br>10600 W Charleston Blvd<br>Las Vegas, NV 89135-1260 |
| **RE:** | **Process Served in Arizona** |
| **FOR:** | DIAMOND RESORTS MANAGEMENT, INC.  (Domestic State: AZ) |

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | NORMAN ZWICKY, etc., Pltf. vs. DIAMOND RESORTS, INC., et al., Dfts.<br>*Name discrepancy noted.* |
| **DOCUMENT(S) SERVED:** | - |
| **COURT/AGENCY:** | None Specified<br>Case # CV2020010141 |
| **ON WHOM PROCESS WAS SERVED:** | National Registered Agents, Inc, Phoenix, AZ |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 11/16/2020 at 11:01 |
| **JURISDICTION SERVED :** | Arizona |
| **APPEARANCE OR ANSWER DUE:** | None Specified |
| **ATTORNEY(S) / SENDER(S):** | None Specified |
| **REMARKS:** | Please note even though the documents are directed to DIAMOND RESORTS, our records indicate that we are agent for all entities beginning with this name and they all share the same delivery instructions |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via  UPS Next Day Air , 1ZX212780138587657<br><br>Image SOP<br><br>Email Notification,  Shannon Goebel-Fitzpatrick<br> Shannon.Goebel@diamondresorts.com<br><br>Email Notification,  Trimiriam Arnold  Trimiriam.arnold@diamondresorts.com<br><br>Email Notification,  Nicole Wanders  Nicole.wanders@diamondresorts.com<br><br>Email Notification,  Russell Burke  russell.burke@diamondresorts.com<br><br>Email Notification,  Russell Burke  russell.burke@diamondresorts.com<br><br>Email Notification,  Brittany De Johnette  brittany.dejohnette@diamondresorts.com |
| **SIGNED:**<br>**ADDRESS:** | National Registered Agents, Inc<br>1999 Bryan Street<br>Suite 900<br>Dallas, TX 75201 |

Page 1 of  2 / AS

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

 CT Corporation

**Service of Process Transmittal**
11/16/2020
CT Log Number 538594715

| | |
|---|---|
| **TO:** | Russell Burke<br>Diamond Resorts International<br>10600 W Charleston Blvd<br>Las Vegas, NV 89135-1260 |
| **RE:** | **Process Served in Arizona** |
| **FOR:** | DIAMOND RESORTS MANAGEMENT, INC.  (Domestic State: AZ) |

| For Questions: | 866-665-5799 |
|---|---|
| | SouthTeam2@wolterskluwer.com |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

LAW OFFICES
PHELPS & MOORE
PROFESSIONAL LIMITED LIABILITY COMPANY
7430 EAST BUTHERUS DRIVE
SUITE A
SCOTTSDALE, ARIZONA 85260
(480) 534-1400
Jon L. Phelps (027152)
jon@phelpsandmoore.com
Robert M. Moore (013338)
rob@phelpsandmoore.com

Edward L. Barry (005856)
2120 Company Street, Third Floor
Christiansted, Virgin Islands 00820
(340) 719-0601
e.barry.legal@gmail.com
Counsel for Plaintiff Norman Zwicky

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| NORMAN ZWICKY, for himself and on behalf of all others similarly situation,<br><br>       Plaintiff;<br><br>v.<br><br>DIAMOND RESORTS, INC.; ILX ACQUISITION, INC.; DIAMOND RESORTS MANAGEMENT, INC.; STEPHEN J. CLOOBECK; DAVID F. PALMER; C. ALAN BENTLEY; TROY MAGDOS; KATHY WHEELER; LINDA RIDDLE; and DOES 1-10;<br><br>       Defendants. | Case No.:<br><br>CV2020-010141<br><br>SUMMONS<br><br><br>If you would like legal advice from a lawyer, contact the Lawyer Referral Service at 602-257-4434<br>or<br>www.maricopalawyers.org<br>Sponsored by the<br>Maricopa County Bar Association |

THE STATE OF ARIZONA TO THE DEFENDANT(S):

## DIAMOND RESORTS, INC.

1

2      1.     A lawsuit has been filed against you. A copy of the lawsuit and other Court

3      papers are served on you with this Summons.

4      2.     If you do not want a Court judgment or order taken against you without your

5      input, you must file an Answer or Response in writing with the Court and pay the Court's

6      filing fee. If you do not file an Answer or Response, the other party may be given the relief

7      requested in his/her/its Petition or Complaint. To file your Answer or Response, mail a copy

8      of your Answer or Response to the other party at the address listed on top of this Summons

9      and also take, or send, the Answer or Response to the:

10          a.     Office of the Clerk of the Superior Court, 201 West Jefferson Street,

11          Phoenix, Arizona 85003; or

12          b.     Office of the Clerk of the Superior Court, 18380 North 40th Street,

13          Phoenix, Arizona 85032; or

14          c.     Office of the Clerk of the Superior Court, 222 East Javelina Avenue,

15          Mesa, Arizona 85210; or

16          d.     Office of the Clerk of the Superior Court, 14264 West Tierra Buena

17          Lane, Surprise, Arizona 85374.

18      3.     If this Summons and the other Court papers were served on you by a

19      registered process server or the Sherriff within the State of Arizona, your Response or

20      Answer must be filed within TWENTY (20) CALENDAR DAYS from the date you were

21      served, not counting the day you were served. If this Summons and the other Court papers

22      were served on you by a registered process server or the Sherriff outside of the State of

23      Arizona, your Response or Answer must be filed within THIRTY (30) CALENDAR DAYS

24      from the date you were served, not counting the day you were served. Service by a

25      registered process server or the Sheriff is complete when made. Service by Publication is

26      complete thirty (30) days after the date of first publication.

4. You can get a copy of the Court papers filed in this case from the Petitioner at the address listed at the top of the first page from the Clerk of the Superior Court's customer Service Center at:

      a.     601 West Jefferson Street, Phoenix, Arizona 85003; or

      b.     18380 North 40th Street, Phoenix, Arizona 85032; or

      c.     222 East Javelina Avenue, Mesa, Arizona 85210; or

      d.     14264 West Tierra Buena Lane, Surprise, Arizona 85374.

5. Requests for reasonable accommodation for persons with disabilities must be made to the division assigned to the case by the party needing accommodation or his/her/its counsel at least three (3) judicial days in advance of a scheduled Court proceeding.

6. Requests for an interpreter for persons with limited or no English proficiency must be made to the division assigned to the case by the party needing the interpreter and/or translator or his/her/its counsel at least ten (10) judicial days in advance of a scheduled Court proceeding.

The name and address of the Plaintiff's attorney is:

Jon L. Phelps
PHELPS & MOORE, PLC
7430 East Butherus Drive, Suite A
Scottsdale, Arizona 85260

Edward L. Barry (005856)
2120 Company Street, Third Floor
Christiansted, Virgin Islands 00820

SIGNED AND SEALED this _____ day of _____, 2020.

COPY

_____
CLERK OF SUPERIOR COURT

AUG 21 2020

CLERK OF THE SUPERIOR COURT
V. GARCIA
DEPUTY CLERK

3

CLERK OF THE
SUPERIOR COURT
FILED
V. GARCIA, DEP
2020 AUG 21 PM 3: 57

LAW OFFICES
**PHELPS & MOORE**
PROFESSIONAL LIMITED LIABILITY COMPANY
7430 EAST BUTHERUS DRIVE
SUITE A
SCOTTSDALE, ARIZONA 85260
(480) 534-1400

Jon L. Phelps (027152)
jon@phelpsandmoore.com
Robert M. Moore (013338)
rob@phelpsandmoore.com

Edward L. Barry (005856)
2120 Company Street, Third Floor
Christiansted, Virgin Islands 00820
(340) 719-0601
e.barry.legal@gmail.com

Counsel for Plaintiff Norman Zwicky

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

**IN AND FOR THE COUNTY OF MARICOPA**

| | |
|---|---|
| NORMAN ZWICKY, for himself and on behalf of all others similarly situation,<br><br>Plaintiff;<br><br>v.<br><br>DIAMOND RESORTS, INC.; ILX ACQUISITION, INC.; DIAMOND RESORTS MANAGEMENT, INC.; STEPHEN J. CLOOBECK; DAVID F. PALMER; C. ALAN BENTLEY; TROY MAGDOS; KATHY WHEELER; LINDA RIDDLE; and DOES 1-10;<br><br>Defendants. | Case No.: CV 2020-010141<br><br>**CERTIFICATE OF COMPULSORY ARBITRATION** |

Undersigned counsel hereby certifies that Plaintiff in this action seeks monetary

damages which are expected to exceed $50,000.00.

Therefore, pursuant to Arizona Rule of Civil Procedure 72(b), this case is **not** subject to compulsory arbitration.

RESPECTFULLY SUBMITTED this 21st day of August, 2020.

/s/ Jon L. Phelps
Jon L. Phelps (027152)
Robert Moore (013338)
PHELPS & MOORE PLLC
7430 East Butherus Drive, Suite A
Scottsdale, AZ 85260
(480) 534-1400
jon@phelpsandmoore.com
rob@phelpsandmoore.com

/s/ Edward L. Barry
Edward L. Barry (005856)
2120 Company Street, Third Floor
Christiansted, Virgin Islands 00820
(340) 719-0601
ed.barry.legal@gmail.com
**Attorneys for Plaintiff**

LAW OFFICES
PHELPS & MOORE
PROFESSIONAL LIMITED LIABILITY COMPANY
7430 EAST BUTHERUS DRIVE
SUITE A
SCOTTSDALE, ARIZONA 85260
(480) 534-1400

Jon L. Phelps (027152)
jon@phelpsandmoore.com
Robert M. Moore (013338)
rob@phelpsandmoore.com

Edward L. Barry (005856)
2120 Company Street, Third Floor
Christiansted, Virgin Islands 00820
(340) 719-0601
e.barry.legal@gmail.com
Counsel for Plaintiff Norman Zwicky

COPY

AUG 21 2020

CLERK OF THE SUPERIOR COURT
V. GARCIA
DEPUTY CLERK

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| NORMAN ZWICKY, for himself and on behalf of all others similarly situation,<br><br>Plaintiff;<br><br>v.<br><br>DIAMOND RESORTS, INC.; ILX ACQUISITION, INC.; DIAMOND RESORTS MANAGEMENT, INC.; STEPHEN J. CLOOBECK; DAVID F. PALMER; C. ALAN BENTLEY; TROY MAGDOS; KATHY WHEELER; LINDA RIDDLE; and DOES 1-10;<br><br>Defendants. | Case No.:<br><br>CV2020-010141<br><br>**CLASS ACTION COMPLAINT**<br><br>*Jury Trial Demanded* |

Plaintiff Norman Zwicky, on his own behalf and on behalf of all others similarly situated, for his cause of action against Diamond Resorts, Inc.; ILX Acquisition, Inc.;

Diamond Resorts Management, Inc.; Stephen J. Clobeck; Troy Magdos; Kathy Wheeler; Linda Riddle; and Does 1-10, allege as follows:

**Jurisdiction**

1.    **Plaintiff Norman Zwicky** is a citizen of Arizona.

2.    **Defendant Diamond Resorts, Inc.** (formerly known as Diamond Resorts International, Inc.) is a corporation organized and existing under the laws of Delaware, with its principal place of business in Las Vegas, Nevada.

3.    **Defendant ILX Acquisition, Inc.** is a corporation organized and existing under the laws of Delaware, with its principal place of business in Phoenix, Arizona.

4.    **Defendant Diamond Resorts Management, Inc.** is a corporation organized and existing under the laws of Arizona, with its principal place of business in Las Vegas, Nevada.

5.    Upon information and belief, individual **Defendants Stephen J. Cloobeck, David F. Palmer, C. Alan Bentley, Troy Magdos, Kathy Wheeler,** and **Linda Riddle** are all citizens of Nevada.

6.    Does 1-10 are fictitiously-designated natural persons, corporations, or other entities whose identities and citizenship are unknown to at this time, and who are or may be liable to Plaintiff in the premises. Leave to amend this Complaint to state their true identities and citizenship will be sought when the same are ascertained.

7.    There are at least 100 members of the putative class.

8. The amount in controversy, aggregated, exceeds five million dollars ($5,000,000.00), exclusive of interest and costs.

9. This Court has personal jurisdiction of each Defendant under Arizona's long-arm statute, 16 A.R.S. Rules Civil. Proc, Rule 4.3(a).

10. Specifically, the non-resident Defendants, and each of them, did business in Arizona, maintained systematic and continuous affiliations with Arizona for purposes of general jurisdiction, and in most instances maintained a physical presence in the State; alternatively, each Defendant purposeful availed itself (or himself or herself) of the privileges of conducting activities in Arizona, and purposely directed tortious and illegal conduct at the forum out of which the claims herein arise, satisfying the requirements of specific jurisdiction. The exercise of *in personam* jurisdiction, as to each Defendant, comports with "fair play and substantial justice."

### Summary of the Case

11. Plaintiff's allegations are based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters. The allegations herein have been informed by an investigation that included, among other things: (i) a review of materials produced in connection with Plaintiff's corporate books and records inspection action captioned *Zwicky v. Premiere Collection, Inc.*, No. 2015 Civ. 051911 (Ariz. Super. Ct.); (ii) an analysis of Diamond Resorts, Inc.'s public filings with the U.S. Securities and Exchange Commission ("SEC"); and (iii) review of news articles and other publicly

available information.  Plaintiff believes additional evidentiary support will exist for their allegations after a reasonable opportunity for discovery

12. Plaintiff Norman Zwicky is among approximately 25,000 current and former timeshare owners/members of Premiere Vacation Collection Owners Association, which encompasses a group of resorts located in in Arizona, Colorado, Indiana, Nevada and Baja, Mexico. The Premiere Vacation Collection is only one of at least eight distinct "Collections" (groupings of resorts) held by Diamond Resorts, Inc. ("DRI") or subsidiaries, others being the European Collection, the U.S. Collection, and the Hawaii Collection, for example.

13. The Premiere Vacation Collection Owners Association (hereinafter, sometimes, "the Collection" or "the Association," as the context requires) is an incorporated association of "timeshare" owners.  These are not timeshares in the traditional sense; the Association's members hold no deed, leasehold assignment, or any other legal or equitable interest in real property.   Each member instead holds an intangible personal property interest in the Collection called a "Points Certificate."

14. These "points" serve as the basis for calculating the member's voting rights in the Association, and his or her pro rata assessment obligations.  They also serve as the basis for calculating the members' "reservation privileges," which are non-exclusive rights to book accommodations at resorts within the Collection (only on a first-come, first-served basis), provided that the member is current on his or her assessments and fees.  Points serve

4

as the internal currency of the DRI regime, with the member spending his or her points, as opposed to cash, to book rooms.

15.     To become an owner/member, the consumer makes an initial investment, typically in the neighborhood of $20,000, to acquire his or her "Points Certificate." DRI, through a subsidiary, often finances part of the up-front purchase price.  Members make a life-long, essentially-irrevocable contractual commitment to pay annual assessments (typically exceeding $2,000 a year).

16.     Assessments are levied by the Association's Board of Directors based upon an annual budget for estimated common expenses and the member's proportionate share thereof (determined by the number of his or her points).     All members of all DRI Collections are additionally required to pay annual fees to "The Club" (membership mandatory), typically several hundred dollars.

