LAW OFFICES
PHELPS & MOORE
PROFESSIONAL LIMITED LIABILITY COMPANY
7430 EAST BUTHERUS DRIVE, SUITE A
SCOTTSDALE, ARIZONA 85260
(480) 534-1400

Jon L. Phelps (027152)
jon@phelpsandmoore.com
Robert M. Moore (013338)
rob@phelpsandmoore.com
Jennie I. Tetreault (035566)
jennie@phelpsandmoore.com

Edward L. Barry (005856)
2120 Company Street, Third Floor
Christiansted, Virgin Islands 00820
(340) 719-0601, ed.barry.legal@gmail.com
Counsel for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| **NORMAN ZWICKY**; **GEORGE ABARCA**; **VIKKI OSBORN**; and **ELIZABETH STRYKS-SHAW**, for themselves and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br><br>v.<br><br>**DIAMOND RESORTS INTERNATIONAL, INC.**, a Delaware Corporation; **DIAMOND RESORTS MANAGEMENT, INC.**, an Arizona Corporation; **TROY MAGDOS**; and **KATHY WHEELER**,<br><br>                    Defendants. | Case No.: CV-20-02322-PHX-DJH<br><br>**THIRD AMENDED CLASS ACTION COMPLAINT**<br><br>*Jury Trial Demanded*<br><br>(ASSIGNED TO THE HONORABLE **DIANE J. HUMETEWA**) |

Plaintiffs Norman Zwicky ("Zwicky"), George Abarca ("Abarca"), Vikki Osborn ("Osborn"), and Elizabeth Stryks-Shaw ("Stryks-Shaw"), on their own behalf and on behalf

of all others similarly situated, for their Third Amended Complaint and cause of action against Diamond Resorts International, Inc. ("DRI"); Diamond Resorts Management, Inc. ("DRMI"); Troy Magdos ("Magdos"); and Kathy Wheeler ("Wheeler"), allege as follows:

**I.**     **JURISDICTION**

1.     **Plaintiff Norman Zwicky** ("Zwicky") was a citizen of Arizona at all times material to this complaint; Plaintiffs Abarca and Osborn are, and were, citizens of Arizona at all material times; Plaintiff Stryks-Shaw was a citizen of California at all times material to this complaint.

2.     **Defendant Diamond Resorts International, Inc.** ("DRI") is a corporation organized and existing under the laws of Delaware, with its principal place of business in Las Vegas, Nevada.

3.     **Defendant Diamond Resorts Management, Inc**. ("DRMI") is a corporation organized and existing under the laws of Arizona, with its principal place of business in Las Vegas, Nevada, and is also a wholly-owned subsidiary of DRI.

4.     Upon information and belief, **Defendants Troy Magdos** ("Madgos") and **Kathy Wheeler** ("Wheeler") are citizens of Nevada and were, at all times relevant to this complaint, employed by DRI or its wholly owned subsidiaries and/or served as agents of the same; specifically, **Defendant Magdos** was, at all times material to this Complaint, employed by DRI as Senior Vice President, Resort Specialist; and **Defendant Wheeler** was, at all times material to this Complaint, employed by DRI as Vice President, Homeowners Division.

5.     There are at least 100 members of the putative class.

6.     The amount in controversy, aggregated, exceeds five million dollars ($5,000,000.00), exclusive of interest and costs.

7.     This Court has personal jurisdiction of each Defendant under Arizona's long-arm statute, 16 A.R.S. Rules Civil. Proc, Rule 4.3(a).

2

8.      Specifically, the non-resident Defendants, and each of them, did business in Arizona, maintained systematic and continuous affiliations with Arizona for purposes of general jurisdiction, and in most instances maintained a physical presence in the State; alternatively, each Defendant purposeful availed itself (or himself or herself) of the privileges of conducting activities in Arizona, and purposefully directed tortious and illegal conduct at the forum out of which the claims herein arise, thus satisfying the requirements of specific jurisdiction because the exercise of *in personam* jurisdiction as to each Defendant comports with "fair play and substantial justice."

## II.      SUMMARY OF THE CASE

9.      Plaintiffs' allegations are based upon personal knowledge, and upon information and belief where specifically noted.

10.     The allegations herein have been informed by an investigation that included, among other things:

(i)      A review of materials produced in connection with Plaintiff's corporate books and records inspection action captioned *Zwicky v. Premiere Vacation Collection Owners Association, Inc.*, No. CV2015-051911 (Ariz. Super. Ct.) (the "**Records Inspection Action**");

(ii)     An analysis of DRI's public filings with the U.S. Securities and Exchange Commission ("**SEC**"); and

(iii)    Review of news articles and other publicly available information.

11.     Plaintiffs believe additional evidentiary support will exist for their allegations after a reasonable opportunity for discovery.

### A.      Introduction; Definition of Key Terms

12.     Plaintiffs **Zwicky**, **Abarca**, **Osborn**, and **Stryks-Shaw** are among approximately 25,000 current and former timeshare owners/members (hereinafter, "**Private**

3

**Members**") of a non-profit, incorporated association of purchasers who bought timeshare interests within DRI's Premier Vacation Collection (the "**Collection**"), formerly known as the "Premiere Vacation Club."

13. Those current and former timeshare owners/members are Private Members of the **Premiere Vacation Collection Owners Association** ("**PVCOA**"), which is a non-profit corporation organized and existing under the laws of Arizona with its principal place of business in Phoenix, Arizona.

14. The **Collection** encompasses a group of resorts located in Arizona, Colorado, Indiana, Nevada and Baja, Mexico.

15. The Collection itself is only one of at least eight distinct collections or groupings of resorts held by DRI or its subsidiaries (others being the European Collection, the U.S. Collection, and the Hawaii Collection, for example); each individual resort property within a collection or grouping of resorts is also known as a "**Component Site**" in internal DRI corporate documents, and each Component Site has its own Home Owners Association ("**HOA**").

16. Private Members of PVCOA such as Zwicky have not purchased timeshares in the traditional sense; they hold no deed, leasehold assignment, or any other legal or equitable interest in real property.

17. Each Private Member instead holds an intangible personal property interest in the Collection called a "**Points Certificate**."

18. To become a PVCOA Member, a consumer makes an initial investment to acquire his or her Points Certificate; DRI, through a subsidiary, often elects to finance part of his or her purchase price.

19. The "**Points**" that comprise a PVCOA Private Member's Point Certificate serve as the basis for calculating his or her "**Reservation Privileges**," which are the non-exclusive

right to book accommodations at any Component Site within a specific Collection on a first-come, first-served basis only if the Private Member is current on his or her Annual Assessments and fees.

20.     **Points** serve as the internal currency of the DRI regime, with the Private Member spending his or her Points, as opposed to cash, to book rooms in the Collection at any Component Site (but only if the Private Member is current on his or her Annual Assessments).

21.     PVCOA Private Members like Plaintiffs are obligated to pay "**Annual Assessments**" to PVCOA to defray their pro rata share of budgeted "**Common Expenses**" (calculated by dividing the Private Member's number of Points by the number of total outstanding Points in the **Collection**, plus a flat fee), as determined and levied by the Board of Directors of PVCOA (the "PVCOA Board"), with the collaboration and assistance of **DRMI.** These **Common Expenses** include **PVCOA's** share of Common Expenses levied by HOAs, which PVCOA must pay due to its entity-level ownership interests in each Component Site, and which are indirectly passed through to PVCOA's Private Members.

22.     PVCOA Private Members must additionally pay annual fees to DRI as members of "**THE Club,**" which renders certain timeshare booking, exchange and related services, which fees are typically several hundred dollars a year.

23.     Each Private Member of PVCOA makes a life-long and essentially irrevocable contractual commitment to pay the fees and Annual Assessments of PVCOA. The failure to pay Annual Assessments prevents the Private Member from using his or her Points to gain Reservation Privileges to book vacation resort accommodations in the Collection, and exposes the Private Member to personal liability for breach of contract in a lawsuit brought by PVCOA.

24.     As stated, each Private Member's Annual Assessments are determined in large part upon on a pro-rata basis by the amount of Points he or she holds in his or her Points Certificate.

25.     Each Private Member's voting rights in PVCOA are also determined by the number of Points he or she owns.

26.     The PVCOA Board bases the **Annual Assessments** upon an Annual Budget (hereinafter referred to as the "**Budget**") for estimated Common Expenses.

27.     Because PVCOA ostensibly operates as an ordinary common interest real estate association and an Arizona nonprofit corporation, its Annual Assessments are tax-exempt under 26 U.S.C. § 528(d)(3).