17.     The Association, an Arizona nonprofit corporation ostensibly operating as an ordinary common interest real estate association, collects assessments on a tax-exempt basis under IRC § 528(d)(3), to cover common expenses.  It purports to be governed by a democratically-elected Board of Directors, managing the Association's property and fiscal affairs through a property management company—all ostensibly for the common benefit of its thousands of members, and in all in accordance with fiduciary standards.

18.     However, DRI, through its subsidiaries, maintains absolute power over the Association's fiscal affairs.  DRI, through ILX Acquisition, dominates the Association by stacking its Board with its DRI executives, exercising the overwhelmingly numerous votes

granted by its "bulk membership" in the Association and by virtue of its special voting powers granted in the Association's organic documents (ninefold that of other members). These directors invariably retain DRI's subsidiary, Diamond Resorts Management, Inc., as property manager under perpetually-renewable, sweetheart property management agreements guarantying them a substantial, 100% profit at members' expense.

19.    DRI thus has a stranglehold on the finances of the Association, which it maintains through its own employees and affiliates serving as conflicted fiduciaries. DRI has in fact corrupted the Association's fiscal affairs through the systematic, fraudulent conduct of these fiduciaries.

20.    Year after year, the Association's controlling Directors, acting in concert with DRI's principal executives and property management company, secretly shifted massive amounts of DRI's internal corporate overhead expenses to the timeshare owners under the guise of legitimate common expenses of the Association. The Defendants concealed such illicit hidden subsidies by means of false and misleading annual Budgets disseminated to members electronically and through the mail.

21.    Defendants carried out this fraudulent scheme for many years, thereby extracting massively-inflated assessment charges from members.

**The Plaintiff/Proposed Class Representative**

22.    The proposed class consists of all current and former members of the Association, approximately 25,000 in number.

6

23.    **Plaintiff Norman Zwicky** is a retired postal worker who formerly owned a timeshare interest (a traditional timeshare granting him a time-specific fractional interest in real property) in Kohl's Ranch in Payson, Arizona.

24.    Kohls Ranch (to the extent its property was not titled to individual timeshare owners) was an asset held by ILX Resorts Incorporated (now dissolved and defunct). DRI in August of 2010 purchased a grouping of resorts from the bankruptcy estate of ILX Resorts Incorporated, through DRI's wholly-owned subsidiary, Defendant ILX Acquisition, Inc. Those resorts, now under DRI's control (through its subsidiary), became the Premiere Vacation Collection.

25.    In 2010, Zwicky was induced by DRI to purchase a "Points Certificate" for 13,000 points in the Premiere Vacation Collection. Zwicky invested $26,395 (including the stipulated trade-in value of his Kohl's Ranch timeshare). In addition, Zwicky, and all other members, contractually agreed to a lifetime obligation for annual assessments as levied by the Association's Board (as well as occasional special assessments). Zwicky, and all other Association members, were also required to pay DRI annual fees imposed by "The Club."

26.    Zwicky's 13,000 points translate roughly into the right to book a 10-day vacation at a resort within the Collection, subject to room-availability (and subject to payment of his assessment obligations).

27.    Under the DRI regime, Zwicky's annual assessment obligations, compared with his Kohl's Ranch obligations, roughly tripled. In 2014, for example, DRI charged him

$2,337.59 (including fees of approximately $200 for mandatory membership in DRI's "Club"); in 2016 the total annual charges were $2,535.01.

28.    The effective cost to Zwicky of an annual ten-day vacation under DRI's "points" regime (including his up-front investment hypothetically amortized over seven years) exceeds $600 per day.  This amount far exceeds the fair market value of the typical accommodations within the Collections, and far exceeds the ordinary commercial rates that DRI charges the general public for direct bookings of all or most of the same accommodations.

29.    For example, current room rates (March 2019-high season) quoted for direct bookings of units in the Collection by the general public through Expedia are $132 per night for Kohl's Ranch, $199 per night for the Varsity Club of Tucson, and $291 for Los Abrigados (Sedona).

30.    Due to these exorbitant annual charges, Zwicky's Points Certificate is now completely worthless.  Many disaffected owners attempt to sell thousands of points on eBay or online timeshare exchanges for a total of $1, or to simply give them away in order to avoid annual assessment obligations.

31.    Zwicky's assessments were grossly inflated by, among other things, the fraudulent hidden charges for DRI's internal overhead expenses, as more particularly set forth below.

**Defendants; Business Operations; Relationships**

32.    **Defendant Diamond Resorts, Inc. ("DRI")**, formerly known as Diamond Resorts International, Inc. (publicly traded as NYSE:DRII until acquired by a private equity firm for approximately $2.2 billion in June of 2016), is one of the largest companies in the vacation ownership industry, with a timeshare "ownership base" reported to number in the hundreds of thousands.  DRI holds and controls a network of approximately 300 resorts worldwide (with many additional resorts under management contract).

33.    DRI's basic business activities consist of timeshare sales, timeshare sales financing, and hospitality and management services.   Additionally, DRI (itself or through subsidiaries) directly offers its own substantial timeshare inventory for booking by the general public.

34.    **ILX Acquisition, Inc.** is a wholly owned subsidiary of DRI, formed for the purpose of acquiring and holding the assets held by the bankruptcy estate of now-defunct ILX Resorts Incorporated in 2010, which included the grouping of resorts now comprising the Premier Vacation Collection.

35.    ILX Acquisition is the "developer" (as the term is commonly understood) of this Collection, referred to as the "Seller" of timeshare interests in the organic document (declaration) of the Association, called the "Second Amended and Restated Premiere Vacation Collection Plan" dated November 10, 2010 and recorded with the Maricopa County, Arizona Recorder of Deeds (hereinafter, sometimes, "the Plan").

36.     ILX Acquisition, Inc. is itself a member of the Association, holding a "bulk membership" consisting of its unsold timeshare inventory.  Such unsold timeshare inventory includes a substantial and perpetually-renewing number of forfeited timeshare interests of members who defaulted in their assessment obligations.

37.     ILX Acquisition, Inc., and indirectly DRI, maintain and exercise absolute control of the Association's Board through the voting power existing by virtue of their vast "points" ownership in the Association.    Their stranglehold on the Board is further effectively guaranteed by Section 3.03 of the Plan, which provides:

> Voting. Total Authorized Voting Shares. Each Member shall be entitled to cast a number of votes equal to such Member's total Membership Share. Notwithstanding the foregoing, until such time as 95% of the Total Authorized Voting Membership Shares in the Collection (including those held for sale by Seller and its affiliates) have been sold by Seller and its affiliates, Seller shall be entitled to cast a number of votes equal to Seller's total Membership Share for all Memberships held by Seller and its affiliates (including those held for sale by Seller and its affiliates) multiplied by nine (9).

*Id.*

38.     The 95% equal-voting-rights threshold has never been reached and likely never will be.

39.     Under the basic "inventory-recapture" business model of DRI and ILX Acquisition, DRI depends upon the high rate of member defaults and forfeitures as a cheap source of self-replenishing timeshare resale inventory, which minimizes DRI's need to invest its capital in new properties as a source of timeshare sales inventory. Further, the loss

of DRI's super-voting powers (ninefold that of private members), and consequent loss of its absolute control of Association's Board, is an obvious disincentive for DRI to achieve the 95% private-ownership benchmark.

40.     The **Premiere Vacation Collection Association** (not a defendant herein) is an Arizona nonprofit corporation.  The Board of Directors of the Association manages and maintains the "timeshare" properties (the constituent resorts of the Collection) and the Association's finances, purportedly for the benefit of the collective interests of its members.

41.     The Board levies and collects annual assessments from members to defray common expenses (on a tax-exempt basis under IRC § 528(d)(3)), pursuant to an annual Budget determined by the Board disseminated to members together with the annual assessment billing statements sent to members.  The Plan defines these "common expenses," in typical fashion, as

> the actual and estimated costs of operating and managing Association and its property including, but not limited to: Assessments, Association administrative costs, taxes, insurance, utilities, reserves, legal fees and accounting fees; the annual maintenance fees or dues and other costs of ownership of the Resort Interests and any Common Furnishings.

*Id.*, Section 1.13.

42.     Each resort within the Collection (called a "component site" in the Plan) has its own separate owners association (whose members typically include a certain number of "legacy" timeshare owners in those resorts not opting to buy into the DRI "points" regime), often referred to in corporate documents as "HOAs" (abbreviation for homeowners associations).

11

43. As is also typical in a timeshare association (or other common interest property regime), the Board delegates many of its duties to a property management company.

44. DRI, through the disproportionate voting powers of its subsidiary, ILX Acquisition, controls not only the Association but also the HOAs of each of the individual constituent resorts. As a result, it invariably hires its own subsidiary, Diamond Resorts Management, Inc. as property management company for the Association and for each constituent resort.

45. The Association holds itself out as an ordinary nonprofit property association of timeshare owners, governed by a democratically-elected Board of Directors duty-bound to represent the collective rights and interests of its many thousands of members, and availing itself of the tax-exemptions granted to bona fide property owner associations. However, in substance and reality, the Association is a sham, operating as a mere a proprietary arm or instrumentality of DRI, as further set forth.

46. **Defendant Diamond Resorts Management, Inc.** (hereinafter, sometimes, "DRMI") is a wholly owned subsidiary of DRI. At all material times DRMI served, and continues to serve, as the property management company of the Association (and of each constituent resort's HOA), undertaking by delegation the Board's fiduciary duties to manage the Association's property, resort operations, and finances in the collective best interests of the members.

12

47. DRMI owes fiduciary duties directly to members under the Arizona Timeshare Owners Association and Management Act, Ariz. Rev. Stat. Ann. § 33-2203(B).

48. The Plan of the Association does not disclose that DRMI or any other developer-affiliate was to act as property manager (although in 2016 the Attorney General of Arizona in consumer fraud proceedings ordered DRI to make that future disclosure in public documents).

49. Instead the Plan, Section 4.03, provides that the Association will use its "best efforts" to retain a "reputable firm" as Managing Agent.

50. The management agreement is to contain certain provisions:

- The term is to be not more than 10 years, and is to be automatically renewed for successive 10-year terms unless written notice of termination is given by the Association within 180 prior to the expiration of the term.
- The Association may not terminate the management agreement except upon the vote or consent of 95% of the Association members (including ILX Acquisition, Inc. as "bulk member").
- The fee paid to the Managing Agent "or a subsidiary or affiliate thereof" is "not to exceed fifteen percent (15%) of the total Assessments assessed upon Members in each Fiscal Year."
- "Such compensation may be increased if authorized by the vote or written consent of a majority of the Board or if the [Association] is unable to induce a qualified, reputable and experienced management firm to act as Managing Agent without increasing such compensation."

51. The Developer-Directors of the Association chose DRMI as property manager and its terms of compensation without competitive bidding from non-developer affiliated property management companies.

52. DRI similarly installed DRMI as the property manager of each of the local constituent resorts, thereby extending its absolute control. As stated in DRI's Form 10-K

Annual Report of December 31, 2014 filed with the U.S. Securities and Exchange Commission:

> HOAs. Each of the [domestic] Diamond Resorts managed resorts ... is typically operated through an HOA, which is administered by a board of directors. Directors are elected by the owners of intervals at the resort ... and may also include representatives appointed by us as the developer of the resort. As a result, we are entitled to voting rights with respect to directors of a given HOA by virtue of (i) our ownership of intervals at the related resort; (ii) our control of the Diamond Collections that hold intervals at the resort and/or (iii) our status as the developer of the resort.

> The board of directors of each HOA hires a management company to provide the services described above, which in the case of all Diamond Resorts managed resorts, is us.

53. According to DRI's 10-K for 2014—disclosures made to DRI's securities investors, but not to Association members—DRMI's management fees are "based on a cost-plus structure and are calculated based on the direct and indirect costs (including the absorption of a substantial portion of our overhead related to the provision of our management services) incurred by the Diamond Collection."

54. This internal corporate overhead-absorption practice was not disclosed to Association members.

55. DRI's Chief Executive Officer, Defendant David Palmer stated, in a September 2014 investors conference:

> Anything that is put in the [Association's] budget that gets expended on an annual basis, we get our 15 percent fee. ... That is basically a 100 percent profit business. ... All the costs are disclosed on a private website. There are no hidden fees.

14

56. In fact DRI and affiliates imposed massive hidden charges upon owners, concealed in misleading Budgets provided to owners, which were not disclosed to Association members on a "private website" or otherwise.

57. The amounts actually charged by DRMI for fees, including secret corporate subsidies, grossly exceeded the 15% cap specified in the Plan.

58. According to the Notes to the Consolidated Financial Statement of Diamond Resort Parent, LLC regarding "Transactions with Related Parties," contained in an Amendment to DRI's 2011 Registration Statement (SEC Form S-4), DRI disclosed to securities investors (but not to Association members):

> **Allocation of Expenses.**
> In addition to management services revenues, the Company has entered into agreements with the HOAs to be reimbursed for a portion of the Company's resort management and general and administrative expenses to the HOAs."

No such actual agreement involving the Premiere Vacation Collection or its constituent resorts' HOAs authorizing such reimbursement has ever been disclosed to Association members, nor has the actual amount of such reimbursement ever been disclosed to Association members.

59. **Defendant Stephen J. Cloobeck** is the founder of DRI, held 22% of its stock (until the 2016 acquisition/privatization of DRI by a private investment firm), and served as Chairman of the Board and CEO of DRI during certain material times herein.

60. At all material times, Cloobeck was fully aware of the practice of shifting DRI's internal overhead expenses to the Association, inasmuch as that practice was a

system-wide policy adopted by DRI, as reflected in DRI's 2014 10-K Form. Said SEC report disclosed to DRI's investors (but not to Association members) that "[w]e pass through to the HOAs and the Diamond Collections certain overhead charges incurred to manage the resorts."

61.     This "pass-through"/corporate subsidy involved massive sums. DRI's 2011 Registration Statement (SEC Form S-4), referred to above, acknowledged that the amount of DRI's internal expenses shifted over to its Collection associations (system-wide) was $24,467,000 in 2009, and $30,766,000 in 2010. Upon information and belief, the amount of such subsidies, system-wide, increased by massive amounts in later years (although no known SEC filing discloses those amounts for 2011 and later).

62.     Upon information and belief, Cloobeck routinely reviewed the annual Budgets of each Collection, including those of the Association; the Collections' revenues and expenses amounted to hundreds of millions of dollars annually and substantially impacted DRI's profitability. Upon information and belief, Cloobeck was fully aware that the Association's Budget, year after year, fraudulently concealed the "pass-through" of internal corporate overhead to members.

63.     **Defendant David F. Palmer** was at material times President, Chief Executive Officer and a member of DRI's Board of Directors, holding approximately 5% of DRI's outstanding common stock when it was publicly listed (2013-2016). Palmer was also fully aware of DRI's system-wide overhead-shifting practice, adopted as a basic DRI business model.

16

64.     Upon information and belief, Palmer routinely reviewed the annual Budgets of each Collection, including that of the Association; the Collections' revenues and expenses amounted to hundreds of millions of dollars annually and substantially impacted DRI's profitability.  Upon information and belief, Palmer was fully aware that the Association's Budget, year after year, fraudulently concealed the "pass-through" of internal corporate overhead to members.

65.     **Defendant C. Alan Bentley** was at material times Executive Vice President and Chief Financial Officer of DRI, and held a substantial amount of DRI's stock.  Bentley was fully aware of DRI's system-wide overhead-shifting practice.