28.     On paper, the PVCOA Board is a democratically elected group of individuals ostensibly tasked with managing PVCOA's affairs through a property management company (referred to in internal documents as a "**Managing Agent**") for the common benefit of thousands of Private Members.

29.     DRI and its subsidiaries, however, maintain absolute power and control over these organizations by stacking the PVCOA Board with DRI executives.

30.     DRI or its subsidiaries such as ILX Acquisition, Inc. ("**ILXA**"), maintain dominance of the PVCOA Board due to the massive number of Points they hold through a "**Bulk Membership**" in PVCOA (as further explained below), and also through their special voting powers that render their votes nine times as potent as Private Members' votes (as further specified below).

31.     The Board invariably retains DRI's subsidiary, DRMI, as property manager for PVCOA, and for each Component Site in the Collection under perpetually-renewable sweetheart agreements that guarantee DRMI and its subsidiaries a substantial 100% profit at the expense of Private Members.

32.     Specifically, by ignoring conflicts of interest and their fiduciary duties to Private Members, the Directors of the PVCOA Board—a majority of whom serve simultaneously as employees or agents of DRI and its subsidiaries—have systematically and fraudulently mismanaged the finances of PVCOA and its Component Sites for the benefit of DRI and its subsidiaries and at the expense of all Private Members.

33.     Year after year, the PVCOA Board's controlling Directors—acting in concert DRI and DRMI—illegally foisted tens of millions of dollars of DRI's internal corporate overhead expenses (referred to in certain confidential corporate documents as "indirect corporate costs," as further specified below) upon Private Members. Defendants disguised and misrepresented these "**Hidden Corporate Overhead Subsidies**" as legitimate Common Expenses of PVCOA and secretly passed these costs on to Private Members in their Annual Assessment billing statements.

34.     The Defendants concealed these illicit Hidden Corporate Overhead Subsidies by means of false and misleading annual Budgets they either prepared or approved and then disseminated to Private Members electronically and through the mail.

35.     Defendants carried out this fraudulent scheme for many years—and, upon information and belief, continue to do so to this day—thereby extracting millions of dollars' worth of massively inflated Annual Assessments from Private Members by automatically, systematically, deliberately, and illicitly passing on massive amounts of DRI's Hidden Corporate Overhead Subsidies to each Private Member.

**B.   The Plaintiffs/Proposed Class Representatives; Membership Acquisitions**

36.     The proposed class consists of all current and former Private Members of PVCOA, which are approximately 25,000 in number.

7

37.     Plaintiff Zwicky is a retired postal worker who formerly owned a traditional timeshare interest—one that granted him a time-specific fractional interest in real property—in Kohl's Ranch in Payson, Arizona.

38.     Kohl's Ranch, to the extent its property was not titled to individual timeshare owners, was an asset held by ILX Resorts Incorporated ("**ILXRI**"), which is now dissolved and defunct.

39.     In or about August of 2010, DRI purchased a grouping of resorts from the bankruptcy estate of ILXRI through DRI's wholly owned subsidiary, ILXA.

40.     The resorts DRI purchased through ILXA from ILXRI's bankruptcy estate, including Kohl's Ranch, became Component Sites and parts of the Collection.

41.     In or about 2010, following DRI's acquisition of Kohl's Ranch, DRI induced Zwicky to relinquish his traditional timeshare interest in Kohl's Ranch and purchase his own Points Certificate and 13,000 Points in the Collection, thereupon becoming a Private Member of PVCOA.

42.     For that initial purchase (i.e., conversion of his standard timeshare interest into Points), Zwicky paid $26,395 including the stipulated trade-in value of his Kohl's Ranch timeshare.

43.     Just like all other Private Members, Zwicky contractually agreed to a lifetime obligation to pay for Annual Assessments levied by the PVCOA Board.

44.     The 13,000 Points Zwicky initially purchased translated roughly into a right to book a ten-day vacation at a Component Site (including Kohl's Ranch), subject to room-availability and payment of his Annual Assessments and fees for THE Club.

45.     Under the DRI regime, however, the cost of Zwicky's Points and Annual Assessments were roughly triple what he paid to book a ten-day vacation at Kohl's Ranch before DRI acquired the resort from ILXRI's bankruptcy estate.

46.     For example, in 2014 and 2016, DRI charged Zwicky $2,337.59 and $2,535.01, respectively, for his Annual Assessments and fees for THE Club.

47.     Therefore—including his up-front Points investment amortized over the period of seven years—Zwicky was effectively charged over $600.00 per day to enjoy an annual ten-day vacation under DRI's Points regime.

48.     At $600.00 per day, Zwicky's vacation costs far exceeded the fair market value of the typical accommodations at Component Sites within the Collection.

49.     Moreover, $600.00 per day far exceeded the ordinary commercial rates that DRI charged the public for direct bookings for all or most of the Component Sites in the Collection.

50.     For example, room rates during the March 2019 high season, as quoted for a direct booking of units in the Collection to the public through Expedia, were merely $132.00 per night at the Kohl's Ranch Component Site, $199.00 per night at the Varsity Club of Tucson Component Site, and $291.00 per night at the Los Abrigados Component Site in Sedona, Arizona.

51.     Due to these exorbitant Annual Assessments and fees for THE Club, Zwicky's Points Certificate is now effectively worthless.

52.     Plaintiffs Abarca, Osborn, and Stryks-Shaw were similarly timeshare owners in resort properties owned and operated by ILXRI prior to the sale of their assets in bankruptcy to DRI's subsidiary, ILXA in 2010. Each Plaintiff's ownership interests were converted into ownership of "Points" in PVCOA (formerly known as the "Premiere Vacation Club"), and each Plaintiff has paid Annual Assessments starting in 2010 or 2011.

53.     Because their Points Certificates are, like Zwicky's, effectively worthless, many disaffected Private Members have attempt to sell the thousands of Points they own on eBay or online timeshare exchanges for a total of $1.00, or have simply offered to give them away to avoid their Annual Assessments.

54.     Defendants grossly inflated the Annual Assessments they levied upon Plaintiffs and other Private Members because, among other things, Defendants included fraudulent charges for DRI's Hidden Corporate Overhead Subsidies in the annual Budgets of both PVCOA and the Component Site HOAs, as more particularly set forth below.

**C.   Defendants; Business Operations; Relationships**

55.     Defendant DRI—publicly traded as NYSE:DRII until acquired by a private equity firm for approximately $2.2 billion in June of 2016—is one of the largest companies in the vacation ownership industry with a timeshare ownership base reported to number in the hundreds of thousands.

56.     DRI holds or controls a network of approximately 300 resorts worldwide with many additional resorts under management contracts.

57.     DRI's basic business activities consist of timeshare sales, timeshare sales financing, and hospitality and management services.

58.     Additionally, DRI—itself or through subsidiaries—directly offers its own substantial timeshare inventory for booking by the public.

59.     ILXA is a wholly owned subsidiary of DRI formed for the purpose of acquiring and holding the assets held by the bankruptcy estate of now-defunct ILXRI, which included the Component Sites, like Kohl's, that are now part of the Collection.

60.     In a document entitled the "Second Amended and Restated Premiere Vacation Collection Plan" (the "**Plan**")—dated November 10, 2010 and recorded with the Maricopa County, Arizona Recorder of Deeds—ILXA is referred to as the "**Developer**" and "**Seller**" of the Collection's timeshare interests. The Plan serves as the declaration of PVCOA.

61.     ILXA is itself a member of PVCOA and holds a "Bulk Membership" consisting of unsold timeshare inventory.

62.     ILXA's Bulk Membership also consists of a substantial and perpetually renewing number of forfeited timeshare interests of Private Members who have defaulted in their Annual Assessments or other obligations incident to their status as PVCOA Private Members.

63.     Thus, ILXA (and, indirectly, DRI) maintains and exercises absolute control of the Board through its massive voting power it enjoys by virtue of its vast ownership of Points and Bulk Membership in PVCOA.

64.     DRI and its subsidiaries' stranglehold on the Board is further effectively guaranteed by § 3.03 of the Plan, which provides:

> <u>Voting. Total Authorized Voting Shares.</u> Each Member shall be entitled to cast a number of votes equal to such Member's total Membership Share. Notwithstanding the foregoing, until such time as 95% of the Total Authorized Voting Membership Shares in the Collection (including those held for sale by Seller and its affiliates) have been sold by Seller and its affiliates, Seller shall be entitled to cast a number of votes equal to Seller's total Membership Share for all Memberships held by Seller and its affiliates (including those held for sale by Seller and its affiliates) multiplied by nine (9).