66.     Upon information and belief, Bentley routinely reviewed the annual Budgets of each Collection, including that of the Association; the Collections' revenues and expenses amounted to hundreds of millions of dollars annually and substantially impacted DRI's profitability.  Upon information and belief, Bentley was fully aware that the Association's Budget, year after year, fraudulently concealed the "pass-through" of internal corporate overhead to members.

67.     **Defendant Troy Magdos** was at material times a Director and the President of the Premiere Vacation Collection Owners Association, while simultaneously employed by DRI as Senior Vice President-Resort Specialist.

68.     Magdos was not only fully aware of the overhead-shifting practice referred to above, but also actively participated, with fellow Directors and DRMI, in the preparation,

approval and dissemination of the fraudulent Budgets contained in the billing statements sent to members.

69. **Defendant Kathy Wheeler** was at material times a Director and the Secretary/Treasurer of the Premiere Vacation Collection Owners Association, while simultaneously employed by DRI as Vice President-Homeowners Division.

70. Wheeler was not only fully aware of the overhead-shifting practice referred to above, but also actively participated, with fellow Directors and DRMI, in the preparation, approval and dissemination of the fraudulent Budgets contained in the billing statements sent to members.

71. **Defendant Linda Riddle** was at material times a Director and the Vice President of the Premiere Vacation Collection Owners Association, while simultaneously employed by DRI as Vice President-Association Administration.

72. Riddle was not only fully aware of the overhead-shifting practice referred to above, but also actively participated, with fellow Directors and DRMI, in the preparation, approval and dissemination of the fraudulent Budgets contained in the billing statements sent to members.

73. Defendants Magdos, Wheeler and Riddle (hereinafter, sometimes, the "Director-Defendants") were at material times the sole officers of the Association, and comprised the majority of the five-member Board.

74.     **Does 1-10** are natural persons or legal entities who are or may be liable in the premises, but whose identities are presently unknown. Leave to amend this Complaint will be sought when the same are ascertained.

75.     All individual Defendants herein, including the Director-Defendants, were agents of DRI, acting within the scope of said agency, and for the benefit of DRI, such that DRI is vicariously liable.

### Fraudulent Budgets, Assessment Billing Statements

76.     Beginning in 2011 (the first full budget-year after the Premiere Vacation Collection was formed), and every year thereafter, the Association's Board, with the collaboration of DRMI, created a Budget for the Association, purporting to be a reasonable and good faith estimate of the common expenses to be incurred in the upcoming calendar year.

77.     The Budget served as the basis for calculating the amount of the annual assessment charged to each member for that year (a pro rata share of common expenses determined by the number of his or her points in the Collection).

78.     No Budget of the Association has meaningfully disclosed the DRI subsidies described above, with the result that each of the Budgets was materially misleading.

79.     For example, in the 2013 Budget, and the associated assessment billing statements sent to members, the Board stated that the amount the Association would be charged $1,070,739 for "assessment, billing and accounting fees" plus "general and administrative expenses" (in addition to the disclosed management fee of $3,522,993).

80.     In fact, the actual amount DRI charged the Association for such fees and expenses in 2013—classified in DRI's confidential internal accounting records as "Indirect Corporate Costs" reimbursed to DRI at both at the Collection level and local HOA level—was materially greater than the estimated amounts.  In fact, the actual amount of such charges was ████████ (amount redacted in compliance with Superior Court confidentiality Order).   The Board knew that its 2013 Budget estimate of such payments to DRMI were materially less because in the immediately preceding year, 2012, the amount was ████ ████ (amount redacted in compliance with Superior Court confidentiality Order).

81.     In the 2014 Budget, and the associated assessment billing statements sent to members, the Board stated that the Association would be charged $1,120,008 for "assessment, billing and accounting fees" plus "general and administrative expenses" (in addition to the disclosed management fee of $3,682,000).   The Board knew that this estimated amount was materially less than the amount actually charged by DRMI in the previous years and knew that it was materially less than the amount DRMI intended to charge in 2014.

82.     In fact, the actual amount DRI charged the Association for such fees and expenses in 2014—classified in DRI's confidential internal accounting records as "Indirect Corporate Costs" reimbursed at both the Collection level and the local HOA level—was materially greater than the corresponding Budgeted amounts.  In fact, the actual amount of such charges was ████████ (amount redacted in compliance with Superior Court confidentiality Order).

83.     In the 2015 Budget, and the associated assessment billing statements sent to members, the Board stated that the Association would be charged $1,605,146 for "assessment, billing and accounting fees" plus "general and administrative expenses" (in addition to the disclosed management fee of $3,229,014). Once again, the Board knew that this estimated amount was materially less than the amount actually charged by DRMI in the previous years and knew that it was materially less than the amount DRMI intended to charge in 2015.

84.     In fact, the actual amount DRI charged the Association for such fees and expenses in 2015 (the last year for which Plaintiff has obtained access to the actual figures)—classified in DRI's confidential internal accounting records as "Indirect Corporate Costs" reimbursed at both the Collection and the local HOA level—was materially greater than the corresponding Budgeted amounts. In fact, the actual amount of such charges was ███████ (amount redacted in compliance with Superior Court confidentiality Order).

85.     The subsequent annual Budgets estimated the following amounts for "assessment, billing and accounting fees" and "general and administrative expenses" combined: **2016**- $1,073,901; **2017**- $992,905; **2018**- $1,105,240; **2019**- $1,890,300.

86.     The actual amounts paid to DRMI for such fees and expenses ("Indirect Corporate Costs") in those years was not disclosed in the Superior Court inspection action (described below), and is otherwise unknown to Plaintiff. However, and upon information and belief, the amounts actually charged were and continue to be materially greater than the amount disclosed in each of these subsequent Budgets.

87.     Documents confirming the existence and amount of the "indirect corporate costs" charged to this Association—disclosed by DRI only under compulsion of court order—were deliberately kept secret from members by Defendants.  As stated by Director Kathy Wheeler in an affidavit filed in support of DRI's motion for an appellate stay of a Superior Court order:

> PVCOA [the Premiere Vacation Collection Owners Association] uses reasonable efforts to maintain the confidentiality of this information designated CONFIDENTIAL [including the "indirect corporate cost" summary]. PVCOA does not share this information with the public or its general membership, however the information is made available to PVCOA's member officers and directors.

In fact the Association, a nonprofit entity, strenuously resisted disclosure of the "indirect corporate costs," asserting that this information was a protected "trade secret" in Zwicky's state court inspection action, as further addressed below.

### Annual Reports

88.     At the end of each year, the Association provides an audited Consolidated Financial Report containing a Consolidated Statement of Revenues, Expenses and Changes in Fund Balance ("Annual Report"), accessible online to members (only by persistently exploring a labyrinth of vaguely-labeled hyperlinks on DRI's website).

89.     The Annual Reports do not fully, understandably, or meaningfully disclose the nature or true amount of the Association's annual subsidy to DRI ("indirect corporate costs"), including the developer subsidies imposed on each constituent resort's HOA and passed through to the Association as a common expense.

90.     In fact the Annual Reports only generically describe the corporate subsidies under the labels "administrative costs" and "administration," and the amounts reported under those labels grossly understate the actual amount of such subsidies.

91.     Further specificity in the allegations relating to the Annual Reports is precluded by the terms of a certain confidentiality order of the Superior Court, later described in this Complaint.

## COUNT I: FEDERAL CIVIL RICO; CONSPIRACY

92.     All foregoing allegations are incorporated by reference.

93.     Defendants, and each of them, violated the federal Racketeer Influenced and Corrupt Organizations Act of 1970, 18 U.S.C. §§ 1961, *et seq.* ("RICO"), which renders it unlawful for "any person employed by or associated with any enterprise engaged in ... interstate ... commerce ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

### Person

94.     Each Defendant is a "person" within the meaning of the RICO Act, 18 U.S.C. § 1961(3) because each Defendant is an "individual or entity capable of holding a legal or beneficial interest in property."

### Enterprise

95.     The Premiere Vacation Collection Owners Association ("Association") is a RICO "enterprise" because it is a "corporation, association, or other legal entity" within the

definition of Section 1961(4), and because its existence is legally separate and distinct from the Defendants herein.

96.     Defendants, directly or indirectly, participated in the operation or management of the enterprise through a pattern of racketeering activity.

97.     Specifically, and as previously set forth, Defendants Magdos, Wheeler, and Riddle were officers and directors of the Association responsible for preparing and disseminating the Budgets, and levying annual assessments, while simultaneously acting as executive level employees of DRI and beholden to DRI.  Defendant DRMI, as the Association's property manager and agent, undertook by delegation from the Board to manage the Association's fiscal affairs in a fiduciary capacity, and illicitly profited by the hidden overcharges.  Defendant DRI maintained absolute dominion and control of the Association and its finances by stacking the Board with conflicted Directors and a conflicted property management company, such that the Directors and DRMI wrongfully subordinated the collective interests of timeshare owners to the commercial interests of DRI, rendering the Association a mere proprietary arm or instrumentality of DRI.  DRI also illicitly profited from the fraudulent overcharges.  Defendants Cloobeck, Palmer and Bentley (at material times DRI's Chief Executive Officer, President and Vice-President/Chief Financial Officer, respectively) were fully aware of DRI's strategy of shifting DRI's internal corporate overhead to Associations as purported "common expenses" charged to timeshare owners; and (upon information and belief) were actually aware that the true nature and extent of such practice was fraudulently concealed from Association members.  Defendants

Cloobeck, Palmer and Bentley also illicitly profited by the fraudulent overcharges by virtue of their substantial stock ownership in DRI.

### Predicate Acts: Mail Fraud and Wire Fraud

98.     Defendants knowingly and willfully participated in a scheme to defraud Association members out of materially significant sums of money, in violation of 18 U.S.C. §§ 1341(Mail Fraud) and 1343 (Wire Fraud), both being indictable predicate offenses under 18 U.S.C. § 1961.

99.     Defendants, in violation of 18 U.S.C. § 1341, "obtain[ed] money ... by means of false or fraudulent pretenses [or] representations" by using the United States Postal Service to mail fraudulent Budgets included in the annual assessment billing statements, which were sent to timeshare owners with a self-addressed, stamped envelope (requesting that owners remit assessment payments by check and mail to avoid credit card charges).

100.     Defendants, in violation of 18 U.S.C. § 1343, similarly "obtain[ed] money ... by means of false or fraudulent pretenses [or] representations" by means of "wire ... communication." Specifically, Defendants, among other things, utilized the Internet to post, on DRI's website (accessible through each member's password-protected online account), the fraudulent Budgets and billing statements; accepted payments of assessments via the Internet through electronic debit (EFT) or credit card; and encouraged members to utilize their "Surepay" program, under which DRI was authorized to automatically take monthly electronic payments from members' bank accounts to pay assessments.

101. The Budgets, included within the assessment billing statements, were an integral facet of Defendants' scheme, which entailed the use of the mails, "wires," and other instrumentalities of interstate commerce to accomplish their illegal purposes.

102. Specifically, the Budgets were substantially and materially misleading because they failed to disclose that massive sums of money characterized therein as common expenses of the Association were not legitimate common expenses but were in fact secret subsidies of DRI's internal corporate overhead.

103. The Budgets were substantially and materially misleading because they disclosed only a fraction of the amount of expenses reasonably characterized as "assessment, billing and accounting fees" and/or "general and administrative expenses."

104. The audited Annual Reports available to members through the DRI website were similarly misleading, in that they reported only the payments made directly by the Association to DRI for such expenses, while invariably omitting reference to massive amounts of such charges paid to DRI at the constituent resort-HOA level. The undisclosed corporate subsidies paid by the local HOAs were secretly passed through to the Association through its payment of assessments to the constituent-resort HOAs.

105. Defendants, and each of them, had a specific intent to defraud timeshare owners.

106. Plaintiff, and the current and former members comprising the proposed class herein, justifiably relied upon these misrepresentations in that the Defendants directly making them, being the Association Directors and property management company, all had

fiduciary duties and Plaintiff trusted them to act accordingly. Moreover, Association members, as a practical matter, had no access to detailed financial records of the Association except through the arduous and expensive pursuit of their inspection rights (an effort undertaken by Plaintiff Zwicky, *infra*).

### Pattern of Racketeering Activity

107.   Defendants in or about January of 2013 violated the mail fraud and wire fraud statutes by disseminating the 2013 Association Budget, which was materially misleading because it concealed material amounts of DRI subsidies disguised as legitimate common expenses.

108.   Defendants in or about January of 2014 repeated the identical conduct by disseminating the 2014 Budget, which similarly concealed material amounts of DRI subsidies disguised as legitimate common expenses.

109.   Defendants in or about January of 2015 repeated the identical conduct involving similar material sums.

110.   Upon information and belief, Defendants initiated the illicit practice of secret overhead-shifting at the very inception of the Premiere Vacation Collection Association (in its first annual Budget of 2011), and continue to this day to adhere to the same practice of imposing hidden overcharges upon members.

111.   Said allegation is made upon information and belief because Plaintiff does not have access to the internal financial records for any years except 2013-15. However, Plaintiff has a good faith, reasonable belief that Defendants' conduct took place in 2011 and

2012 and continues to this day. The basis for that belief is that DRI in its SEC filings (not disclosed to Association owners) described the overhead-shifting practice as being a part of its basic business model; that DRI in SEC filings disclosed that it imposed over $30 million in such charges in the year 2010, system-wide; and further that no annual Budget ever issued by the Association throughout its existence (including the 2019 Budget) discloses the practice.

112. Defendants' conduct constitutes a "pattern" of racketeering activity; Defendants committed at least two acts of such activity occurring within ten years of each other, within the meaning of 18 U.S.C. § 1961(5).

113. Defendants' conduct constitutes a "pattern" of racketeering activity for the further reason that Defendants' extraction of illicit corporate subsidies from Association members were done in furtherance of a basic plan of DRI, and such acts were repetitive, continuous and consistent (identical in nature, varying only in the dollar amounts of fraud). Such acts comprise at least a "closed-ended" pattern encompassing the three-year period in which the relevant financial information is currently known (2013-15); and upon information and belief is an "open-ended" pattern because Defendants' conduct "projects into the future with a threat of repetition."

### Conspiracy

114. Defendants, and each of them, conspired with each other to violate Section 1962(c), in violation of 18 U.S.C. § 1962(d).

28

115.  Each Defendant agreed, explicitly or tacitly, to secretly impose DRI's internal corporate overhead charges upon unwitting members of the Association, who believed that the Board and DRMI were charging only legitimate common expenses.

116.  Each Defendant substantially participated in and carried out such fraudulent scheme by actually disseminating, or approving the dissemination of, false and misleading annual Budgets, and by collecting the fraudulent overcharges, year after year.

### Injury

117.  Plaintiff, and members of the proposed class consisting of current and former members of the Association, are "person[s] injured in [their] … business or property by reason of a violation of section 1962" of the RICO Act, within the meaning of 18 U.S.C. § 1964(c).

118.  Specifically, Defendants fraudulently overcharged members approximately ████████in 2013; ████████ in 2014; and ████████ in 2015 (amounts redacted per Superior Court confidentiality order), proximately causing Plaintiff and the proposed class actual harm in said amounts.

119.  Upon information and belief, Defendants, by means of the identical fraudulent scheme, overcharged members similar amounts in the prior Budget years (2011 and 2012) as well as subsequent Budget years (2016, 2017, 2018 and 2019), with the direct and proximate result that Plaintiff and the proposed class sustained actual pecuniary loss during those years in similarly massive amounts.