*Id.*

65.     This 95% equal-voting-rights threshold has never been reached, and likely never will be.

66.     The threshold has not been reached, in part, because of the basic "inventory-recapture" business model of DRI and ILXA. Under that business model, DRI and ILXA use the high rate of Private Member defaults and forfeitures as a cheap source of self-replenishing timeshare resale inventory, thereby minimizing their need to invest capital in new properties to increase their source of timeshare sales inventory.

67.     Furthermore, the loss of DRI's super-voting powers—which, as the Plan specifies, are nine-fold that of Private Members—and consequent loss of its absolute control

11

of the PVCOA Board is an obvious disincentive for DRI to ever achieve the 95% private-ownership benchmark or threshold in the Plan.

68.  **PVCOA** is an Arizona nonprofit corporation; the PVCOA Board manages PVCOA's finances purportedly for the benefit of the collective interests of PVCOA's Private Members.

69.  The PVCOA Board levies and collects Annual Assessments from PVCOA Private Members to defray its Common Expenses on a tax-exempt basis under 26 U.S.C. § 528(d)(3) pursuant to an annual Budget, which is determined by the PVCOA Board and disseminated to PVCOA Private Members together with their fee for THE Club in billing statements.

70.  The Plan defines PVCOA's "**Common Expenses**," in typical fashion, as:

> [T]he actual and estimated costs of operating and managing Association and its property including, but not limited to: Assessments, Association administrative costs, taxes, insurance, utilities, reserves, legal fees and accounting fees; the annual maintenance fees or dues and other costs of ownership of the Resort Interests and any Common Furnishings.

*Id.*, § 1.13.

71.  Each HOA, whose members include PVCOA as entity-level owner of substantial interests in each Component Site, and whose members may also include DRI, its subsidiaries, as well as a certain number of "legacy" timeshare owners in those Component Sites who have not opted to buy into the DRI Points regime.

72.  As is also typical in a timeshare association or other common interest property regime, the HOA Board delegates many of its duties to a property management company.

73.  DRI, through the disproportionate voting powers of its subsidiary, ILXA, controls not only PVCOA, but also the HOAs.

74.     As a result, DRI invariably hires DRMI, its own wholly-owned subsidiary, as the Managing Agent for PVCOA and for each Component Site.

75.     PVCOA holds itself out as an ordinary nonprofit property association of timeshare owners, governed by a democratically-elected Board that is ostensibly duty-bound to represent the collective rights and interests of its many thousands of Private Members, and availing itself of the tax-exemptions granted to bona fide property owner associations.

76.     In substance and reality, however, PVCOA is a sham, operating as a mere proprietary arm or instrumentality of DRI, as further set forth herein.

77.     **Defendant DRMI**, is a wholly owned subsidiary of DRI, at all material times served and continues to serve as the Managing Agent of PVCOA and of each HOA.

78.     As Managing Agent, DRMI undertook by delegation the PVCOA Board and HOA Boards' duties to manage the Collection's property, Component Sites, and finances in the collective best interests of the Private Members and Bulk Membership entities.

79.     PVCOA's Plan, however, does not disclose that DRMI or any other subsidiary of DRI is to act as Managing Agent; in 2016, however, the Arizona Attorney General, in consumer fraud proceedings, ordered DRI to make disclosures regarding the identity of and relationship it had with PVCOA's Managing Agent in public documents.

80.     The Plan, under § 4.03, provides that PVCOA will use its "best efforts" to retain a "reputable firm" as Managing Agent.

81.     Moreover, the Plan provides that the Managing Agent's "**Management Agreement**" must contain certain provisions:

(i)     The Management Agreement's term is to be not more than 10 years, and is to be automatically renewed for successive 10-year terms unless written notice of termination is given by PVCOA within 180 days prior to the expiration of the term;

13

(ii)      PVCOA may not terminate the Management Agreement except upon the vote or consent of 95% of the PVCOA's members, which include ILXA as a "Bulk Member";

(iii)      The fee PVCOA pays to the Managing Agent "or a subsidiary or affiliate thereof" is "not to exceed fifteen percent (15%) of the total Assessments assessed upon Members in each Fiscal Year"; and

(iv)      "Such compensation may be increased if authorized by the vote or written consent of a majority of the Board or if [PVCOA] is unable to induce a qualified, reputable and experienced management firm to act as Managing Agent without increasing such compensation."

82.      In contravention of the Plan, however, the PVCOA Board repeatedly chose DRMI as Managing Agent and increased its compensation without seeking or allowing competitive bidding from property management companies not affiliated with DRI or its subsidiaries.

83.      DRI similarly installed DRMI as the Managing Agent of each HOA, thereby extending its absolute control of every Component Site within the Collection.

84.      As stated in DRI's "Form 10-K Annual Report" of December 31, 2014 filed with the SEC:

> <u>HOAs.</u> Each of the [domestic DRI-] managed resorts [or Component Sites] … is typically operated through an HOA, which is administered by a board of directors. Directors are elected by the owners of intervals at the [Component Site]… and may also include representatives appointed by [DRI/ILXA] as the developer of the [Component Site]. As a result, we are entitled to voting rights with respect to directors of a given HOA by virtue of (i) our ownership of intervals at the related [Component Site]; (ii) our control of the Diamond Collections that hold intervals at the [Component Site] and/or (iii) our status as the developer of the [Component Site].

14

> The board of directors of each HOA hires a management company to provide the services described above, which in the case of all [DRI-]managed [Component Sites], is us.

*Id*.

85.     Further, according this same 10-K Report—which contained disclosures made to DRI's securities investors, but not to Private Members—DRMI's management fees, which are passed on to Private Members as Annual Assessments, are "based on a cost-plus structure and are calculated based on the direct and indirect costs (including the absorption of a substantial portion of our overhead related to the provision of our management services) incurred by the Diamond Collection" or DRI. *Id*.

86.     DRI never disclosed this practice of shifting its Hidden Corporate Overhead Subsidies—sometimes referred to as "indirect corporate costs" in certain confidential documents provided to Plaintiff Zwicky in the Records Inspection Action—to Private Members though their Annual Assessments.

87.     David Palmer, DRI's then-Chief Executive Officer, stated in a September 2014 investors conference:

> Anything that is put in the [Association's] Budget that gets expended on an annual basis, we get our 15 percent fee. … That is basically a 100 percent profit business. … All the costs are disclosed on a private website. There are no hidden fees.

*Id*.

88.     In fact, however, DRI and its affiliates imposed hidden charges in the tens of millions upon Private Members in misleading annual Budgets that never disclosed the relationship between those Budgets and DRI's Hidden Corporate Overhead Subsidies on a "private website" or via any other method.

89.     The amounts Defendants actually charged Private Members for management fees illicitly included DRI's Hidden Corporate Overhead Subsidies, thereby grossly exceeding the 15% cap on management fees specified by the Plan.

90.     According to the "Notes" to the "Consolidated Financial Statement of Diamond Resort Parent, LLC" regarding "Transactions with Related Parties," contained in an Amendment to DRI's "2011 Registration Statement" (SEC Form S-4), DRI disclosed to investors, but not to Private Members:

> **Allocation of Expenses.** In addition to management services revenues [of DRMI], the Company has entered into agreements with the HOAs to be reimbursed for a portion of the Company's resort management and general and administrative expenses to the HOAs.

*Id*.

91.     No such "agreement[]" involving any HOA or PVCOA permitting reimbursement of such expenses of "the Company" has ever been disclosed to Private Members.

92.     No such "agreement[]" involving any HOA or PVCOA permitting reimbursement of such expenses of "the Company" was ever disclosed in the Records Inspection Action, despite the court's order of September 14, 2016 that all property management agreements, as well as amendments or modifications thereof, be produced to Zwicky. Upon information and belief, no such written agreement exists.

93.     DRI's 2014 10-K Form—filed with the SEC and disclosed to DRI's investors, but not to Private Members—stated that "[w]e pass through to the HOAs and the Diamond Collections certain overhead charges incurred to manage the resorts." *Id.*

94.     This "pass-through" or corporate subsidy for DRI's corporate overhead expenses, involved tens of millions of dollars, "**System-Wide**" across DRI's numerous collections ("**System-Wide**").

95.     For example, DRI's "2011 Registration Statement" (SEC Form S-4), referred to above, acknowledged that the amount of DRI's corporate overhead expenses imposed System-Wide, was $24,467,000 in 2009, and $30,766,000 in 2010.

96.   Upon information and belief, the amount of such subsidies, System-Wide, increased by massive amounts in later years; although no SEC filings known to Plaintiffs disclosed those amounts for 2011 and subsequent years.

97.   **Defendant Magdos** was at material times a Director of the PVCOA Board and the President of PVCOA, while simultaneously employed by DRI as Senior Vice President, Resort Specialist.