**WHEREFORE,** Plaintiff, for himself and on behalf of all others similarly situated, prays for damages according to the proofs, with prejudgment interest, trebled pursuant to 18 U.S.C. § 1964(c), plus costs of suit and reasonable attorneys' fees.

## COUNT II: ARIZONA CIVIL RACKETEERING

120. Plaintiff incorporates by reference and re-alleges all foregoing paragraphs.

121. Defendants' conduct, as aforesaid, violates Section 13-2312(B) of the Arizona Revised Statutes ("Illegally Conducting an Enterprise").

122. Specifically, Defendants, and each of them, are or were "employed by or associated with any enterprise and conduct[ed] such enterprise's affairs through racketeering"; or, in the alternative, "participate[d] directly or indirectly in the conduct of any enterprise," each with actual knowledge that the enterprise was being "conducted through racketeering." A.R.S. § 13-2312(B).

123. The Association was and is an Arizona RICO "enterprise," within the meaning of A.R.S. § 13-2301(D)(2), because it is a "corporation … association … or other legal entity."

124. Defendants' conduct constitutes a "pattern" of criminal activity, entailing repeated and systematic violations of A.R.S. § 13-2310 ("Fraudulent Schemes and Artifices"), a predicate offense under Arizona RICO. A.R.S. § 13–2301(D)(4)(b)(xx). Specifically, Defendants, "pursuant to a scheme or artifice to defraud, knowingly obtain[ed]

30

any benefit by means of false or fraudulent pretenses, representations, promises or material omissions" within the meaning of A.R.S. § 13-2310(A), as previously set forth herein.

125. Reliance is not a necessary element of Arizona RICO. A.R.S. § 13-2310(B).

126. Defendants, and each of them, conspired and/or jointly participated in the fraudulent scheme such that each is vicariously liable for the acts of the other.

127. Specifically, and as previously alleged, each individual Defendant named herein is directly liable or vicariously liable for the acts of others because he or she "authorized, requested, commanded, ratified or recklessly tolerated the unlawful conduct of the other," within the meaning of 10 A.R.S. § 13–2314.04(L).

128. Each corporate Defendant named herein is vicariously liable for the acts of others because such Defendants, through "a director or high managerial agent performed, authorized, requested, commanded, ratified or recklessly tolerated the unlawful conduct of [its] agent[s]," within the meaning of 10 A.R.S. § 13–2314.04(L).

129. Plaintiff, and other members of the proposed class, "sustain[ed] reasonably foreseeable injury to [their] person, business or property by a pattern of racketeering activity, or by a violation of § 13-2312 involving a pattern of racketeering activity" within the meaning of A.R.S. § 13-2314.04(A), in that they were charged materially inflated amounts in assessments, year after year.

130. Plaintiff shall cause notice of this action and a copy of this Complaint to be served upon the Attorney General of the State of Arizona within thirty days, in accordance with A.R.S. § 13–2314.04(H).

WHEREFORE, Plaintiff, for himself, and for members of the class, prays for actual damages according to the proofs, with prejudgment interest, trebled pursuant to A.R.S. § 13-2314.04(A); for costs of suit, including reasonable attorneys' fees; and for an injunction restraining and preventing Defendants' ongoing pattern of racketeering, pursuant to § 13-2314.04(B).

## COUNT III: BREACH OF FIDUCIARY DUTY

131. Plaintiff incorporates by reference and re-alleges all prior paragraphs.

132. The Directors of the Association, a nonprofit corporation, had and have fiduciary duties to all members to adhere to fiduciary standards of conduct in the exercise of their responsibilities.

133. DRMI, the managing agent, had and have fiduciary duties owing directly to members under the Arizona Timeshare Owners Association and Management Act, Ariz. Rev. Stat. Ann. § 33-2203(B).

134. The Director-Defendants herein breached their fiduciary duties to Plaintiff and other members of the Association, by creating and disseminating false and fraudulent Budgets. Such conduct was undertaken in furtherance of the conflicting interests of DRI, the dominant member of the Association, which employed said Directors as executive-level employees, and to whom said Directors were beholden.

135. Defendant DRI, as employers of the Directors, and exercising control of their conduct, is vicariously liable for their conduct.

32

136.    Defendant DRMI assisted in the creation and dissemination of the false Budgets, and otherwise participated in the fraudulent scheme, receiving the proceeds of such fraud.

137.    The remaining Defendants, individual and corporate, participated in, facilitated, encouraged and ratified the ongoing, systematic breaches of fiduciary duty of the Directors and property management company, such that all Defendants are jointly liable therefore.

WHEREFORE, Plaintiff prays for damages or restitution according to the proofs; for prejudgment interest; and for costs of suit, including reasonable attorneys' fees.

## DATE OF DISCOVERY; EQUITABLE TOLLING (AS TO ALL COUNTS)

138.    All foregoing allegations are incorporated by reference.

139.    In April of 2015, Plaintiff Zwicky, following an unsuccessful attempt to obtain adequate voluntary disclosures of the financial records from the Association's Board, filed suit in the Maricopa County Superior Court seeking to enforce his statutory and common law inspection rights. *Zwicky v. Premiere Vacation Collection Owners Ass'n*, Sup. Crt. No. CV 2015-051911.

140.    Zwicky in the inspection action contended that he had a good faith, reasonable basis for inspecting the books and records, advising the Superior Court that his assessments had become so exorbitant as to render his "points" investment worthless. Zwicky sought inspection to determine whether the inflation of his assessments was the result of managerial

misfeasance or malfeasance, while acknowledging to the Court that he had no evidence of actual wrongdoing at the time.

141.   The Association opposed disclosure of critical financial documents (including those revealing the nature and amount of the overhead-shifting practice) on the basis that the information sought was proprietary and constituted protected "trade secrets."

142.   The Superior Court on May 6, 2016 granted Zwicky summary judgment and ordered that certain records be disclosed.  The Superior Court further ordered, on an interim basis, as follows:

> [A]ll documents and records provided to the plaintiff pursuant to this order, and the information in those documents, shall be maintained in confidence by the plaintiff and not disclosed to anyone except the plaintiff, his current attorneys and any attorneys with whom they be discussing potential future representation of the plaintiff …
>
> The Court is of the view that it may well be appropriate for the plaintiff to be permitted to disclose this information in other forums including other litigation, government agencies and so on but those matters are not before the Court now.

143.   On June 6, 2016, the Association produced certain records, including those revealing the existence and extent of the overhead-shifting practice for the Budget Years 2013-15 ("indirect corporate costs"), including the dollar amounts of such DRI subsidies on both the Association level and constituent-resort HOA level.

144.   At that time, and not before, Plaintiff Zwicky acquired the requisite evidence of wrongdoing necessary to proceed with this substantive litigation.

145.    On August 19, 2016, the Superior Court, upon Zwicky's motion, modified its May 6, 2016 protective order "to permit the plaintiff or his attorneys to quote or refer to the information produced in connection with this litigation in a complaint or other court filing in the proposed class action litigation."

146.    The Association timely appealed, and successfully obtained an appellate-level stay of the Order.

147.    By Order of the Arizona Court of Appeals dated March 22, 2017, Zwicky was "enjoined from disclosing, using, or relying on any documents designated confidential by appellant for any purpose during the pendency of this appeal pending further order of this court."

148.    In its published decision of January 23, 2018, *Zwicky v. Premiere Vacation Collection Owners Ass'n*, 244 Ariz. 228, 418 P.3d 1001 (App. 2018), the Court of Appeals upheld Zwicky's rights of inspection, but reversed the trial court's Order of August 19, 2016 (allowing use of the disclosed information for substantive litigation purposes), remanding to the trial court "to evaluate the need for a continued protective order covering the confidential documents."

149.    After further litigation on the confidentiality issue on remand, the Superior Court on August 23, 2018 entered a Stipulated Order (mirroring the terms of the Court's prior minute entry), which provided, in material part, that Zwicky was permitted to

> use the information covered by the protective order to formulate
> his proposed complaint. For example, the protective order will
> not prevent the Plaintiff from alleging in a complaint that the

management costs that the members were actually paying were materially greater than what was disclosed.

However, the Superior Court further ordered:

[T]he portion of the Court's previous order permitting the Plaintiff and his attorneys to quote confidential information in a complaint or other court filing in other litigation will not be reinstated. Plaintiff may not quote from or attach the confidential documents to a complaint and may not include specific numerical figures derived from the confidential documents in a complaint. The Plaintiff may verbally describe the allegations based on that information.

150. Plaintiff Zwicky, as stated, discovered Defendants' malfeasance on June 6, 2016, but was forbidden by court order (including the stay issued by the Court of appeals) from disclosing or utilizing such information for any purpose until August 23, 2018.

151. The statute of limitations on all causes of action should be deemed equitably tolled until August 23, 2018.

**CLASS TREATMENT**

152. The proposed Class members are readily ascertainable. The number and identity of the Class members are determinable from the records of Defendants. For purpose of notice and other purposes related to this action, their names and addresses are readily available from Defendants. Notice can be provided by means permissible under Fed.R.Civ.P. 23.

**Numerosity**

153.    The proposed Class consists of approximately 25,000 current and former members of the Premiere Vacation Collection Association. Joinder of all members is impracticable.

**Commonality**

154.    There are questions of fact and law common to all members, which overwhelmingly predominate over questions unique to individual members, including:

a.  Whether the annual Budgets concealed the corporate subsidy;

b.  Whether each of the Defendants knowingly engaged in a fraudulent scheme to overcharge members through the secret subsidy;

c.  Whether the Association is a RICO "enterprise";

d.  Whether the Defendants' conduct constitutes the requisite pattern of racketeering activity for purposes of federal and Arizona RICO;

e.  Whether the participation of each Defendant in the fraudulent scheme was sufficient in character and degree to support the imposition of either direct liability or vicarious liability under principal-agent, joint tortfeasor, and/or civil conspiracy principles;

f.  whether members were damaged by alleged fraudulent overcharges.

155.    Although there will be considerable variation in the amount of damages to each member, the computation of such damages will be a ministerial exercise, once the

aggregate amount of damages has been determined by the jury for each budget year. The amount of each individual's proportionate share of damages sustained by the Class is readily calculable based on each member's specific years of ownership and the number of points owned for each year by the individual.

156. A limited exception to the Class-wide commonality of issues exists with respect to certain Association members (limited in eligibility and participation) who claimed benefits, and may have signed mutual releases, in connection with the Attorney General proceedings against Diamond Resorts, Inc. for enforcement of the Arizona Consumer Fraud Act, A.R.S. §§ 44-1521, *et seq.,* and the "Assurance of Discontinuance" agreed upon by DRI in 2016. In settlement of those claims, DRI paid a total of $800,000 and agreed to allow eligible consumers to cancel their memberships. Upon information and belief, the Attorney General's action and the settlement will have a minimal impact on the present action, and will reduce the number of Class members by a few hundred individuals at most.

157. A further limited exception may exist for a limited number of former members whom DRI voluntarily allowed to cancel their memberships, or who were defendants in an action for collection of delinquent assessments adjudicated in DRI's favor, resulting in a preclusive final judgment. Upon information and belief, the number of members fitting these categories is also very small in relation to the overall proposed Class.

158. A further limited exception to the commonality amongst class members may exist to the extent that individual members may have agreed to mandatory arbitration; at

present Plaintiff does not know the number of Premiere Vacation Collection members, if any, who may have agreed to arbitration.

### Typicality

159.   Defendants have acted on grounds equally applicable to the entire Class, making final relief appropriate to the class as a whole.   In fact the liability claims of members appear to be identical, with variations only as to the amount of damages.

### Adequacy

160.   Plaintiff is able to fairly and adequately protect the interests of the Class and has no interests antagonistic to the Class.   Plaintiff Zwicky, through current counsel (Arizona-licensed counsel) has already devoted over three years to enforcing his inspection rights in the state court system, without which the essential facts giving rise to this action would not have been uncovered.   Plaintiff is represented by attorneys who are experienced and competent in timeshare consumer rights litigation (including the former representation of timeshare associations comprised of thousands of members).

### Superiority

161.   Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that individual actions would entail. Further, the dollar amounts of the individual claims are too small to economically justify full-blown litigation efforts against well-funded corporate defendants, with the result that the vast majority of these individual claims would otherwise go unremedied.   Individual

litigation would also pose a risk of inconsistent adjudications on identical facts and identical legal issues.

162. For the foregoing reasons, class treatment represents the most efficient and effective use of the Court's limited resources, and the most efficient and effective way of vindicating the rights of members.

RESPECTFULLY SUBMITTED this 21st day of August, 2020.

*/s/ Jon L. Phelps*
Jon L. Phelps (027152)
Robert Moore (013338)
PHELPS & MOORE PLLC
7430 East Butherus Drive, Suite A
Scottsdale, AZ 85260
(480) 534-1400
jon@phelpsandmoore.com
rob@phelpsandmoore.com

*/s/ Edward L. Barry*
Edward L. Barry (005856)
2120 Company Street, Third Floor
Christiansted, Virgin Islands 00820
(340) 719-0601
ed.barry.legal@gmail.com
**Attorneys for Plaintiff**

## **VERIFICATION**

In accordance with A.R.S. § 13-2314.04(O) & (P), the undersigned certifies that he has carefully read the foregoing Complaint and, based on a reasonable inquiry, believes all of the following:

1. It is well grounded in fact;

2. It is warranted by existing law or there is a good faith argument for the extension, modification or reversal of existing law;

3. It is not made for any bad faith, vexatious, wanton, improper or oppressive reason, including to harass, to cause unnecessary delay, to impose a needless increase in the cost of litigation or to force an unjust settlement through the serious character of the averments.

*/s/ Edward L. Barry*

Clerk of the Superior Court
*** Electronically Filed ***
T. Hays, Deputy
11/9/2020 5:30:14 PM
Filing ID 12201798

1

LAW OFFICES
PHELPS & MOORE
PROFESSIONAL LIMITED LIABILITY COMPANY
7430 EAST BUTHERUS DRIVE, SUITE A
SCOTTSDALE, ARIZONA 85260
(480) 534-1400
Jon L. Phelps (027152)
jon@phelpsandmoore.com
Robert M. Moore (013338)
rob@phelpsandmoore.com
Jennie I. Tetreault (035566)
jennie@phelpsandmoore.com

Edward L. Barry (005856)
2120 Company Street, Third Floor
Christiansted, Virgin Islands 00820
(340) 719-0601, ed.barry.legal@gmail.com
Counsel for Plaintiff Norman Zwicky

2

3

4

5

6

7

8

9

10

11

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

12

## IN AND FOR THE COUNTY OF MARICOPA

13

14

15

16

17

18

19

20

21

22

23

24

| | |
|---|---|
| **NORMAN ZWICKY,** for himself and on behalf of all others similarly situated,<br><br>Plaintiff;<br><br>v.<br><br>**DIAMOND RESORTS, INC.,** a Nevada Corporation; **ILX ACQUISITION, INC.,** a Delaware Corporation; **DIAMOND RESORTS MANAGEMENT, INC.,** an Arizona Corporation; **STEPHEN J. CLOOBECK; DAVID F. PALMER; C. ALAN BENTLEY; TROY MAGDOS; KATHY WHEELER; LINDA RIDDLE; JOHN & JANE DOES 1–10;** and **DOES 1–10;**<br><br>Defendants. | Case No.: CV2020-010141<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>*Jury Trial Demanded*<br><br>(ASSIGNED TO THE HONORABLE **JOSEPH MIKITISH**) |

25

26

Plaintiff Norman Zwicky ("Zwicky"), on his own behalf and on behalf of all others

similarly situated, for his First Amended Complaint and cause of action against Diamond Resorts, Inc. ("DRI"); ILX Acquisition, Inc. ("ILXA"); Diamond Resorts Management, Inc. ("DRMI"); Premiere Vacation Collection Owners Association (the "Association"); Stephen J. Clobeck ("Clobeck"); Troy Magdos ("Magdos"); Kathy Wheeler ("Wheeler"); Linda Riddle ("Riddle"); John and Jane Does 1–10, and Does 1–10, alleges as follows:

## I.  JURISDICTION

1.  **Plaintiff Norman Zwicky** ("Zwicky") is a citizen of Arizona.