98.   Magdos was not only fully aware of the illicit practice of secretly padding PVCOA's budget with DRI's Hidden Corporate Overhead Subsidies, but also actively participated with fellow Directors and DRMI in the preparation, approval, and dissemination of the fraudulent annual Budgets contained in the Annual Assessment billing statements sent to Private Members.

99.   **Defendant Wheeler** was at material times a Director of the PVCOA Board and the Secretary/Treasurer of PVCOA, while simultaneously employed by DRI as Vice President, Homeowners Division.

100.   Wheeler was not only fully aware of the practice of "passing through" DRI's Hidden Corporate Overhead Subsidies to Private Members as referred to above, but also actively participated with fellow Directors and DRMI in the preparation, approval, and dissemination of the fraudulent annual Budgets contained in the billing statements sent to Private Members.

101.   Defendants Magdos, Wheeler, and one or more additional DRI executive employees were at material times the Directors and sole officers of PVCOA and comprised the majority of its five-member Board.

102.   Director-Defendants Magdos and Wheeler were agents of DRI, acting within the scope of said agency, and for the benefit of DRI, such that DRI is vicariously liable for the Director-Defendants' actions.

**D.   Fraudulent Budgets; Assessment Billing Statements**

103.    Beginning in 2011, the first full Budget-year after DRI formed the Collection and every year thereafter, the PVCOA Board, in collaboration with DRMI, created an annual Budget for PVCOA, which purported to be a reasonable and good faith estimate of the Common Expenses PVCOA would incur in the upcoming year.

104.    That annual Budget served as the basis for calculating the amount of the Annual Assessments charged to each Private Member for that year, which is determined by his or her pro rata share of PVCOA's Common Expenses as defined in the Plan.

105.    No annual Budget of PVCOA has ever meaningfully disclosed DRI's systemic practice of imposing DRI's Hidden Corporate Overhead Subsidies upon Private Members; therefore, each annual Budget materially misled Private Members.

106.    For example, in the 2013 Budget and the associated statements sent to Private Members, the PVCOA Board stated that DRI would charge PVCOA $1,070,739 that year for "assessment, billing and accounting fees" plus "general and administrative expenses"— all in addition to the disclosed management fee of $3,522,993 for DRMI—as "Common Expenses" (as that term is defined in the Plan).

107.    In fact, the actual amount DRI directly and indirectly charged PVCOA for Common Expenses in 2013—including DRI's Hidden Corporate Overhead Subsidies—was materially greater than the amounts estimated in that year's annual Budget.

108.    In fact, the actual amount of such Common Expenses in 2013 was ███████ (amount redacted in compliance with Records Inspection Action confidentiality order).

109.    The PVCOA Board knew that its 2013 Budget, which purported to estimate the amount of such Common Expenses, were materially less than disclosed to the Private Members because in the preceding year, 2012, the amount charged for Common Expenses

was ███████ (amount redacted in compliance with Records Inspection Action confidentiality order).

110.    Moreover, in the 2014 annual Budget and the associated statements sent to Private Members, the PVCOA Board stated that DRI would charge PVCOA $1,120,008 for "assessment, billing and accounting fees" plus "general and administrative expenses" in addition to the disclosed management fee of $3,682,000 for DRMI as Common Expenses.

111.    The PVCOA Board knew that its 2014 Budget, which purported to estimate the amount of such Common Expenses, was materially less than the amount actually charged in the previous years and knew that it was materially less than the amount DRI and its subsidiaries intended to charge in 2014 as Common Expenses.

112.    In fact, the actual amount directly and indirectly charged to PVCOA for Common Expenses in 2014—including DRI's Hidden Corporate Overhead Subsidies—was materially greater than the corresponding amounts estimated in that year's annual Budget.

113.    In fact, the actual amount of such Common Expenses in 2014 was ███████ (amount redacted in compliance with Records Inspection Action confidentiality order).

114.    Finally, in the 2015 Budget and the associated statements sent to Private Members, the PVCOA Board stated that DRI would charge PVCOA $1,605,146 for "assessment, billing and accounting fees" plus "general and administrative expenses" in addition to the disclosed management fee of $3,229,014 for DRMI as Common Expenses.

115.    Once again, the Board knew that this estimated amount was materially less than the amount actually charged in the previous years and knew that it was materially less than the amount DRI and its subsidiaries intended to charge in 2015 for Common Expenses.

116.    In fact, the actual amount directly and indirectly charged to PVCOA for Common Expenses in 2015, which is the last year for which Plaintiff has obtained access to

those charges—including DRI's Hidden Corporate Overhead Subsidies—was materially greater than the corresponding amounts estimated in that year's annual Budget.

117.    In fact, the actual amount of such charges in 2015 was ████████ (amount redacted in compliance with Records Inspection Action confidentiality order).

118.    For the years subsequent to 2015, PVCOA disseminated annual Budgets for the following estimated amounts for "assessment, billing and accounting fees" and "general and administrative expenses" as Common Expenses, combined:

  (i)        In 2016: $1,073,901;

  (ii)       In 2017: $992,905;

  (iii)      In 2018: $1,105,240; and

  (iv)      In 2019: $1,890,300.

119.    The actual amounts paid for those Common Expenses in the years 2016–present, and also presumably to reimburse DRI for its illicitly Hidden Corporate Overhead Subsidies included therein, was not disclosed in the Records Inspection Action and is otherwise unknown to Plaintiffs.

120.    However, upon Plaintiffs' information and belief, the amounts DRI actually charged PVCOA were and continue to be materially greater than the amount disclosed in each of PVCOA's subsequent annual Budgets.

121.    Confidential documents confirming the existence and amount of the Hidden Corporate Overhead Subsidies charged to PVCOA and the HOAs (referred to as "indirect corporate costs" in certain of those confidential documents) were disclosed by DRI only under compulsion of court order in Zwicky's Records Inspection Action, and were deliberately kept secret from Private Members by the Defendants.

122.    DRI's practice of keeping those costs concealed from Private Members was confirmed by PVCOA Director Wheeler in an affidavit filed in support of DRI's motion for an appellate stay of the Records Inspection Action's order:

> PVCOA [the Premiere Vacation Collection Owners Association] uses reasonable efforts to maintain the confidentiality of this information designated CONFIDENTIAL [including the "Indirect Corporate Costs" summary]. PVCOA does not share this information with the public or its general membership, however the information is made available to PVCOA's member officers and directors.

*Id.*

123.    In fact, PVCOA, even though it was a nonprofit entity, strenuously resisted disclosure of any document revealing how DRI passed on its Hidden Corporate Overhead Subsidies to Private Members, by asserting that the practice was a protected "trade secret" in Zwicky's Records Inspection Action, as further described below.

**E.  Annual Reports**

**1.  Annual Reports Prior to and During the Records Inspection Action**

124.    At the end of each year, PVCOA provides an audited "Consolidated Financial Report" containing a "Consolidated Statement of Revenues, Expenses and Changes in Fund Balance" (heretofore referred to as "**Annual Reports**"), which was accessible online to PVCOA's Private Members only if they persistently explored a labyrinth of vaguely labeled hyperlinks on DRI's website.

125.    The Annual Reports do not fully, understandably, or meaningfully disclose the nature or amount of PVCOA's annual assessment of DRI's Hidden Corporate Overhead Subsidies, or the amount of Hidden Corporate Overhead Subsidies imposed on HOAs and passed through as Common Expenses.

126.   In fact, the Annual Reports only generically describe these Hidden Corporate Overhead Subsidies under the labels "administrative costs" and "administration"; and the amounts reported under those labels grossly understate the actual amount of such subsidies.

### 2.   Annual Reports Subsequent to the Records Inspection Action

127.   In the most recent years for which PVCOA audited financial statements are available (2017–2019)—the years following the Records Inspection Action—there are cryptic references to "indirect corporate costs" charged as Common Expenses to PVCOA Private Members, but nowhere are these charges meaningfully defined or explained to Private Members, and nowhere is it communicated to Private Members in understandable terms that they were being charged Hidden Corporate Overhead Subsidies for the  internal overhead expenses of DRI or its affiliates, in addition to the management fees and administrative costs charged by DRMI.

128.   None of the more recent PVCOA audited financial statements in any manner disclose the Hidden Corporate Overhead Subsidies of DRI charged to the HOAs, major portions of which were indirectly and secretly passed on to PVCOA Private Members as purported Common Expenses of PVCOA.

129.   Plaintiff cannot provide further specificity in his allegations relating to the Annual Reports because the Records Inspection Action confidentiality order precludes him from doing so, as further described below.