2.  **Defendant Diamond Resorts, Inc.** ("DRI") (formerly known as Diamond Resorts International, Inc.) is a corporation organized and existing under the laws of Delaware, with its principal place of business in Las Vegas, Nevada.

3.  **Defendant ILX Acquisition, Inc.** ("ILXA") is a corporation organized and existing under the laws of Delaware, with its principal place of business in Phoenix, Arizona, and a wholly-owned subsidiary of DRI.

4.  **Defendant Diamond Resorts Management, Inc.** ("DRMI") is a corporation organized and existing under the laws of Arizona, with its principal place of business in Las Vegas, Nevada, and is also a wholly-owned subsidiary of DRI.

5.  Upon information and belief, individuals **Defendants Stephen J. Cloobeck** ("Cloobeck"), **David F. Palmer** ("Palmer"), **C. Alan Bentley** ("Bentley"), **Troy Magdos** ("Magdos"), Kathy Wheeler ("Wheeler"), and **Linda Riddle** ("Riddle") are all citizens of Nevada and were, at all times relevant to this complaint, employed by DRI or its wholly owned subsidiaries and/or served as agents of the same; specifically:

(i)  **Defendant Cloobeck** is the founder of DRI and, at all times material to this Complaint, the Chairman of DRI's Board of Directors.

(ii)  **Defendant Palmer** was, at all times material to this Complaint, DRI's Chief Executive Officer.

(iii)     **Defendant Bentley** was, at all times material to this Complaint, DRI's Executive Vice President and Chief Financial Officer.

(iv)     **Defendant Magdos** was, at all times material to this Complaint, employed by DRI as Senior Vice President, Resort Specialist.

(v)     **Defendant Wheeler** was, at all times material to this Complaint, employed by DRI as Vice President, Homeowners Division.

(vi)     **Defendant Riddle** was, at all times material to this Complaint, employed by DRI as Vice President, Association Administration.

(vii)     **Defendants Jane and John Does 1–10**, to be named later, are the spouses of the above-named individual defendants acting in furtherance of the marital community and are citizens of Nevada; Plaintiff reserves the right to amend this Complaint to state their true names when the same are ascertained.

6.     **Defendants Does 1–10** are fictitiously-designated natural persons, corporations, or other entities whose identities and citizenship are unknown to at this time, and who are or may be liable to Plaintiff; Plaintiff reserves the right to amend this Complaint to state their true identities and citizenship when the same are ascertained.

7.     There are at least 100 members of the putative class.

8.     The amount in controversy, aggregated, exceeds five million dollars ($5,000,000.00), exclusive of interest and costs.

9.     This Court has personal jurisdiction of each Defendant under Arizona's long-arm statute, 16 A.R.S. Rules Civil. Proc, Rule 4.3(a).

10.     Specifically, the non-resident Defendants, and each of them, did business in Arizona, maintained systematic and continuous affiliations with Arizona for purposes of general jurisdiction, and in most instances maintained a physical presence in the State; alternatively, each Defendant purposeful availed itself (or himself or herself) of the

privileges of conducting activities in Arizona, and purposely directed tortious and illegal conduct at the forum out of which the claims herein arise, thus satisfying the requirements of specific jurisdiction because the exercise of *in personam* jurisdiction as to each Defendant comports with "fair play and substantial justice."

## II.   SUMMARY OF THE CASE

11.   Plaintiff's allegations are based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters.

12.   The allegations herein have been informed by an investigation that included, among other things:

(i)   A review of materials produced in connection with Plaintiff's corporate books and records inspection action captioned *Zwicky v. Premiere Collection, Inc.*, No. CV2015-051911 (Ariz. Super. Ct.);

(ii)   An analysis of DRI's public filings with the U.S. Securities and Exchange Commission ("SEC"); and

(iii)   Review of news articles and other publicly available information.

13.   Plaintiff believes additional evidentiary support will exist for his allegations after a reasonable opportunity for discovery.

### A.   Introduction; Definition of Key Terms

14.   **Plaintiff Zwicky** is among approximately 25,000 current and former timeshare owners/members (hereinafter, "**Members**") of a non-profit, incorporated association of purchasers who bought timeshares within DRI's Premier Vacation Collection (the "**Collection**").

15.   Namely, those current and former timeshare owners/members are members of organization such as the **Premiere Vacation Collection Owners Association** (the "**Association**"), which is a non-profit corporation organized and existing under the laws of Arizona with its principal place of business in Phoenix, Arizona.

16.     As for the **Collection**, it encompasses a group of resorts located in Arizona, Colorado, Indiana, Nevada and Baja, Mexico.

17.     The Collection itself is only one of at least eight distinct collections or groupings of resorts held by DRI or its subsidiaries (others being the European Collection, the U.S. Collection, and the Hawaii Collection, for example); each individual resort property within a collection or grouping of resorts is also known as a "**Component Site**" in internal DRI corporate documents.

18.     Members of the Association and like organizations controlled and/or operated by DRI ("**Association Members**"), such as Zwicky, have not purchased timeshares in the traditional sense; they hold no deed, leasehold assignment, or any other legal or equitable interest in real property.

19.     Each Association Member instead holds an intangible personal property interest in the Collection called a "**Points Certificate**."

20.     To become an Association Member, a consumer makes an initial investment—usually about $20,000—to acquire his or her Points Certificate; DRI, through a subsidiary, often elects to finance part of his or her purchase price.

21.     The "**Points**" that comprise an Association Member's Point Certificate serve as the basis for calculating his or her "**Reservation Privileges**," which are non-exclusive right to book accommodations at any Component Site within a specific Collection on a first-come, first-served basis only the Member is current on his or her assessments and fees.

22.     Namely, because Association Members like Zwicky are members of a Component Site's home-owners' association (heretofore referred to as an "**HOA**") and also members of a DRI Collection's Association (heretofore referred to as an "**Association**," or, in the case of the specific Association Zwicky belonged to—Premiere Vacation Collection Owners Association—the "Association") (both an HOA and Association, together, are

5

heretofore collectively referred to as "**HOA/Association**"), Members must also be pay the annual fees of each Collection's "**Club**", which typically are several hundred dollars a year, in addition to the fees and assessments levied upon the Member pursuant to his or her membership in a HOA (the Club fees and assessments for a Collection's Association and the fees and assessments for a Component Site's HOA, combined, are heretofore referred to as "**Member Obligations**").

23.     Points therefore serve as the internal currency of the DRI regime, with the Member spending his or her Points, as opposed to cash, to book rooms in the Collection at any Component Site only if the Member is current on his or her Member Obligations.

24.     Thus, by making an initial investment and acquiring a Points Certificate, each Member of an Association/HOA makes a life-long and essentially irrevocable contractual commitment to pay the fees and assessments of both a Collection's Association and a Component Site's HOA—which typically exceed $2,000 a year, collectively—because failure to pay the same prevents him or her from using his or her Points to gain Reservation Privileges and book accommodations at any Component Site in the Collection.

25.     Each Member's Member Obligations are determined on a pro-rata basis by the amount of Points he or she holds in his or her Points Certificate.

26.     Moreover, each Member's voting rights in his or her Association/HOA is also determined on a pro-rata basis by the amount of Points he or she holds in his or her Points Certificate.

27.     Each Association/HOA has a Board of Directions (the "**Board**") which bases its annual assessments and fees—and thus, each Member's Member Obligations—upon an Annual Budget (hereinafter referred to as the "**Budget**") for the estimated common expenses of the Component Site or Collection.

28.     Because each Association/HOA ostensibly operates as an ordinary common interest real estate association and an Arizona nonprofit corporation, its assessments are tax-exempt under 26 U.S.C. § 528(d)(3).

29.     On paper, the Board is thus a democratically elected group of individuals ostensibly tasked with managing the a Component Site's property and a Collection's fiscal affairs through a property management company (referred to in internal documents as a "**Managing Agent**") for the common benefit of thousands of Members in accordance with generally applicable fiduciary standards.

30.     DRI and its subsidiaries, however, maintain absolute power over these organizations by stacking their Boards with DRI and ILXA executives.

31.     Namely, DRI or its subsidiaries such as ILXA keep control over the Board through the its management documents, which not only grant DRI and its subsidiaries "**Bulk Membership**" in the Association (as further specified below at ¶ 63 *et seq.*), but also allow the corporate entities to exercise special voting powers that render their votes nine times as potent as all other Members' votes (as further specified below at ¶ 66 *et seq.*).

32.     Thus, the Board invariably retains DRI's subsidiary, DRMI, as property manager and Managing Agent of each Component Site in the Collection under a perpetually-renewable sweetheart agreement that guarantees DRMI and its subsidiaries a substantial 100% profit at the expense of Members such as Zwicky.

33.     Specifically, by ignoring conflicts of interest and their fiduciary duties to Members, the Directors of the Board—a majority of which serve both as a Director on the Board and as employees or agents of DRI and its subsidiaries—have systematically and fraudulently mismanaged the finances of Associations/HOAs for DRI and its subsidiaries' substantial benefit at the expense of all ordinary Members such as Zwicky.

34.     Year after year, the Board's controlling Directors—acting in concert with DRI's principal executives and DRMI—illegally foisted tens of millions of dollars of DRI's internal corporate overhead expenses (referred to in DRI internal corporate documents as **"Indirect Corporate Costs"** as further specified below at ¶ 124 *et seq*.) to the Members as Association/HOA assessments by misrepresenting those corporate overhead expenses as legitimate common expenses of the Association/HOA.

35.     The Defendants concealed these illicit hidden corporate subsidies by means of false and misleading annual Budgets they either prepared or approved and then disseminated to Members electronically and through the mail.

36.     Defendants carried out this fraudulent scheme for many years—and, upon information and belief, continue to do so to this day—thereby extracting millions of dollars worth of massively inflated Association/HOA charges from Members like Zwicky by automatically, systematically, deliberately, and illicitly passing on undisclosed amounts of DRI's Indirect Corporate Costs to each Association/HOA and its Members.

**B.      The Plaintiff/Proposed Class Representative; Membership Acquisition**

37.     The proposed class consists of all current and former Members of the Association, which are approximately 25,000 in number.

38.     Plaintiff Zwicky is a retired postal worker who formerly owned a traditional timeshare interest—one that granted him a time-specific fraction interest in real property— in Kohl's Ranch in Payson, Arizona (**"Kohl's"**).

39.     Kohl's, to the extent its property was not titled to individual timeshare owners, was an asset held by ILX Resorts Incorporated (**"ILXRI"**), which is now dissolved and defunct.

40.     In or about August of 2010, DRI purchased a grouping of resorts from the bankruptcy estate of ILXRI through DRI's wholly owned subsidiary, Defendant ILXA.

41.    The resorts DRI purchased through ILXA from ILXRI's bankruptcy estate, such as Kohl's, became Component Sites and parts of the Collection.

42.    In or about 2010, pursuant to DRI's acquisition of Kohl's, DRI induced Zwicky to purchase his own Points Certificate and 13,000 Points in the Collection, thereupon becoming a member of the Collection's Association and Kohl's HOA.

43.    For that initial purchase, Zwicky paid $26,395 including the stipulated trade-in value of his ILXRI timeshare at Kohl's.

44.    Just like all other Members, Zwicky thus contractually agreed to a lifetime obligation to pay for annual Member Obligations consisting of annual and special assessments levied by the Collection Association's Board and annual fees levied by Kohl's HOA.

45.    The 13,000 Points Zwicky initially purchased translated roughly into a right to book a ten-day vacation at a resort such as Kohl's within the Collection, subject to room-availability and payment of his Member Obligations.

46.    Under the DRI regime, however, the cost of Zwicky's Points and annual Member Obligations were roughly triple what he paid to book a ten-day vacation at Kohl's before DRI acquired the resort from ILXRI's bankruptcy estate.

47.    For example, in 2014 and 2016, DRI charged Zwicky $2,337.59 and $2,535.01, respectively, for his Membership Obligations.

48.    Therefore—including his up-front Points investment amortized over the period of seven years—Zwicky paid over $600.00 per day to enjoy an annual ten-day vacation under DRI's Points regime.

49.    At $600.00 per day, Zwicky's vacation costs far exceeded the fair market value of the typical accommodations at Component Sites within the Collection.

50.     Moreover, $600.00 per day far exceeded the ordinary commercial rates that DRI charged the public for direct bookings for all or most of the Component Sites in the Collection.

51.     For example, room rates during the March 2019 high season, as quoted for a direct booking of units in the Collection to the public through Expedia, were merely $132.00 per night at the Kohl's Component Site, $199.00 per night at the Varsity Club of Tucson Component Site, and $291.00 per night at the Los Abrigados Component Site in Sedona, Arizona.

52.     Due to these exorbitant annual Membership Obligations, Zwicky's Points Certificate is now effectively worthless.

53.     Because their Points Certificates are, like Zwicky's, effectively worthless, many disaffected Members have attempt to sell the thousands of Points they own on eBay or online timeshare exchanges for a total of $1.00, or have simply given them away in order to avoid their annual Member Obligations.

54.     Defendants grossly inflated the Member Obligations they levied upon Zwicky and other Members because, among other things, Defendants hid fraudulent charges for DRI's internal overhead as "Indirect Corporate Costs" in the Association/HOA annual Budgets, as more particularly set forth below at ¶ 120 *et seq.*

**C.     Defendants; Business Operations; Relationships**

55.     **Defendant DRI**—formerly known as Diamond Resorts International, Inc. and publicly traded as NYSE:DRII until acquired by a private equity firm for approximately $2.2 billion in June of 2016—is one of the largest companies in the vacation ownership industry with a timeshare ownership base reported to number in the hundreds of thousands.

56.     DRI holds and controls a network of approximately 300 resorts worldwide with many additional resorts under management contracts.

57.     DRI's basic business activities consist of timeshare sales, timeshare sales financing, and hospitality and management services.

58.     Additionally, DRI—itself or through subsidiaries—directly offers its own substantial timeshare inventory for booking by the public.

59.     **Defendant ILXA** is a wholly owned subsidiary of DRI and formed for acquiring and holding the assets held by the bankruptcy estate of now-defunct ILXRI, which included the Component Sites, like Kohl's, that ILXA acquired in 2010 and are now part of the Collection .

60.     ILXA serves as the "**Developer**," as the term is commonly understood, of the Collection.

61.     The organic documents and declaration of the Association also refer to ILXA as the "**Seller**" of the Collection's timeshare interests.