## III.   CAUSES OF ACTION

### A.   COUNT I: FEDERAL CIVIL RICO

130.   All foregoing allegations are incorporated herein by reference.

131.   Defendants, and each of them, violated the federal Racketeer Influenced and Corrupt Organizations Act of 1970, 18 U.S.C. §§ 1961, *et seq.* ("RICO"), which renders it unlawful for "any person employed by or associated with any enterprise engaged in …

interstate … commerce ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

132.    Each Defendant is a "person" within the meaning of the RICO Act, 18 U.S.C. § 1961(3), because each Defendant is an "individual or entity capable of holding a legal or beneficial interest in property."

133.    PVCOA is a RICO "enterprise" because it is a "corporation, association, or other legal entity" within the definition of 18 U.S.C. § 1961(4) and because its existence is legally separate and distinct from the Defendants herein.

134.    Defendants, directly or indirectly, participated in the operation or management of the enterprise through a pattern of racketeering activity.

135.    Specifically, and as previously set forth, Defendants Magdos and Wheeler were Officers and Directors of PVCOA responsible for preparing and disseminating its annual Budgets and levying its Annual Assessments—including the illicit DRI Hidden Corporate Overhead Subsidies—while simultaneously acting as executive-level employees of DRI and acting under DRI's direction and control as its agents.

136.    Defendant DRMI, as PVCOA's property manager/Managing Agent and agent, undertook by delegation from the PVCOA Board to manage PVCOA's fiscal affairs and illicitly profited by the Hidden Corporate Overhead Subsidies that were imposed upon PVCOA Private Members in annual Budgets used to calculate Annual Assessments.

137.    Defendant DRI maintained absolute dominion and control of PVCOA and its finances by stacking the PVCOA Board with conflicted Directors and Managing Agents such that the Directors and DRMI wrongfully subordinated the collective interests of PVCOA's Private Members to the commercial interests of DRI, thereby rendering PVCOA a mere proprietary arm or instrumentality of DRI.

138.    DRI also illicitly profited from the fraudulent overcharges it concealed within the annual Budgets and billing statements disseminated to each Private Member—thereby inducing each Private Member, unbeknownst to him or her, to pay DRI's Hidden Corporate Overhead Subsidies included in the "Common Expenses" of PVCOA—because the Private Member could not use his or her Points at any Component Site within the Collection if he or she did not pay the Annual Assessments that compensated DRI for those "Common Expenses." Moreover, Private Members faced contractual liability to DRI (or its subsidiaries) for defaulting on their Annual Assessment or other obligations incident to their status as PVCOA Private Members.

### 1.    <u>Defendants' Predicate Acts: Federal Mail and Wire Fraud</u>

139.    Defendants knowingly and willfully participated in a scheme to defraud Private Members out of millions of dollars in violation of 18 U.S.C. §§ 1341 ("Mail Fraud") and 1343 ("Wire Fraud"), both being indictable predicate offenses under the RICO Act, 18 U.S.C. § 1961.

140.    Defendants, in violation of 18 U.S.C. § 1341, "obtain[ed] money … by means of false or fraudulent pretenses [or] representations."

141.    Specifically, Defendants used the United States Postal Service ("USPS") to mail fraudulent annual Budgets, which were included in the annual billing statements that DRI sent to Private Members in a self-addressed, stamped envelope and requested that Private Members remitted payments of Annual Assessments back by check and mail to avoid credit card charges.

142.    Defendants, in violation of 18 U.S.C. § 1343, similarly "obtain[ed] money … by means of false or fraudulent pretenses [or] representations" by means of "wire … communication."

24

143.     Specifically, Defendants, among other things, utilized the Internet to post on DRI's website (as accessible through each Private Member's password-protected online account), the fraudulent annual Budgets and billing statements; accepted payments of Annual Assessments via the Internet through electronic debit ("EFT") or credit card; and encouraged Private Members to utilize their "Surepay" program, under which DRI was authorized to automatically take monthly electronic payments from Private Members' bank accounts to pay their Annual Assessments.

144.     The annual Budgets included within those billing statements were an integral facet of Defendants' scheme, and therefore Defendants' scheme entailed the use of the mails, "wires," and other instrumentalities of interstate commerce to accomplish their illegal purposes.

145.     Specifically, the annual Budgets were substantially and materially misleading because they failed to disclose that massive sums of money—mischaracterized in those Budgets as "Common Expenses" of PVCOA—were not legitimate Common Expenses but were, in fact, DRI's Hidden Corporate Overhead Subsidies.

146.     The annual Budgets substantially and materially misled Private Members because the Budgets disclosed only a fraction of the amount of expenses that the Budgets characterized as "assessment, billing and accounting fees" and/or "general and administrative expenses," and was in fact charging DRI's Hidden Corporate Overhead Subsidies under the guise of those generic accounting labels and otherwise.

147.     Moreover, the Annual Reports available to Private Members through the DRI website were similarly misleading in that they reported only the payments made directly by PVCOA to DRI for such expenses while omitting any meaningful or understandable disclosure of the massive amounts of DRI's charges for its Hidden Corporate Overhead Subsidies assessed upon both the PVCOA level and the HOA level.

148.    The Hidden Corporate Overhead Subsidies of DRI were thus secretly passed through to each of PVCOA's Private Members.

149.    Defendants, and each of them, had a specific intent to defraud PVCOA's Private Members.

150.    Plaintiffs, and the current and former Private Members comprising the proposed class herein, justifiably relied upon Defendants' misrepresentations contained in the Annual Assessments billing statements and accompanying materials because the PVCOA Board had fiduciary duties to the Plaintiffs and the proposed class as PVCOA Directors and/or agents of PVCOA.

151.    PVCOA Private Members, as a practical matter, were completely dependent upon the PVCOA Board to exercise fiduciary duties of honesty and good faith in the promulgation of Budgets and levying of Annual Assessments because Private Members had no access to detailed financial records allowing them to scrutinize the accuracy and propriety of their Annual Assessments, except through the arduous and expensive pursuit of their inspection rights, which was an effort undertaken by Plaintiff Zwicky as detailed below.

## 2.    **Defendants' "Pattern of Racketeering Activity"**

152.    Defendants, in or about January of 2013, violated the federal mail fraud and wire fraud statutes by disseminating the annual 2013 PVCOA Budget through the internet and USPS; that Budget was materially misleading to Private Members because it concealed material amounts of DRI's Hidden Corporate Overhead Subsidies by disguising them as legitimate Common Expenses.

153.    Defendants, in or about January of 2014, repeated the identical conduct by disseminating the annual 2014 PVCOA Budget to Private Members, which similarly concealed material amounts of DRI's Hidden Corporate Overhead Subsidies by disguising them as legitimate Common Expenses.

154.   Defendants, in or about January of 2015, repeated the identical conduct involving similar material sums.

155.   Upon information and belief, Defendants initiated their illicit practice of imposing DRI's Hidden Corporate Overhead Subsidies to PVCOA's Private Members as Annual Assessments at the very inception of the Collection in its first annual Budget of 2011 and continue, to this day, to adhere to the same practice of imposing DRI's Hidden Corporate Overhead Subsidies upon PVCOA Private Members, thus illicitly improving DRI's profitability.

156.   Said allegation is made upon information and belief only because Plaintiffs do not have access to internal financial records for any years except 2013–2015; Plaintiffs, however, have a good faith, reasonable belief that Defendants' conduct took place in 2011–2012 and continues to this day.

157.   The basis for Plaintiffs' above belief is that the following:

(i)     DRI in its SEC filings, which were disclosed to DRI investors but not disclosed to PVCOA Private Members, described the System-Wide practice of shifting its corporate overhead expenses to Private Members as being a part of its basic business model;

(ii)     DRI, in those same SEC filings, disclosed that it imposed over $30 million in such charges in the year 2010; and

(iii)     Further, no annual Budget ever issued by PVCOA throughout its existence, including the 2019 Budget, discloses that practice to Private Members.

158.   Defendants' conduct thus constitutes a "pattern" of racketeering activity and Defendants committed at least two acts of such activity within ten years of each other within the meaning of 18 U.S.C. § 1961(5).

159.    Defendants' conduct thus also constitutes a "pattern" of racketeering activity for the further reason that Defendants' extraction of illicit Hidden Corporate Overhead Subsidies from PVCOA Private Members was done in furtherance of a basic plan of DRI and such acts were repetitive, continuous, and consistent—identical in nature and varying only in dollar amounts.

160.    Such acts comprise at least a "closed-ended" pattern encompassing the three-year period of 2013–2015 for which Plaintiffs currently have financial information; and upon information and belief, is an "open-ended" pattern because Defendants' conduct "projects into the future with a threat of repetition."