62.     Specifically, in a document entitled the "Second Amended and Restated Premiere Vacation Collection Plan" (the "**Plan**")—dated November 10, 2010 and recorded with the Maricopa County, Arizona Recorder of Deeds—ILXA is referred to as the "Developer" and "Seller" of the Collection's timeshare interests.

63.     ILXA is itself a member of the Association and holds a "**Bulk Membership**" consisting of its entire unsold timeshare inventory.

64.     ILXA's Bulk Membership also consists of a substantial and perpetually renewing number of forfeited timeshare interests of Members who have defaulted in their Member Obligations.

65.     Thus, ILXA (and, indirectly, DRI) maintains and exercises absolute control of the Board through its massive voting power it enjoys by virtue of its vast Points and Bulk Membership in the Association.

66. DRI and its subsidiaries' stranglehold on the Board is further effectively guaranteed by § 3.03 of the Plan, which provides:

> Voting. Total Authorized Voting Shares. Each Member shall be entitled to cast a number of votes equal to such Member's total Membership Share. Notwithstanding the foregoing, until such time as 95% of the Total Authorized Voting Membership Shares in the Collection (including those held for sale by Seller and its affiliates) have been sold by Seller and its affiliates, Seller shall be entitled to cast a number of votes equal to Seller's total Membership Share for all Memberships held by Seller and its affiliates (including those held for sale by Seller and its affiliates) multiplied by nine (9).

*Id.*

67. This 95% equal-voting-rights threshold, appearing in the Plan as has specified above at ¶ 66, has never been reached, and likely never will be.

68. The threshold has not been reached, in part, because of the basic "inventory-recapture" business model of DRI and ILXA; namely, the entities use the high rate of Member defaults and forfeitures as a cheap source of self-replenishing timeshare resale inventory, thereby minimizing their need to invest capital in new properties to increase their source of timeshare sales inventory to guarantee its nine-fold voting power under the Plan.

69. Furthermore, the loss of DRI's super-voting powers—which, as the Plan specifies and as shown above ¶ 66, are nine fold that of private Members like Zwicky—and consequent loss of its absolute control of the Board is an obvious disincentive for DRI to ever achieve the 95% private-ownership benchmark or threshold in the Plan.

70. **The Association** is an Arizona nonprofit corporation; its Board manages and maintains the Component Sites of the Collection and the Collection's finances purportedly for the benefit of the collective interests of the Association's Members.

71. The Association's Board levies and collects annual Association assessments from Association members like Zwicky to defray its common expenses on a tax-exempt

basis under 26 U.S.C. § 528(d)(3) pursuant to an annual Budget, which is determined by the Board and disseminated to Association members together with their annual Member Obligations in billing statements.

72.　The Plan defines the Association's "common expenses," in typical fashion, as:

> [T]he actual and estimated costs of operating and managing Association and its property including, but not limited to: Assessments, Association administrative costs, taxes, insurance, utilities, reserves, legal fees and accounting fees; the annual maintenance fees or dues and other costs of ownership of the Resort Interests and any Common Furnishings.

*Id.*, § 1.13.

73.　Each resort within the Collection, or Component Site, has its own separate HOA whose Members also typically include a certain number of "legacy" timeshare owners in those resorts who have not opted to buy into the DRI Points regime.

74.　As is also typical in a timeshare association or other common interest property regime, the Board delegates many of its duties to a property management company or, as referred to in the Plan, a "Managing Agent."

75.　DRI, through the disproportionate voting powers of its subsidiary, ILXA, controls not only the Collection's Association but also the HOAs of each of the individual Component Sites within the Collection.

76.　As a result, DRI invariably hires DRMI, its own wholly-owned subsidiary, as the Managing Agent for the Association and for each Component Site.

77.　The Association holds itself out as an ordinary nonprofit property association of timeshare owners, governed by a democratically elected Board ostensibly duty-bound to represent the collective rights and interests of its many thousands of Members, and availing itself of the tax-exemptions granted to bona fide property owner associations.

78.     In substance and reality, however, the Association is a sham, operating as a mere a proprietary arm or instrumentality of DRI, as further set forth herein at ¶ 120 *et seq.*

79.     **Defendant DRMI**, as wholly owned subsidiary of DRI, at all material times served and continues to serve as the Managing Agent of the Association and of each Component Site's HOA.

80.     As Managing Agent, DRMI undertook by delegation the Board's fiduciary duties to manage the Association's property, resort operations, and finances in the collective best interests of the Members.

81.     DRMI therefore owes fiduciary duties directly to Members like Zwicky under the Arizona Timeshare Owners Association and Management Act. *See* A.R.S. § 33-2203(B).

82.     The Association's Plan, however, does not disclose that DRMI or any other subsidiary of DRI must act as Managing Agent; in 2016, however, the Arizona Attorney General, in consumer fraud proceedings, ordered DRI to make disclosures regarding the identity of and relationship it had with the Association's Managing Agent in public documents.

83.     Instead the Plan, under § 4.03, provides that the Association will use its "best efforts" to retain a "reputable firm" as Managing Agent.

84.     Moreover, the Plan provides that the Managing Agent's "**Management Agreement**" must contain certain provisions:

> (i)     The Management Agreement's term is to be not more than 10 years, and is to be automatically renewed for successive 10-year terms unless written notice of termination is given by the Association within 180 prior to the expiration of the term;

14

(ii)     The Association may not terminate the Management Agreement except upon the vote or consent of 95% of the Association's members, which include ILXA as a "Bulk Member";

(iii)    The fee the Association pays to the Managing Agent "or a subsidiary or affiliate thereof" is "not to exceed fifteen percent (15%) of the total Assessments assessed upon Members in each Fiscal Year"; and

(iv)     "Such compensation may be increased if authorized by the vote or written consent of a majority of the Board or if the [Association] is unable to induce a qualified, reputable and experienced management firm to act as Managing Agent without increasing such compensation."

85.     Contravening ¶ 84(iv), however, the Association's Board repeatedly chose DRMI as Managing Agent and increased its compensation without seeking or allowing competitive bidding from property management companies not affiliated with DRI or its subsidiaries.

86.     DRI similarly installed DRMI as the Managing Agent of each Component Site's HOA, thereby extending its absolute control of every HOA/Association within the Collection.

87.     As stated in DRI's "Form 10-K Annual Report" dated December 31, 2014 (the "**2014 10-K**") and filed with the SEC:

> <u>HOAs.</u> Each of the [domestic DRI-]managed resorts [or Component Sites] … is typically operated through an HOA, which is administered by a [B]oard of directors. Directors are elected by the owners of intervals at the [Component Site]… and may also include representatives appointed by [DRI/ILXA] as the developer of the [Component Site]. As a result, we are entitled to voting rights with respect to directors of a given HOA by virtue of (i) our ownership of intervals at the related [Component Site]; (ii) our control of the Diamond Collections that hold intervals at the [Component Site] and/or (iii) our status

15

as the developer of the [Component Site].

The [B]oard of directors of each HOA hires a management company [or Managing Agent] to provide the services described above, which in the case of all [DRI-]managed [Component Sites], is us [through DRI, our wholly-owned subsidiary].

*Id.*

88.     According to this same document—which contained disclosures made to DRI's securities investors, but not to Members—DRMI's management fees, which are passed on to Members as Member Obligations, are "based on a cost-plus structure and are calculated based on the direct and indirect costs (including the absorption of a substantial portion of our overhead related to the provision of our management services) incurred by the Diamond Collection" or DRI. *Id.*

89.     DRI never disclosed this practice of shifting its Indirect Corporate Costs to Members though their Member Obligations.

90.     **Defendant Palmer**, DRI's Chief Executive Officer, stated in a September 2014 investors conference that:

Anything that is put in the [Association's] Budget that gets expended on an annual basis, we get our 15 percent fee. ... That is basically a 100 percent profit business. ... All the costs are disclosed on a private website. There are no hidden fees.

*Id.*

91.     In fact, however, DRI its affiliates imposed hidden charges in the tens of millions upon Members in misleading annual Budgets that never disclosed the relationship between those Budgets and DRI's Indirect Corporate Costs on a "private website" or via any other method.

92.     The amounts DRMI actually charged Members for their Member Obligations—ostensibly as fees for the Managing Agent, but also illicitly including DRI's

Indirect Corporate Costs—grossly exceeded the 15% allowed by the Plan as specified above in ¶ 84(iii).

93. According to the "Notes" to the "Consolidated Financial Statement of Diamond Resort Parent, LLC" regarding "Transactions with Related Parties," which was contained in an Amendment to DRI's "2011 Registration Statement" (SEC Form S-4), DRI disclosed to investors, but not to Members, that:

> **Allocation of Expenses.** In addition to management services revenues [of DRMI], the Company has entered into agreements with the HOAs to be reimbursed for a portion of the Company's resort management and general and administrative expenses to the HOAs."

*Id.*

94. No such "agreements" actually involving the HOAs and/or Associations that allegedly authorized that regime of reimbursement of DRI's Indirect Corporate Costs has ever been disclosed to Members, nor has the actual amount of such reimbursement ever been disclosed to Members.

95. **Defendant Cloobeck** is the founder of DRI, held 22% of its stock until a private investment firm acquired it in 2016, and served as its Chairman of the Board of Directors and CEO during certain material times herein.

96. At all material times, Cloobeck was fully aware of the practice of shifting DRI's Indirect Corporate Costs to Members through the Association's payment of DRMI's Managing Agent fees because that practice was a system-wide policy adopted by DRI, as reflected in portions of DRI's 2014 10-K Form, as appearing above at ¶ 87.

97. That 2014 10-K Form—filed with the SEC and disclosed to DRI's investors, but not to Members—stated that "[w]e pass through to the HOAs[/Associations] and the Diamond Collections certain overhead charges incurred to manage the resorts[/Component Sites]." *Id.*

98.     This "pass-through," or corporate subsidy for DRI's Indirect Corporate Costs, involved tens of millions of dollars.

99.     Namely, DRI's "2011 Registration Statement" (SEC Form S-4), referred to above in ¶ 93, also acknowledged that the amount of DRI's Indirect Corporate Costs imposed upon the Associations/HOAs, system-wide, was $24,467,000 in 2009, and $30,766,000 in 2010.

100.    Upon information and belief, the amount of such subsidies, system-wide, increased by massive amounts in later years; although no SEC filings known to Plaintiff disclosed those amounts for 2011 and subsequent years.

101.    Upon information and belief, Cloobeck routinely reviewed the annual Budgets of each Component Site within the Collection, including those of the Collection's Association; therefore, Cloobeck had knowledge that DRI's practice of inflating those annual Budgets by concealing DRI's Indirect Corporate Costs therein amounted to millions of dollars annually and substantially improved DRI's profitability at the expense of individual Members.

102.    Upon information and belief, Cloobeck was fully aware that the Association's Budget, year after year, fraudulently concealed the "pass-through" of DRI's internal corporate overhead and costs to Association members.

103.    **Defendant Palmer** was at material times President, Chief Executive Officer and a member of DRI's Board of Directors who held approximately 5% of its outstanding common stock when it was publicly listed between 2013 and 2016.

104.    Palmer was also fully aware of DRI's system-wide practice of illicitly foisting its Indirect Corporate Costs upon Members, which it adopted as its basic business model.

105.    Upon information and belief, Palmer routinely reviewed the annual Budgets of each Component Site within the Collection, including those of the Collection's Association;

therefore, Palmer was fully aware that DRI's practice of inflating those annual Budgets by concealing DRI's Indirect Corporate Costs therein amounted to millions of dollars annually and substantially improved DRI's profitability at the expense of individual Members.

106. Upon information and belief, Palmer was also fully aware that the Association's Budget, year after year, fraudulently concealed the "pass-through" of DRI's internal corporate overhead and costs to Association members.

107. **Defendant Bentley** was at material times the Executive Vice President and Chief Financial Officer of DRI and held a substantial amount of DRI's stock.

108. Like previously named Defendants, Bentley was also fully aware of DRI's system-wide practice of inflating annual.

109. Upon information and belief, Bentley routinely reviewed the annual Budgets of each Component Site within the Collection, including those of the Collection's Association; Bentley was therefore fully aware that the artificially inflated annual Budgets substantially improved DRI's profitability at the expense of individual Members.

110. Upon information and belief, Bentley was fully aware that those Budgets, year after year, fraudulently concealed the "pass-through" of DRI's Indirect Corporate Expenses onto individual Members like Zwicky.

111. **Defendant Magdos** was at material times a Director and the President of the Association, while simultaneously employed by DRI as Senior Vice President, Resort Specialist.

112. Magdos was not only fully aware of the illicit practices referred to above, but also actively participated with fellow Directors and DRMI in the preparation, approval, and dissemination of the fraudulent annual Budgets contained in the Member Obligation billing statements sent to Members.

113.   **Defendant   Wheeler**   was   at   material   times   a   Director   and   the Secretary/Treasurer of the Association's Board while simultaneously employed by DRI as Vice President, Homeowners Division.

114.   Wheeler was not only fully aware of the practice of "passing through" DRI's Indirect Corporate Expenses to Members as referred to above, but also actively participated with fellow Directors and DRMI in the preparation, approval, and dissemination of the fraudulent annual Budgets contained in the billing statements sent to Members.

115.   **Defendant Riddle** was at material times a Director and the Vice President of the Association while simultaneously employed by DRI as Vice President, Association Administration.

116.   Riddle was not only fully aware of the practices referred to above, but also actively participated with fellow Directors and DRMI in the preparation, approval, and dissemination of the fraudulent annual Budgets contained in the billing statements sent to Members.

117.   Defendants Magdos, Wheeler and Riddle (hereinafter, sometimes, the **"Director-Defendants"**) were at material times the sole Directors and officers of the Association and comprised the majority of its five-member Board.

118.   **Defendants Does 1–10** are natural persons or legal entities who are or may be liable in the premises, but whose identities are presently unknown; Plaintiff reserves leave to amend this Complaint when the true identities of these natural persons or legal entities are ascertained.

119.   All individual Defendants herein, including the Director-Defendants, were agents of DRI, acting within the scope of said agency, and for the benefit of DRI, such that DRI is vicariously liable for Defendants' actions.

**D.** **Fraudulent Budgets; Assessment Billing Statements**

120.    Beginning in 2011, the first full Budget-year after DRI formed the Collection and every year thereafter, the Association's Board, in collaboration with DRMI, created an annual Budget for the Association, which it purported to be a reasonable and good faith estimate of the common expenses the Association would incur in the upcoming year.

121.    That annual Budget served as the basis for calculating the amount of the annual Association assessment charged to each Member for that year as part of his or her Member Obligation, which is determined by his or her pro rata share of Association's common expenses according to the number Points he or she possessed in the Collection as specified above at ¶ 25.

122.    No annual Budget of the Association has ever meaningfully disclosed DRI's systemic practice of imposing DRI's corporate overhead upon Members as Indirect Corporate Costs, described above in ¶¶ 87–89; therefore, each annual Budget materially mislead Members.

123.    For example, in the 2013 Budget and the associated statements sent to Members, the Board stated that DRI would charge the Association $1,070,739 that year for "assessment, billing and accounting fees" plus "general and administrative expenses" in addition to the disclosed management fee of $3,522,993 for DRMI as "common expenses." *See supra* at ¶ 72 (defining "common expenses").

124.    In fact, the actual amount DRI charged HOAs/Associations for common expenses in 2013—including DRI's Indirect Corporate Costs concealed therein—was materially greater than the amounts estimated in that year's annual Budget.