### 3.    Defendants' Conspiracy to Violate the RICO Act

161.    Defendants, and each of them, conspired with each other to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d).

162.    Each Defendant agreed, explicitly or tacitly, to secretly impose  Corporate Overhead Subsidies upon PVCOA Private Members by disguising them as legitimate "Common Expenses" so that PVCOA Private Members would believe that the PVCOA Board and DRMI were charging them only those legitimate expenses of PVCOA as defined by the Plan, and not any amount of DRI's Hidden Corporate Overhead Subsidies.

163.    Each Defendant substantially participated in and carried out this fraudulent scheme by actually disseminating—or approving the dissemination of—false and misleading annual Budgets and by collecting the fraudulent overcharges from Private Members via the Internet and USPS, year after year.

### 4.    Plaintiffs and the Proposed Class's Injury

164.    Plaintiffs—and members of the proposed class consisting of current and former Private Members of PVCOA—are "person[s] injured in [their] … business or property by

reason of a violation of section 1962" of the RICO Act, within the meaning of 18 U.S.C. § 1964(c).

165.    Specifically, Defendants fraudulently overcharged PVCOA Private Members approximately ███████ in 2013, ███████████ in 2014, and ██████████ in 2015 (amounts redacted per Records Inspection Action confidentiality order), which directly and proximately caused Plaintiffs and the proposed class actual harm in said amounts.

166.    Upon information and belief, Defendants, by means of the identical fraudulent scheme, overcharged Private Members by similar amounts in the prior Budget years 2011–2012 as well as subsequent Budget years (2016 and later) with the direct and proximate result that Plaintiffs and the proposed class sustained actual pecuniary loss during those specified years in similarly massive amounts.

167.    **WHEREFORE,** Plaintiffs, for themselves, and on behalf of all others similarly situated, pray for damages in the amount of the fraudulent overcharges imposed upon Private Members in PVCOA's Annual Assessments, with prejudgment interest, trebled pursuant to 18 U.S.C. § 1964(c), plus costs of suit and reasonable attorneys' fees.

## B.   COUNT II: ARIZONA CIVIL RACKETEERING

168.    Plaintiffs incorporate by reference and re-allege all foregoing paragraphs.

169.    Defendants' conduct, as previously mentioned, violates A.R.S. § 13-2312(B) ("Illegally Conducting an Enterprise") (hereinafter referred to as "**Arizona RICO**").

170.    Specifically, Defendants, and each of them, are or were "employed by or associated with any enterprise and conduct[ed] such enterprise's affairs through racketeering"; or, in the alternative, "participate[d] directly or indirectly in the conduct of any enterprise," each with actual knowledge that the enterprise was being "conducted through racketeering." *See* A.R.S. § 13-2312(B).

171.   PVCOA was and is an Arizona RICO "enterprise" within the meaning of A.R.S. § 13-2301(D)(2) because it is a "corporation … association … or other legal entity."

172.   Defendants' conduct constitutes a "pattern" of criminal activity, entailing repeated and systematic violations of A.R.S. § 13-2310 ("Fraudulent Schemes and Artifices"), which is a predicate offense under Arizona RICO. *See* A.R.S. § 13-2301(D)(4)(b)(xx).

173.   Specifically, Defendants, "pursuant to a scheme or artifice to defraud, knowingly obtain[ed] any benefit by means of false or fraudulent pretenses, representations, promises or material omissions" within the meaning of A.R.S. § 13-2310(A), as previously set forth herein.

174.   Reliance is not a necessary element of a claim under Arizona RICO. *See* A.R.S. § 13-2310(B).

175.    Defendants, and each of them, conspired and/or jointly participated in the fraudulent scheme such that each is vicariously liable for the acts of the other.

176.   Specifically, and as previously alleged, each individual Defendant named herein is directly liable or vicariously liable for the acts of others because he or she "authorized, requested, commanded, ratified or recklessly tolerated the unlawful conduct of the other," within the meaning of A.R.S. § 13-2314.04(L).

177.    Each corporate Defendant named herein is vicariously liable for the acts of the others because such Defendants, through "a director or high managerial agent performed, authorized, requested, commanded, ratified or recklessly tolerated the unlawful conduct of [its] agent[s]," within the meaning of A.R.S. § 13-2314.04(L).

178.   Plaintiffs, and other members of the proposed class consisting of current and former Private Members of PVCOA, "sustain[ed] reasonably foreseeable injury to [their] person, business or property by a pattern of racketeering activity, or by a violation of A.R.S. § 13-2312 involving a pattern of racketeering activity" within the meaning of A.R.S.

§ 13-2314.04(A) in that they were charged materially inflated amounts for Annual Assessments that included   DRI's Hidden Corporate Overhead Subsidies as "Common Expenses" in annual Budgets, year after year.

179.   Plaintiffs shall cause notice of this action and a copy of this Complaint to be served upon the Attorney General of the State of Arizona within thirty (30) days, in accordance with A.R.S. § 13-2314.04(H).

180.   **WHEREFORE**, Plaintiffs, for themselves, and on behalf of all others similarly situated, pray for actual damages in the amount of the fraudulent overcharges imposed in PVCOA's Annual Assessments, with prejudgment interest, trebled pursuant to A.R.S. § 13-2314.04(A); for costs of suit, including reasonable attorneys' fees; and for an injunction restraining and preventing Defendants' ongoing pattern of racketeering, pursuant to § 13-2314.04(B).

### C.   COUNT III: BREACH OF FIDUCIARY DUTY

181.   Plaintiffs incorporate by reference and re-allege all prior paragraphs.

182.   The Directors of PVCOA, a nonprofit corporation, had and have fiduciary duties to all PVCOA Private Members to adhere to fiduciary standards of conduct in the exercise of their responsibilities to PVCOA and its Private Members.

183.   The Director-Defendants Magdos and Wheeler breached their fiduciary duties to Plaintiffs and other Private Members of PVCOA by creating false and fraudulent annual Budgets and disseminating the same through the Internet and USPS.

184.   Such conduct was undertaken in furtherance of the conflicting interests of DRI—as the dominant member of PVCOA on its own behalf or as through subsidiaries and agents—and whom employed said Directors as executive-level employees, and to whom said Directors were beholden as agents thereof.

185.   **WHEREFORE**, Plaintiffs, for themselves, and on behalf of all others similarly situated, pray for damages or restitution in the amount of the Hidden Corporate Overhead Subsidies imposed in PVCOA's Annual Assessments, according to the proofs; for prejudgment interest; and for costs of suit, including reasonable attorneys' fees.

## IV.   (ALL COUNTS) DATE OF DISCOVERY & EQUITABLE TOLLING

186.   All foregoing allegations are incorporated by reference.

187.   Plaintiffs Abarca, Osborn, and Stryks-Shaw did not discover, and were not reasonably capable of discovering, the Defendants' illicit imposition of Hidden Corporate Overhead Subsidies in the Annual Assessments levied by PVCOA until after this lawsuit was filed and after the allegations became matters of public knowledge (this action was commenced in the Superior Court of Maricopa County, Arizona on August 21, 2020, and subsequently removed to this Court).

188.   Prior to the commencement of this lawsuit, PVCOA's practice of imposing DRI's Hidden Corporate Overhead Subsidies on Private Members was discovered by Plaintiff Zwicky, only through the legal enforcement of his rights to inspect the books and records of PVCOA.

189.   Specifically, in April of 2015, Plaintiff Zwicky, following an unsuccessful attempt to obtain adequate voluntary disclosures of financial records from the PVCOA Board, filed the Records Inspection Action.

190.   In the Records Inspection Action, Zwicky contended that he had a good faith, reasonable basis for inspecting the books and records of PVCOA; he advised the Superior Court that his Annual Assessments had become so exorbitant as to render his Points and initial investment in his Points Certificate worthless and he thus sought inspection to determine whether the inflation of his Annual Assessments was the result of managerial misfeasance or

malfeasance, while acknowledging to the Superior Court that he had no evidence of actual wrongdoing at the time.

191.    PVCOA opposed disclosure of critical financial documents (including those revealing the nature and amount of the practice of shifting DRI's Hidden Corporate Overhead Subsidies onto Private Members) on the basis that the information sought was proprietary and constituted protected "trade secrets."

192.    On May 6, 2016, Zwicky's request for summary judgment was granted in the Records Inspection Action and the court ordered that certain PVCOA records be disclosed; the court further ordered, on an interim basis, as follows:

> [A]ll documents and records provided to the plaintiff pursuant to this order, and the information in those documents, shall be maintained in confidence by the plaintiff and not disclosed to anyone except the plaintiff, his current attorneys and any attorneys with whom they be discussing potential future representation of the plaintiff …
>
> The Court is of the view that it may well be appropriate for the plaintiff to be permitted to disclose this information in other forums including other litigation, government agencies and so on but those matters are not before the Court now.