125.    In fact, the actual amount of such common expenses in 2013 was ████████ (amount redacted in compliance with Superior Court confidentiality order).

126.    The Board knew that its 2013 Budget, which purported to estimate the amount of such common expenses, were materially less than disclosed to the Members because in

the preceding year, 2012, the amount charged for common expenses was 
(amount redacted in compliance with Superior Court confidentiality order).

127.    Moreover, in the 2014 annual Budget and the associated statements sent to Members, the Board stated that DRI would charge the Association $1,120,008 for "assessment, billing and accounting fees" plus "general and administrative expenses" in addition to the disclosed management fee of $3,682,000 for DRMI as common expenses.

128.    The Board knew that its 2014 Budget, which purported to estimate the amount of such common expenses, was materially less than the amount actually charged in the previous years and knew that it was materially less than the amount DRI and its subsidiaries intended to charge in 2014 as common expenses.

129.    In fact, the actual amount charged to Association for common expenses in 2014—including DRI's Indirect Corporate Costs concealed therein—was materially greater than the corresponding amounts estimated in that year's annual Budget.

130.    In fact, the actual amount of such common expenses in 2014 was
(amount redacted in compliance with Superior Court confidentiality order).

131.    Finally, in the 2015 Budget and the associated statements sent to Members, the Board stated that DRI would charge the Association $1,605,146 for "assessment, billing and accounting fees" plus "general and administrative expenses" in addition to the disclosed management fee of $3,229,014 for DRMI as common expenses.

132.    Once again, the Board knew that this estimated amount was materially less than the amount actually charged in the previous years and knew that it was materially less than the amount DRI and its subsidiaries intended to charge in 2015 for common expenses.

133.    In fact, the actual amount charged to the Association for common expenses in 2015, which is the last year for which Plaintiff has obtained access to those charges—

including DRI's Indirect Corporate Costs concealed therein—was materially greater than the corresponding amounts estimated in that year's annual Budget.

134.   In fact, the actual amount of such charges in 2015 was ████████ (amount redacted in compliance with Superior Court confidentiality order).

135.   For the years subsequent to 2015, the Association disseminated annual Budgets for the following estimated amounts for "assessment, billing and accounting fees" and "general and administrative expenses" as common expenses, combined:

(i)        In 2016: $1,073,901;

(ii)       In 2017: $992,905;

(iii)      In 2018: $1,105,240; and

(iv)      In 2019: $1,890,300.

136.   The actual amounts paid for those common expenses in those years—and also presumably to reimburse DRI for its illicitly concealed Indirect Corporate Costs therein—was not disclosed in the Superior Court inspection action (as described below in Part III.D, ¶ 208 *et seq*), and is therefore otherwise unknown to Plaintiff.

137.   However, upon Plaintiff's information and belief, the amounts DRI actually charged the Association were and continue to be materially greater than the amount disclosed in each of the Association's subsequent annual Budgets.

138.   Documents confirming the existence and amount of the Indirect Corporate Costs charged to the Association—as disclosed by DRI only under compulsion of court order resulting from Zwicky's Superior Court inspection action—were deliberately kept secret from the Members by the Defendants.

139.   Pursuant to DRI's practice of keeping those costs concealed from Members, as stated by Association Director Wheeler in an affidavit filed in support of DRI's motion for an appellate stay of the Superior Court's order:

PVCOA [the Premiere Vacation Collection Owners Association] uses reasonable efforts to maintain the confidentiality of this information designated CONFIDENTIAL [including the "Indirect Corporate Costs" summary]. PVCOA does not share this information with the public or its general membership, however the information is made available to PVCOA's member officers and directors.

*Id.*

140.   In fact, the Association, even though it was a nonprofit entity, strenuously resisted disclosure of any document revealing how DRI passed on its Indirect Corporate Costs to Members by asserting that the practice was a protected "trade secret" in Zwicky's Superior Court inspection action, as detailed in Part III.D, ¶ 208 *et seq.*

**E.**   **Annual Reports**

141.   At the end of each year, the Association provides an audited "Consolidated Financial Report" containing a "Consolidated Statement of Revenues, Expenses and Changes in Fund Balance" (heretofore referred to as **"Annual Reports"**), which was accessible online to the Association's Members only if they persistently explored a labyrinth of vaguely labeled hyperlinks on DRI's website.

142.   The Annual Reports do not fully, understandably, or meaningfully disclose the nature or true amount of the Association's annual subsidy to DRI's Indirect Corporate Costs or the amount of corporate costs imposed on Component Site's HOA and passed through to its Association as a common expense to be incorporated into the Member Obligations each Member was required to pay to enjoy the benefit of his or her Points.

143.   In fact, the Annual Reports only generically describe these Indirect Corporate Costs under the labels "administrative costs" and "administration"; the amounts reported under those labels grossly understate the actual amount of such subsidies.

144. Plaintiff cannot provide further specificity in his allegations relating to the Annual Reports because a certain confidentiality order of the Superior Court precludes him from doing so as later described in this Complaint at Part III.D, ¶ 208 *et seq.*

## III. CAUSES OF ACTION

### A. COUNT I: FEDERAL CIVIL RICO

145. All foregoing allegations are incorporated herein by reference.

146. Defendants, and each of them, violated the federal Racketeer Influenced and Corrupt Organizations Act of 1970, 18 U.S.C. §§ 1961, *et seq.* ("RICO"), which renders it unlawful for "any person employed by or associated with any enterprise engaged in ... interstate ... commerce ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

147. Each Defendant is a "person" within the meaning of the RICO Act, 18 U.S.C. § 1961(3), because each Defendant is an "individual or entity capable of holding a legal or beneficial interest in property."

148. The Association is a RICO "enterprise" because it is a "corporation, association, or other legal entity" within the definition of 18 U.S.C. § 1961(4) and because its existence is legally separate and distinct from the Defendants herein.

149. Defendants, directly or indirectly, participated in the operation or management of the enterprise through a pattern of racketeering activity.

150. Specifically, and as previously set forth, Defendants Magdos, Wheeler, and Riddle were officers and directors of the Association responsible for preparing and disseminating its annual Budgets and levying its annual assessments—including the DRI Indirect Corporate Costs concealed therein—while simultaneously acting as executive-level employees of DRI and beholden its direction and control as its agents.

151. Defendant DRMI, as the Association's property manager/Managing Agent and agent, undertook by delegation from the Board to manage the Association's fiscal

affairs in a fiduciary capacity and illicitly profited by the hidden overcharges—or Indirect Corporate Costs—disseminated to Association Members in annual Budgets.

152. Defendant DRI maintained absolute dominion and control of the Association and its finances by stacking its Board with conflicted Directors and Managing Agents such that the Directors and DRMI wrongfully subordinated the collective interests of the Association's Members to the commercial interests of DRI thereby rendering the Association a mere proprietary arm or instrumentality of DRI.

153. DRI also illicitly profited from the fraudulent overcharges it concealed within the annual Budgets and billing statements disseminated to each Member—thereby inducing each Member, unbeknownst to him or her, to subsidize DRI's Indirect Corporate Costs through the "common expenses" of the Association—because the Member could not use his or her Points at any Component Site within the Collection if he or she did not pay the Member Obligations that compensated DRI for those "common expenses."

154. Defendants Cloobeck, Palmer, and Bentle—at material times DRI's Chief Executive Officer, President, and Vice-President/Chief Financial Officer, respectively— were fully aware of its strategy of shifting its Internal Corporate Costs to Associations as purported "common expenses" charged to the Members as Member Obligations; and, upon information and belief, were actually aware that the true nature and extent of such practice was fraudulently concealed from the Members pursuant to their review of the Association/HOA's Annual Budgets as specified above at ¶ 103 *et seq.*

155. Defendants Cloobeck, Palmer, and Bentley also illicitly and individually profited from this scheme of fraudulently overcharging the Members by virtue of their substantial stock ownership in DRI.

### 1. *Defendants' Predicate Acts: Federal Mail and Wire Fraud*

156. Defendants knowingly and willfully participated in a scheme to defraud Members out of millions of dollars in violation of 18 U.S.C. §§ 1341 ("Mail Fraud") and 1343 ("Wire Fraud"), both being indictable predicate offenses under the RICO Act, 18 U.S.C. § 1961.

157. Defendants, in violation of 18 U.S.C. § 1341, "obtain[ed] money ... by means of false or fraudulent pretenses [or] representations."

158. Specifically, Defendants used the United States Postal Service (the "USPS") to mail fraudulent annual Budgets, which were included in the annual billing statements that DRI sent to Members in a self-addressed, stamped envelope and requested that Members remitted payments of Member Obligations back by check and mail to avoid credit card charges.

159. Defendants, in violation of 18 U.S.C. § 1343, similarly "obtain[ed] money ... by means of false or fraudulent pretenses [or] representations" by means of "wire ... communication."

160. Specifically, Defendants, among other things, utilized the Internet to post on DRI's website (as accessible through each Member's password-protected online account), the fraudulent annual Budgets and billing statements; accepted payments of Member Obligations via the Internet through electronic debit ("EFT") or credit card; and encouraged Members to utilize their "Surepay" program, under which DRI was authorized to automatically take monthly electronic payments from Members' bank accounts to pay their Member Obligations.

161. The annual Budgets included within those billing statements were an integral facet of Defendants' scheme, and therefore Defendants' scheme entailed the use of the mails, "wires," and other instrumentalities of interstate commerce to accomplish their illegal purposes.

162. Specifically, the annual Budgets were substantially and materially misleading because they failed to disclose that massive sums of money—mischaracterized in those Budgets as "common expenses" of the Association—were not legitimate common expenses but were, in fact, secret subsidies of DRI's corporate overhead and thus referred to as "Indirect Corporate Costs" in internal DRI documents.

163. The annual Budgets substantially and materially mislead Members because the Budgets disclosed only a fraction of the amount of expenses that the Plan characterized as "common expenses" by virtue of being legitimate "assessment, billing and accounting fees" and/or "general and administrative expenses."

164. Moreover, the Annual Reports available to members through the DRI website were similarly misleading in that they reported only the payments made directly by the Association to DRI for such expenses while invariably omitting any reference to the massive amounts of charges paid to DRI at the Component Site HOA/Association level for DRI's Indirect Corporate Costs.

165. The undisclosed corporate subsidies of DRI thus paid by each Component Site's HOA/Association were secretly passed through to the Association and its Members.

166. Defendants, and each of them, had a specific intent to defraud the Association's Members.

167. Plaintiff and the current and former members comprising the proposed class herein justifiably relied Defendants' misrepresentations because the had fiduciary duties to the Plaintiff and the proposed class as Association Directors and/or agents of the Association as its property management company or "Managing Agent."

168. Moreover, Association Members, as a practical matter, had no access to detailed financial records tending to reveal the extent and nature of such overcharges except

through the arduous and expensive pursuit of their inspection rights, which was an effort undertaken by Plaintiff Zwicky as detailed below in Part III.D, ¶ 208 *et seq.*

### 2. *Defendants' "Pattern of Racketeering Activity"*

169. Defendants, in or about January of 2013, violated the federal mail fraud and wire fraud statutes—as detailed above at ¶ 156 *et seq.*—by disseminating the annual 2013 Association Budget through the internet and USPS; that Budget was materially misleading to Members because it concealed material amounts of DRI's Indirect Corporate Costs by disguising them as legitimate common expenses.

170. Defendants, in or about January of 2014, repeated the identical conduct by disseminating the annual 2014 Budget to Members, which similarly concealed material amounts of DRI's Indirect Corporate Costs by disguising them as legitimate common expenses.

171. Defendants, in or about January of 2015, repeated the identical conduct involving similar material sums.

172. Upon information and belief, Defendants initiated their illicit practice of secretly shifting DRI's Indirect Corporate Costs to the Association's Members as Member Obligations at the very inception of Collection in its first annual Budget of 2011 and continue, to this day, to adhere to the same practice of imposing DRI's hidden Indirect Corporate Costs upon Association Members, thus illicitly improving DRI's profitability.

173. Said allegation is made upon information and belief only because Plaintiff does not have access to internal financial records for any years except 2013–15; Plaintiff, however, has a good faith, reasonable belief that Defendants' conduct took place in 2011–12 and continues to this day.

174. The basis for Plaintiff's above belief is that the following:

29

(i)     DRI in its SEC filings, as specified in ¶¶ 93–99 and not disclosed to Association Members, described the practice of shifting its Indirect Corporate Costs to Members as being a part of its basic business model;

(ii)     DRI, in those same SEC filings, disclosed that it imposed over $30 million in such charges in the year 2010; and

(iii)     Further, no annual Budget ever issued by the Association throughout its existence, including the 2019 Budget, discloses that practice to Members.

175.    Defendants' conduct thus constitutes a "pattern" of racketeering activity and Defendants committed at least two acts of such activity within ten years of each other within the meaning of 18 U.S.C. § 1961(5).

176.    Defendants' conduct thus also constitutes a "pattern" of racketeering activity for the further reason that Defendants' extraction of illicit corporate subsidies as "Indirect Corporate Costs" from Association Members was done in furtherance of a basic plan of DRI and such acts were repetitive, continuous, and consistent—identical in nature and varying only in dollar amounts.

177.    Such acts comprise at least a "closed-ended" pattern encompassing the three-year period of 2013–15 for which Plaintiff currently has financial information; and upon information and belief, is an "open-ended" pattern because Defendants' conduct "projects into the future with a threat of repetition."

### 3. *Defendants' Conspiracy to Violate the RICO Act*

178.    Defendants, and each of them, conspired with each other to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d).

179.    Each Defendant agreed, explicitly or tacitly, to secretly impose DRI's Indirect Corporate Costs upon Association members by disguising them as legitimate "common expenses" so that the Association's Members would believe that the Board and DRMI were

charging them only those legitimate expenses of the Association as defined by the Plan, *see supra* at ¶ 72 (defining "common expenses"), and not any amount of DRI's Indirect Corporate Costs.

180. Each Defendant substantially participated in and carried out this fraudulent scheme by actually disseminating—or approving the dissemination of—false and misleading annual Budgets and by collecting the fraudulent overcharges from Members via the Internet and USPS, year after year.

### 4. *Plaintiff and the Proposed Class's Injury*

181. Plaintiff—and members of the proposed class consisting of current and former Members of the Association—are "person[s] injured in [their] … business or property by reason of a violation of section 1962" of the RICO Act, within the meaning of 18 U.S.C. § 1964(c).

182. Specifically, Defendants fraudulently overcharged Association Members approximately ███████ in 2013, ███████ in 2014, and ███████ in 2015 (amounts redacted per Superior Court confidentiality order), which proximately caused Plaintiff and the proposed class actual harm in said amounts.

183. Upon information and belief, Defendants, by means of the identical fraudulent scheme, overcharged Members by similar amounts in the prior Budget years 2011–12 as well as subsequent Budget years of 2016–19 with the direct and proximate result that Plaintiff and the proposed class sustained actual pecuniary loss during those specified years in similarly massive amounts.

184. **WHEREFORE,** Plaintiff, for himself and on behalf of all others similarly situated, prays for damages according to the proofs, with prejudgment interest, trebled pursuant to 18 U.S.C. § 1964(c), plus costs of suit and reasonable attorneys' fees.

### B. COUNT II: ARIZONA CIVIL RACKETEERING

185. Plaintiff incorporates by reference and re-alleges all foregoing paragraphs.

186. Defendants' conduct, as previously mentioned, violates A.R.S. § 13-2312(B) ("Illegally Conducting an Enterprise") (hereinafter referred to as **Arizona RICO**").