*Id.*

193.    On June 6, 2016, PVCOA produced certain records that revealed the existence and extent of the Defendants' practice of imposing DRI's Hidden Corporate Overhead Subsidies (referred to in confidential internal documents as "indirect corporate costs") onto PVCOA Private Members as illegitimate "Common Expenses" for the Budget Years 2013–2015 and the dollar amounts of such costs on both the level of the PVCOA and the HOAs.

194.    At that time, and not before, Plaintiff Zwicky acquired the requisite evidence of wrongdoing necessary to proceed with this substantive litigation.

195.    On August 19, 2016, the court, upon Zwicky's motion, modified its May 6, 2016 protective order "to permit the plaintiff or his attorneys to quote or refer to the

information produced in connection with this litigation in a complaint or other court filing in the proposed class action litigation."

196.    PVCOA timely appealed, and successfully obtained an appellate-level stay of the Superior Court's August 19, 2016 order.

197.    By order of the Arizona Court of Appeals dated March 22, 2017, Zwicky was "enjoined from disclosing, using, or relying on any documents designated confidential by appellant for any purpose during the pendency of this appeal pending further order of this court."

198.    In its published decision of January 23, 2018, *Zwicky v. Premiere Vacation Collection Owners Ass'n*, 244 Ariz. 228, 418 P.3d 1001 (App. 2018), the Arizona Court of Appeals upheld Zwicky's rights of inspection, but reversed the Superior Court's August 19, 2016 order which allowed use of the disclosed information for substantive litigation purposes and remanded the matter to the trial court "to evaluate the need for a continued protective order covering the confidential documents."

199.    After further litigation on the confidentiality issue on remand, the trial court on August 23, 2018 entered a Stipulated Order (mirroring the terms of the Court's prior minute entry), which provided, in material part, that Zwicky was permitted to:

> [U]se the information covered by the protective order to formulate his proposed complaint. For example, the protective order will not prevent the Plaintiff from alleging in a complaint that the management costs that the members were actually paying were materially greater than what was disclosed.

*Id.*

200.    However, the Superior Court further ordered:

> [T]he portion of the Court's previous order permitting the Plaintiff and his attorneys to quote confidential information in a complaint or other court filing in other litigation will not be reinstated. Plaintiff may not quote from or attach the confidential documents to a complaint and may not include specific numerical

> figures derived from the confidential documents in a complaint. The Plaintiff may verbally describe the allegations based on that information.

*Id.*

201.    Plaintiff Zwicky, as stated, thus discovered Defendants' malfeasance on June 6, 2016, but was forbidden by court order, including the stay issued by the Court of Appeals, from disclosing or utilizing such information for any purpose until August 23, 2018.

202.    The Court should thus equitably toll the statute of limitations as to Plaintiff Zwicky on all causes of action until August 23, 2018.

203.    The Court should further determine that the statute of limitations as to Plaintiffs Abarca, Osborn, and Stryks-Shaw did not begin to run until August 21, 2020, which is the earliest date that said Plaintiffs had actual or constructive knowledge of any legal injury.

## V.    (ALL COUNTS) CLASS TREATMENT

204.    The proposed class members (hereinafter, referred to as the "**Class**") are readily ascertainable under an objective standard—they are Private Members of PVCOA that paid or incurred Annual Assessments in years in which the Annual Assessments contained DRI's Hidden Corporate Overhead Subsidies.

205.    The number and identity of the Class are determinable from the records of Defendants.

206.    For purpose of notice and other purposes related to this action, the names and addresses of the Class are readily available from Defendants.

207.    Notice to the Class can be provided by means permissible under Rule 23 of the Federal Rules of Civil Procedure.

208.    All Plaintiffs are, in fact, members of the Class—they are Private Members of PVCOA that paid or incurred Annual Assessments in years in which the Annual Assessments contained Hidden Corporate Overhead Subsidies.

209.    All Plaintiffs have standing to bring this matter on behalf of the Class and their claims are ripe; their payment of Annual Assessments caused concrete injuries and the monetary compensation they request shall effectively grant them relief from said injuries.

**A.   Class Numerosity**

210.    The Class consists of approximately 25,000 current and former Private Members of PVCOA.

211.    General knowledge and common sense indicate that the numerosity of the Class makes joinder of all of the individuals in the Class impracticable; upon information and belief, the Class is geographically dispersed and Private Members have individual claims likely too small to make individual litigation against Defendants feasible.

212.    Moreover, the evidence necessary to successfully prosecute an individual action would not be readily accessible to persons other than the putative class representatives, inasmuch as such evidence remains subject to the Records Inspection Action protective order, which has not been vacated or modified by this Court. Such individuals would be compelled to "reinvent the wheel," so to speak, in proving their claims.

**B.   Class Commonality**

213.    There are questions of fact and law common to all members of the Class that will generate common answers apt to drive the resolution of this matter, including:

(i)      Whether the annual PVCOA Budgets, assessment billing statements, and financial statements fraudulently concealed the practice of imposing DRI's Hidden Corporate Overhead Subsidies to the Class;

(ii)     Whether each of the Defendants knowingly engaged in a fraudulent scheme to overcharge the Class through that practice;

(iii)    Whether PVCOA is a RICO "enterprise";

(iv)       Whether the Defendants' conduct constitutes the requisite "pattern of racketeering activity" for purposes of federal and Arizona RICO;

(v)        Whether the participation of each Defendant in that fraudulent scheme was sufficient in character and degree to support the imposition of either direct liability or vicarious liability under principal-agent, joint tortfeasor, and/or civil conspiracy principles;

(vi)       Whether the Class received similar material misrepresentations and omissions from Defendants, causing an injury to the Class;

(vii)      The years in which the Annual Assessments contained Hidden Corporate Overhead Subsidies; and

(viii)     Whether the Class was damaged by the alleged inclusion of Hidden Corporate Overhead Subsidies in Annual Assessments the Class paid or incurred.

214.   Although there is variation in the amount of damages to each member of the Class, there is commonality because the Class shares significant questions of law and fact arising out of their common claims against the Defendants; in other words, the computation of Private Members' damages will be a ministerial exercise utilizing a universal, simple mathematical formula, once the aggregate amount of damages has been determined by the jury for each year.

215.   A limited exception to commonality exists with respect to certain Private Members—limited in eligibility and participation—who claimed benefits and may have signed mutual releases in connection with the Arizona Attorney General's proceedings against DRI for enforcement of the Arizona Consumer Fraud Act, A.R.S. §§ 44-1521, *et seq.,* and the "Assurance of Discontinuance" agreed upon by DRI in 2016.

216.   In settlement of those claims advanced by the Arizona Attorney General, DRI paid a total of $800,000 and agreed to allow eligible consumers to cancel their PVCOA memberships.

217.   Upon information and belief, the Arizona Attorney General's action and the settlement will have a minimal impact on the present action and will reduce the number of the Class by a few hundred individuals, at most.

218.   A further limited exception may exist for a limited number of former Private Members whom DRI voluntarily allowed to cancel their memberships or who were defendants in an action for collection of delinquent Annual Assessments or other obligations incident to their status as PVCOA Private Members that was adjudicated in DRI's favor in a preclusive final judgment and/or settled in a proceeding in which the parties executed global releases.

219.   Upon information and belief, the number of Private Members fitting these categories is also very small in relation to the overall Class proposed herein.

220.   A further limited exception to the Class may exist to the extent that individual Private Members of PVCOA may have agreed to mandatory arbitration with Defendants; at present, Plaintiffs do not know the number of Private Members, if any, who have agreed to engage in arbitration with Defendants related to the cause(s) of action stated herein. Plaintiffs also do not know whether Defendants intend to waive compulsory arbitration, which is an affirmative defense.

221.   Upon information and belief, the number of Private Members fitting that category is also very small in relation to the overall Class proposed herein or may be nonexistent if no such Private Members have agreed to mandatory arbitration with Defendants related to the allegations stated herein.

222.    Further—should such Private Members meeting the above categories exist—they may be readily excluded from the Class definition upon the discovery of evidence within Defendants' possession and/or control, all without substantially impairing the basic integrity or numerosity of the proposed Class as a whole.

### C.    Class Typicality

223.    The claims of the Plaintiffs are typical or reasonably coextensive of the claims or defenses of the Class; Defendants' racketeering conduct, breach of fiduciary duty, and pattern of fraudulent activity injured the Class on grounds equally applicable to the entire Class, making final relief appropriate to the Class as a whole.