187. Specifically, Defendants, and each of them, are or were "employed by or associated with any enterprise and conduct[ed] such enterprise's affairs through racketeering"; or, in the alternative, "participate[d] directly or indirectly in the conduct of any enterprise," each with actual knowledge that the enterprise was being "conducted through racketeering." *See* A.R.S. § 13-2312(B).

188. The Association was and is an Arizona RICO "enterprise" within the meaning of A.R.S. § 13-2301(D)(2) because it is a "corporation ... association ... or other legal entity."

189. Defendants' conduct constitutes a "pattern" of criminal activity, entailing repeated and systematic violations of A.R.S. § 13-2310 ("Fraudulent Schemes and Artifices"), which is a predicate offense under Arizona RICO. *See* A.R.S. § 13–2301(D)(4)(b)(xx).

190. Specifically, Defendants, "pursuant to a scheme or artifice to defraud, knowingly obtain[ed] any benefit by means of false or fraudulent pretenses, representations, promises or material omissions" within the meaning of A.R.S. § 13-2310(A), as previously set forth herein.

191. Reliance is not a necessary element of a claim under Arizona RICO. *See* A.R.S. § 13-2310(B).

192. Defendants, and each of them, conspired and/or jointly participated in the fraudulent scheme such that each is vicariously liable for the acts of the other.

193. Specifically, and as previously alleged, each individual Defendant named herein is directly liable or vicariously liable for the acts of others because he or she

"authorized, requested, commanded, ratified or recklessly tolerated the unlawful conduct of the other," within the meaning of A.R.S. § 13-2314.04(L).

194. Each corporate Defendant named herein is vicariously liable for the acts of the others because such Defendants, through "a director or high managerial agent performed, authorized, requested, commanded, ratified or recklessly tolerated the unlawful conduct of [its] agent[s]," within the meaning of A.R.S. § 13-2314.04(L).

195. Plaintiff, and other members of the proposed class, "sustain[ed] reasonably foreseeable injury to [their] person, business or property by a pattern of racketeering activity, or by a violation of A.R.S. § 13-2312 involving a pattern of racketeering activity" within the meaning of A.R.S. § 13-2314.04(A) in that they were charged materially inflated amounts for Member Obligations as "common expenses" in annual Budgets, year after year.

196. Plaintiff shall cause notice of this action and a copy of this Complaint to be served upon the Attorney General of the State of Arizona within thirty (30) days, in accordance with A.R.S. § 13–2314.04(H).

197. **WHEREFORE**, Plaintiff, for himself, and for members of the class, prays for actual damages according to the proofs, with prejudgment interest, trebled pursuant to A.R.S. § 13-2314.04(A); for costs of suit, including reasonable attorneys' fees; and for an injunction restraining and preventing Defendants' ongoing pattern of racketeering, pursuant to § 13-2314.04(B).

C.    **COUNT III: BREACH OF FIDUCIARY DUTY**

198. Plaintiff incorporates by reference and re-alleges all prior paragraphs.

199. The Directors of the Association, a nonprofit corporation, had and have fiduciary duties to all Association Members to adhere to fiduciary standards of conduct in the exercise of their responsibilities to the Association and its Members.

200. DRMI, as the Association's "Managing Agent," had and presently has fiduciary duties owing directly to the Association's Members under the Arizona Timeshare Owners Association and Management Act. *See* A.R.S. § 33-2203(B).

201. The Director-Defendants herein breached their fiduciary duties to Plaintiff and other Members of the Association by creating false and fraudulent annual Budgets and disseminating the same through the Internet and USPS.

202. Such conduct was undertaken in furtherance of the conflicting interests of DRI—as the dominant member of the Association on its own behalf or as through subsidiaries and agents—and who employed said Directors as executive-level employees, and to who said Directors were beholden as agents thereof.

203. Defendant DRI, as the employer of the Directors and exercising control of their conduct, is therefore vicariously liable for their conduct.

204. Defendant DRMI assisted in the creation and dissemination of the false annual Budgets and otherwise participated in this fraudulent scheme, thereby receiving the proceeds of such fraud.

205. The remaining Defendants, both individual and corporate, participated in, facilitated, encouraged, and ratified the ongoing, systematic breaches of the Managing Agent and Directors' fiduciary duties such that all Defendants are jointly liable therefore.

206. **WHEREFORE**, Plaintiff prays for damages or restitution according to the proofs; for prejudgment interest; and for costs of suit, including reasonable attorneys' fees.

**D.**     (ALL COUNTS) DATE OF DISCOVERY & EQUITABLE TOLLING

207. All foregoing allegations are incorporated by reference.

208. In April of 2015, Plaintiff Zwicky, following an unsuccessful attempt to obtain adequate voluntary disclosures of financial records from the Association's Board, filed suit in the Maricopa County Superior Court seeking to enforce his statutory and

common law inspection rights in *Zwicky v. Premiere Vacation Collection Owners Ass'n,* Sup. Crt. No. CV2015-051911.

209.    In that inspectation action, Zwicky contended that he had a good faith, reasonable basis for the Association's inspecting the books and records; he advised the Superior Court that his Member Obligations had become so exorbitant as to render his Points and initial investment in his Points Certificate worthless and he thus sought inspection to determine whether the inflation of his Member Obligations was the result of managerial misfeasance or malfeasance, while acknowledging to the Superior Court that he had no evidence of actual wrongdoing at the time.

210.    The Association opposed disclosure of critical financial documents (including those revealing the nature and amount of the practice of shifting DRI's Indirect Corporate Costs onto Members) on the basis that the information sought was proprietary and constituted protected "trade secrets."

211.    On May 6, 2016, the Superior Court granted Zwicky summary judgment and ordered that certain Association records be disclosed; the Superior Court further ordered, on an interim basis, as follows:

> [A]ll documents and records provided to the plaintiff pursuant to this order, and the information in those documents, shall be maintained in confidence by the plaintiff and not disclosed to anyone except the plaintiff, his current attorneys and any attorneys with whom they be discussing potential future representation of the plaintiff ...

> The Court is of the view that it may well be appropriate for the plaintiff to be permitted to disclose this information in other forums including other litigation, government agencies and so on but those matters are not before the Court now.

*Id.*

212.    On June 6, 2016, the Association produced certain records that revealed the existence and extent of the Defendants' practice of shifting DRI's Indirect Corporate Costs

onto Association Members as illegitimate "common expenses" for the Budget Years 2013–15 and the dollar amounts of such costs on both the level of the Collection's Association and Component Sites' HOAs.

213. At that time, and not before, Plaintiff Zwicky acquired the requisite evidence of wrongdoing necessary to proceed with this substantive litigation.

214. On August 19, 2016, the Superior Court, upon Zwicky's motion, modified its May 6, 2016 protective order "to permit the plaintiff or his attorneys to quote or refer to the information produced in connection with this litigation in a complaint or other court filing in the proposed class action litigation."

215. The Association timely appealed, and successfully obtained an appellate-level stay of the Superior Court's August 19, 2016 order.

216. By order of the Arizona Court of Appeals dated March 22, 2017, Zwicky was "enjoined from disclosing, using, or relying on any documents designated confidential by appellant for any purpose during the pendency of this appeal pending further order of this court."

217. In its published decision of January 23, 2018, *Zwicky v. Premiere Vacation Collection Owners Ass'n*, 244 Ariz. 228, 418 P.3d 1001 (App. 2018), the Arizona Court of Appeals upheld Zwicky's rights of inspection, but reversed the Superior Court's August 19, 2016 order which allowed use of the disclosed information for substantive litigation purposes and remanded the matter to the Superior Court "to evaluate the need for a continued protective order covering the confidential documents."

218. After further litigation on the confidentiality issue on remand, the Superior Court on August 23, 2018 entered a Stipulated Order (mirroring the terms of the Court's prior minute entry), which provided, in material part, that Zwicky was permitted to:

> [U]se the information covered by the protective order to
> formulate his proposed complaint. For example, the protective

order will not prevent the Plaintiff from alleging in a complaint that the management costs that the members were actually paying were materially greater than what was disclosed.

*Id.*

219.   However, the Superior Court further ordered:

[T]he portion of the Court's previous order permitting the Plaintiff and his attorneys to quote confidential information in a complaint or other court filing in other litigation will not be reinstated. Plaintiff may not quote from or attach the confidential documents to a complaint and may not include specific numerical figures derived from the confidential documents in a complaint. The Plaintiff may verbally describe the allegations based on that information.

*Id.*

220.   Plaintiff Zwicky, as stated, thus discovered Defendants' malfeasance on June 6, 2016, but was forbidden by court order, including the stay issued by the Court of Appeals, from disclosing or utilizing such information for any purpose until August 23, 2018.

221.   The Court should thus equitably toll the statute of limitations on all causes of action until August 23, 2018.

**E.    (ALL COUNTS) CLASS TREATMENT**

222.   The proposed class members (hereinafter, referred to as the "**Class**") are readily ascertainable.

223.   The number and identity of the Class are determinable from the records of Defendants.

224.   For purpose of notice and other purposes related to this action, the names and addresses of the Class are readily available from Defendants.

225.   Notice to the Class can be provided by means permissible under Fed. R. Civ. P. 23.

### 1. Class Numerosity

226. The Class consists of approximately 25,000 current and former Members of the Collection's Association.

227. Joinder of all of the individuals in the Class is therefore impracticable.

### 2. Class Commonality

228. There are questions of fact and law common to all of the Class, which overwhelmingly predominate over questions unique to individuals, including:

(i) Whether the annual Association Budgets fraudulently concealed the practice of shifting DRI's Indirect Corporate Costs to the Association's Members;

(ii) Whether each of the Defendants knowingly engaged in a fraudulent scheme to overcharge the Association's Members through that practice;

(iii) Whether the Association is a RICO "enterprise";

(iv) Whether the Defendants' conduct constitutes the requisite "pattern of racketeering activity" for purposes of federal and Arizona RICO;

(v) Whether the participation of each Defendant in that fraudulent scheme was sufficient in character and degree to support the imposition of either direct liability or vicarious liability under principal-agent, joint tortfeasor, and/or civil conspiracy principles; and

(vi) Whether Association Members were damaged by the alleged fraudulent overcharges.

229. Although there will be considerable variation in the amount of damages to each member of the Class, the computation of such damages will be a ministerial exercise once the aggregate amount of damages has been determined by the jury for each year.

230. The amount of each Class member's individual proportionate share of damages is readily calculable based on his or her specific years of Association membership and the number of Points he or she owned in his or her Points Certificate for each year.

231. A limited exception to this class-wide commonality of issues exists with respect to certain Association Members—limited in eligibility and participation—who claimed benefits and may have signed mutual releases in connection with the Arizona Attorney General's proceedings against DRI for enforcement of the Arizona Consumer Fraud Act, A.R.S. §§ 44-1521, *et seq.,* and the "Assurance of Discontinuance" agreed upon by DRI in 2016.

232. In settlement of those claims advanced by the Arizona Attorney General, DRI paid a total of $800,000 and agreed to allow eligible consumers to cancel their Association memberships.

233. Upon information and belief, the Arizona Attorney General's action and the settlement will have a minimal impact on the present action and will reduce the number of the Class by a few hundred individuals, at most.

234. A further limited exception may exist for a limited number of former Association Members whom DRI voluntarily allowed to cancel their memberships or whom were defendants in an action for collection of delinquent Association assessments that was adjudicated in DRI's favor in a preclusive final judgment.

235. Upon information and belief, the number of Members fitting these categories is also very small in relation to the overall Class proposed herein.

236. A further limited exception to the Class may exist to the extent that individual Association Members may have agreed to mandatory arbitration with Defendants; at present, Plaintiff does not know the number of Association Members, if any, whom have agreed to engage in arbitration with Defendants related to the cause(s) of action stated herein.

237. Upon information and belief, the number of Members fitting that category is also very small in relation to the overall Class proposed herein or may be nonexistent if no

such Members have agreed to mandatory arbitration with Defendants related to the allegations stated herein.

### 3. *Class Typicality*

238. Defendants have acted on grounds equally applicable to the entire Class, making final relief appropriate to Class as a whole.

239. In fact, the liability claims of those in the Class appear to be identical with variations only as to the amount of damages as described above at ¶¶ 229–30.

### 4. *Plaintiff's Adequacy*

240. Plaintiff is able to fairly and adequately protect the interests of the Class and has no interests antagonistic to the same; to the extent necessary and appropriate, additional putative representatives of the Class will be named as plaintiffs by way of amendment of this Complaint.

241. Plaintiff Zwicky, through his current Arizona-licensed counsel, has already devoted over three years to enforcing his inspection rights in the Arizona Superior Court (as detailed above in Part III.D, ¶ 208 *et seq.*), without which the essential facts giving rise to this action would not have been uncovered.

242. Plaintiff are collectively represented by attorneys who are experienced and competent in both class actions and timeshare consumer rights litigation through the representations of timeshare associations comprised of thousands of members; counsel is willing and able to devote the legal and financial resources necessary for the successful prosecution of this action.

### 5. *Superiority of Class Litigation*

243. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that individual actions would entail.

244. Further, the dollar amounts of each individual claim are too small to economically justify full-blown litigation efforts against these well-funded corporate defendants with the result that the vast majority of the individual claims of the Class would otherwise go unremedied.

245. Individual litigation would also pose a risk of inconsistent adjudications on identical facts and identical legal issues.

246. For the foregoing reasons, class treatment represents the most efficient and effective use of the Court's limited resources and the most efficient and effective way of vindicating the rights of the Association's Members comprise this Class.

247. **WHEREFORE,** Plaintiff, for himself and on behalf of all others similarly situated, respectfully prays for certification of the class treatment of all foregoing claims mentioned herein pursuant to A.R.S. § 12-1871 and other applicable law.

RESPECTFULLY SUBMITTED this 9th day of November, 2020.

*/s/ Jon L. Phelps*
Jon L. Phelps (027152)
Robert Moore (013338)
Jennie I. Tetreault (035566)
PHELPS & MOORE PLLC
7430 East Butherus Drive, Suite A
Scottsdale, AZ 85260
(480) 534-1400
jon@phelpsandmoore.com
rob@phelpsandmoore.com
jennie@phelpsandmoore.com

*/s/ Edward L. Barry* (with permission)
Edward L. Barry (005856)
2120 Company Street, Third Floor
Christiansted, Virgin Islands 00820
(340) 719-0601, ed.barry.legal@gmail.com
***Attorneys for Plaintiff***

**V E R I F I C A T I O N**

In accordance with A.R.S. § 13-2314.04(O) & (P), the undersigned certifies that he has carefully read the foregoing Complaint and, based on a reasonable inquiry, believes all of the following:

    1.    It is well grounded in fact;

    2.    It is warranted by existing law or there is a good faith argument for the extension, modification or reversal of existing law; and

    3.    It is not made for any bad faith, vexatious, wanton, improper or oppressive reason, including to harass, to cause unnecessary delay, to impose a needless increase in the cost of litigation or to force an unjust settlement through the serious character of the averments.

/s/ Edward L. Barry (with permission)
Edward L. Barry (005856)
2120 Company Street, Third Floor
Christiansted, Virgin Islands 00820
(340) 719-0601, ed.barry.legal@gmail.com
*Counsel for Plaintiff*