224.    The interests of the named Plaintiffs align with the interests of the Class; adjudication of Defendants' liability to Plaintiffs through Defendants' aforementioned racketeering activities and breach of fiduciary duty will adjudicate Defendants' liability to the entire Class.

225.    The nature of the named Plaintiffs' claims against Defendants—and Defendants' affirmative defenses against Plaintiffs, if any—are typical of the Class; in other words, the same course of Defendants' racketeering conduct and breach of fiduciary duty injured each named Plaintiff in the same or similar fashion as each member of the Class.

226.    If any affirmative defenses apply to any of the named Plaintiffs, they will not be a major focus of the litigation.

227.    In fact, the liability claims of those in the Class appear to be identical with variations only as to the amount of damages as described above.

### D.    Plaintiffs' Adequacy

228.    Plaintiffs are able to fairly and adequately protect the interests of the Class and have no interests antagonistic to the same.

229.    Plaintiffs and current counsel have no serious conflicts of interest with the Class that go to the heart of the litigation such that said conflicts threaten to become the focus of the litigation; specifically, Plaintiffs have not accepted any offers of settlement from Defendants or their agents or incentive payments from current counsel or their agents.

230.    Furthermore, Plaintiff Zwicky and his current Arizona-licensed counsel, have already devoted years to enforcing his rights in the Records Inspection Action, without which the essential facts giving rise to this action would not have been uncovered.

231.    Plaintiffs are represented by attorneys who are, collectively, experienced and competent in class actions, complex litigation, and timeshare consumer rights litigation through the representations of timeshare associations comprised of thousands of members; counsel for Plaintiffs, collectively, are willing and able to devote the legal and financial resources necessary for the successful prosecution of this action.

**E.  Predominance**

232.    This matter is suitable for certification under Rule 23(b)(3) of the Federal Rules of Civil Procedure because Plaintiffs request monetary relief.

233.    Questions of fact and law predominate throughout the Class such that, if each member of the Class brought Plaintiffs' claims and facts in an individual action against Defendants, the claims and facts would be sufficient to sustain a jury finding as to Defendants' liability.

234.    Specifically, the same factual evidence will suffice for each member of the Class to make a prima facie showing of Defendants' liability—in other words, Defendants injured the entire Class, including named Plaintiffs, through the same course of racketeering conduct and breach of fiduciary duty.

235.    Moreover, each member of the Class had a largely uniform experience with Defendants' material omissions or misrepresentations through the course of Defendants'

conduct of including DRI's Hidden Corporate Overhead Subsidies in the Annual Assessments; every member of the Class—based solely on the fact that they were Private Members of PVCOA—received the same Annual Assessment billing statements and related materials that failed to disclose or misrepresented Defendants' practice of inflating Common Expenses with Hidden Corporate Overhead Subsidies of DRI.

236.    Additionally, each Class members' individual damages caused by Defendants' conduct was based upon the amount of Points each Private Member possessed for that year, and the amount of his or her "Points" provides the basis for calculating his or her pro rata share of PVCOA's total Annual Assessments for that year.

237.    In other words, once the aggregate amount of improper charges imposed by PVCOA in any given year has been established by the factfinder, the improper charges falling upon each individual Private Member is readily determinable by the same simple fraction used to determine the Private Member's pro rata share of total Common Expenses.

238.    The information necessary to determine each Class member's damages per year—the Class member's specific years of PVCOA membership, the number of Points owned, the total number of outstanding PVCOA Points, the amount of Annual Assessments each Class member paid or incurred, and the percentage by which Defendants inflated Annual Assessments—are in Defendants' possession as internal documents that already exist or may be easily generated using underlying data files.

239.    Further, the Class definition is not so broad as to include any great number of Class members that could not have been harmed by Defendants' conduct; every Class member that paid or incurred Annual Assessments during the years in which Defendants included Hidden Corporate Overhead Subsidies in Budgets was injured by Defendants through the artificial inflation of Annual Assessments.

240.    Common legal issues central to the litigation also predominate: most of the elements of liability for Plaintiffs' claims are judged by an objective legal standard, such as the materiality of Defendants' omissions or misrepresentations.

241.    Finally, damages are readily capable of measurement on a classwide basis such that, with further discovery, a simple and reliable mathematical formula—based upon the Private Member's years of PVCOA membership, the number of Points owned, the total number of outstanding PVCOA points, the amount of Annual Assessments each Private Member paid or incurred, and the percentage by which Defendants inflated Annual Assessments—can serve as classwide evidence of damages and related penalties which reach only the injuries attributable to Defendants' liability to the Class.

## F.   Superiority of Class Litigation

242.    Class action treatment is the superior method of adjudication of these claims against Defendants; it will meet the objectives of the Class and redress their injuries, thereby permitting a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that individual actions would entail.

243.    Further, the Class members do not have a large interest in individually controlling separate actions because the dollar amounts of each individual claim are too small to economically justify individual litigation efforts against these well-funded corporate Defendants with the result that the vast majority of the individual claims of the Class would otherwise go unremedied.

244.    As additionally revealed by the long and expensive course of Zwicky's Records Inspection Action, even those Class members with larger claims would have litigation costs dwarfing the amount of their respective recoveries, thus showing that there is little to no

incentive for any individual member of the Class to bring a solo action to prosecute the claims against Defendants.

245.    Individual litigation would also pose a risk of inconsistent adjudications on identical facts and identical legal issues because Defendants' largely uniform course of conduct gave rise to each Class member's injury.

246.    Upon information and belief, the broad geographic dispersion of the Class makes class adjudication the superior method of determining Defendants' liability by minimizing the risk of inconsistent judgments in different jurisdictions based upon diverging precedents, if applicable, and further promotes judicial economy and substantial notions of fair play and due process by subjecting Defendants to the jurisdiction of a single forum that is also the locus of their course of their racketeering conduct and breach of fiduciary duty through an Arizona non-profit organization, PVCOA, which served as a RICO enterprise.

247.    Upon information and belief, no other class litigation has been successful against Defendants based upon these predominating common facts and legal theories of liability and, if such litigation currently exists, those of the Class already a party to other litigation may be excluded from this putative Class without defeating numerosity or otherwise making class adjudication a less efficient way of reducing litigation costs and promoting judicial economy.

248.    Adjudication under Federal and Arizona RICO statues is the superior method of determining Defendants' liability to the Class because the legislative intent in enacting and allowing the statutory damages provisions in those statutes was to deter racketeering conduct.

249.    The proposed Class is judicially manageable in that the Court routinely certifies larger and more complex classes and, here, common facts and a simple mathematical formula can determine damages on a classwide basis.

250.   For the foregoing reasons, class treatment represents the most efficient and effective use of the Court's limited resources and the most efficient and effective way of vindicating the rights of Private Members of PVCOA whom comprise this Class.

251.   **WHEREFORE,** Plaintiffs for themselves, and on behalf of all others similarly situated, respectfully pray for certification of the class treatment of all foregoing claims mentioned herein pursuant to Rule 23(b)(3), Federal Rules of Civil Procedure.

RESPECTFULLY SUBMITTED this 13th day of August, 2021.

*/s/ Jon L. Phelps* (with permission)
Jon L. Phelps (027152)
Robert Moore (013338)
Jennie I. Tetreault (035566)
PHELPS & MOORE PLLC
7430 East Butherus Drive, Suite A
Scottsdale, AZ 85260
(480) 534-1400
jon@phelpsandmoore.com
rob@phelpsandmoore.com
jennie@phelpsandmoore.com

*/s/ Edward L. Barry*
Edward L. Barry (005856)
2120 Company Street, Third Floor
Christiansted, Virgin Islands 00820
(340) 719-0601, ed.barry.legal@gmail.com
***Attorneys for Plaintiff***

# **V E R I F I C A T I O N**

In accordance with A.R.S. § 13-2314.04(O) & (P), the undersigned certifies that he has carefully read the foregoing Third Amended Complaint and, based on a reasonable inquiry, believes all of the following:

1.      It is well grounded in fact;

2.      It is warranted by existing law or there is a good faith argument for the extension, modification or reversal of existing law; and

3.      It is not made for any bad faith, vexatious, wanton, improper or oppressive reason, including to harass, to cause unnecessary delay, to impose a needless increase in the cost of litigation or to force an unjust settlement through the serious character of the averments.

*/s/ Edward L. Barry*
Edward L. Barry (005856)
2120 Company Street, Third Floor
Christiansted, Virgin Islands 00820
(340) 719-0601, ed.barry.legal@gmail.com
***Counsel for Plaintiff***
