**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Norman Zwicky, et al., | No. CV-20-02322-PHX-DJH |
| Plaintiffs, | **ORDER** |
| v. | |
| Diamond Resorts Management Incorporated, et al., | |
| Defendants. | |

In August 2021, Plaintiffs filed a Third Amended Class Action Complaint ("TAC") (Doc. 109) per the parties' stipulation. (Doc. 104). In October 2021, the parties sought a 60-day stay of the case so they could engage in mediation (Doc. 117), which the Court granted. (Doc. 118). During the stay, Defendants filed an Answer (Doc. 119) and the parties filed a "Joint Notice on Outcome of Mediation Advising the Court of Settlement" (Doc. 120). Now pending before the Court is Plaintiffs' Unopposed Motion for Preliminary Certification of Class for Settlement Purposes Only, Preliminary Approval of Settlement, and Approval of Notice (Doc. 129). For the following reasons, the Court will grant in part and deny in part Plaintiffs' Unopposed Motion.

**I.    Background[1]**

At the crux of the TAC is Plaintiffs' claim that Defendants imposed hidden corporate overhead expenses upon Plaintiffs through fraudulent annual budgets and reports, which ultimately rendered Plaintiffs' timeshare interests as worthless. Plaintiffs

---

[1] Because the Court discussed at length the background of this case in its prior Order (Doc. 102 at 1–5), the Court only briefly recounts that background here.

Norman Zwicky ("Zwicky"), George Abarca ("Abarca"), Vikki Osborn ("Osborn"), and Elizabeth Stryks-Shaw ("Stryks-Shaw") (collectively "Plaintiffs" or "Class Representatives") are among approximately 25,000 current or former owners of timeshare interests ("Owners") acquired[2] or sold by Defendant Diamond Resorts International, Inc. ("DRI").[3] (Doc. 109 at ¶ 12). These timeshares are part of DRI's Premier Vacation Collection (the "Collection"), a group of resorts located in Arizona, Colorado, Indiana, Nevada, and Baja, Mexico. (*Id.* at ¶ 14–15). The Owners are also members of the Premiere Vacation Collection Owners Association ("PVCOA"). (*Id.* at ¶ 13). ILX Acquisition, a subsidiary of Defendant DRI, is a member of the PVCOA that holds a "Bulk Membership" consisting of DRI's unsold timeshare inventory. (*Id.* at ¶ 61). Defendant Diamond Resorts Management, Inc. ("DRMI") is a property management company and wholly owned subsidiary of DRI that continues to serve as the managing agent ("Manager") of PVCOA. (*Id.* at ¶ 77). Defendants Troy Magdos and Kathy Wheeler (collectively the "Defendant Individuals") are employees of DRI who also served as Officers on the Board of Directors of PVCOA (the "PVCOA Board"). (*Id.* at ¶¶ 4, 97, 99).

### A.    The History of the Timeshare Dispute

Each Owner's timeshare interest amounts to a "Points Certificate" comprised of a specified number of points purchased by each respective Owner. (*Id.* at ¶¶ 17, 19). These points serve as the basis for calculating an Owner's "Reservation Privileges,"[4] which can only be invoked if the Owner pays his or her annual assessments and fees levied by PVCOA. (*Id.* at ¶¶ 19, 23). When acquiring a Points Certificate, each Owner makes a life-

---

[2] Some of the Owners own time share interests in a property held by the now dissolved and defunct corporation, ILX Resorts Incorporated. (Doc. 109 at ¶¶ 37–38). When ILX Resorts Incorporated filed for bankruptcy, a subsidiary of Defendant Diamond Resorts Incorporated named ILX Acquisition acquired ILX Resorts Incorporated's interest in the property. (*Id.* at ¶¶ 39–41). The property then became a part of Defendant's Premier Vacation Collection. (*Id.*)

[3] Hilton Grand Vacations Borrower, LLC, a Delaware limited liability company, is the successor by merger to DRI and is therefore included in the term "DRI" as used throughout this Order. (Doc. 129 at 1 n.2).

[4] Reservation privileges entail the non-exclusive right to book accommodations and experiences at resorts within the Collection on a first-come, first-serve basis. (Doc. 109 at ¶ 19).

long and "irrevocable contractual commitment" to pay the annual assessments[5] and fees as calculated by the PVCOA Board with the assistance of DRMI. (*Id.* at ¶¶ 21–23).

The history of this lawsuit began in August 2015 when Zwicky filed suit in the Maricopa County Superior Court seeking to enforce his statutory and common law inspection rights as a PVCOA member. *See Zwicky v. Premiere Vacation Collection Owners Ass'n*, No. CV2015-051911 (Ariz. Super. 2015) ("State Inspection Action"). Zwicky noticed that the annual assessments and fees issued by PVCOA to Owners at the end of 2010 were "'materially' higher" than what was estimated in the PVCOA's reported budget, and this practice continued through 2015. (Doc. 102 at 3). Zwicky alleged the reason for this difference is "because DRI slipped a 'substantial portion' of its own corporate overhead charges into DRMI's management fee, which was then charged to PVCOA and subsequently passed on to PVCOA members . . . . but not to DRI shareholders." (*Id.*) The Maricopa County Superior Court ordered PVCOA to disclose certain records to Zwicky and allowed him to refer to the documents in filing a complaint. *Zwicky v. Premiere Vacation Collection Owners Ass'n*, No. CV2015-051911, 2016 WL 11475065 (Ariz. Super. Sep. 15, 2016). However, on appeal, the Arizona Court of Appeals enjoined Zwicky from disclosing any documents that PVCOA had deemed confidential and ultimately reversed the superior court's order. *Zwicky v. Premiere Vacation Collection Owners Ass'n*, 418 P.3d 1001 (Ariz. Ct. App. 2018).

In August 2020, Zwicky filed a class action complaint against Defendants in Maricopa County Superior Court. *Norman Zwicky v. Diamond Resorts, Inc., et al*, No. CV2020-010141 (Ariz. Super. 2020). Defendants DRI and Wheeler removed the action to this Court in December 2020. (Doc. 1). Zwicky subsequently joined three other Owners and PVCOA members, Abarca, Osborn, and Stryks-Shaw, as Plaintiffs in August 2021. (Doc. 129-1 at 7–8). Plaintiffs bring three causes of action in the TAC: Count I against all

---

[5] Annual assessments are calculated by "dividing the [Owner's] number of points by the number of total outstanding points . . . plus a flat fee[.]" (Doc. 109 at ¶ 21). The PVCOA Board levies and collects annual assessments from Owners to "defray their pro rata share of budgeted Common Expenses on a tax-exempt basis under 26 U.S.C § 528(d)(3) pursuant to an annual budget[.]" (Doc. 109 at ¶ 69).

Defendants for violation of the Federal Racketeering Influenced and Corrupt Organization Act ("Federal RICO"), 28 U.S.C. §§ 1961 et seq.; Count II against all Defendants for violation of the Arizona Civil Racketeering Statute ("Arizona RICO"), A.R.S. § 13-2312(B); and Count III against Defendant Individuals only for breach of fiduciary duty. (Doc. 109 at ¶ ¶ 130–85).

## B.    The Parties' Proposed Settlement Agreement

The parties engaged in mediation with the Honorable Edward A. Infante (Ret.)[6] (the "Hon. Infante") (Doc. 117 at 2) and reached an agreement on November 4, 2021, to resolve this case in its entirety on a class wide basis. (Doc. 120 at 3). The parties executed a settlement term sheet (the "term sheet") at the conclusion of the mediation setting forth the primary principles of the settlement (*Id.*) and subsequently memorialized their final agreed upon terms in the proposed "Settlement Agreement and Release" (the "Proposed Settlement Agreement" or "Agreement") (Doc. 129-1). Plaintiffs' Unopposed Motion asks this Court to preliminarily certify the class for settlement purposes only; to appoint Plaintiffs as class representatives; to appoint Plaintiffs' counsel as class counsel; to preliminarily approve the Proposed Settlement Agreement; and to approve the proposed class notice program. Although Defendants dispute all allegations of wrongdoing and deny liability of any kind, Defendants agree to settlement to avoid the uncertainty and the attendant time and expense associated with continued litigation. (Doc. 129 at 3).

The parties signed the Proposed Settlement Agreement in April 2022. The Proposed Class of approximately 26,5000 members is defined as:

> [A]ll current and former [m]embers of the [PVCOA] who were assessed Assessments for any Calendar year(s) from 2011 through and including 2022, excluding ILX [Acquisition] and any entity that received any bulk transfer/assignment of ILX [Acquisition]'s Bulk Membership in the [PVCOA]. Excluded from the Class are DRI, DRM, their parents, subsidiaries, successors, affiliates, current officers and directors and all

---

[6] Judge Infante is a current mediator with Judicial Arbitration and Mediation Services, Inc. ("JAMS") former Chief Magistrate Judge of the United States District Court,  Northern District of California, and a former Magistrate Judge in the United States District Court, Northern District of California. (Doc. 117-1 at 2–6).

judges assigned to the [a]ction and their immediate family members.[7]

(Doc. 129-1 at 11). The Agreement provides for both monetary and nonmonetary terms in order to resolve all claims. First, Defendants DRI and DRMI (collectively the "Corporate Defendants") will pay $13,000,000.00 common cash into the Settlement Fund. (*Id.* at 18).[8] The parties propose the following initial payments be made from the Fund: (1) four Service Awards — $10,000.00 to Zwicky and $1,500.00 each to Abarca, Osborn, and Stryks-Shaw; (2) costs of class notice settlement administration; and (3) attorneys' fees and litigation costs. (Docs. 129 at 4; 129-1 at 18–19). The remainder of the Fund will then be distributed *pro rata* to all Proposed Class Members who do not opt-out of the settlement based on the total dollar amount of assessments each Class Member was assessed for calendar years 2011 through and including 2022. (Doc. 129-1 at 38).

Second, the Corporate Defendants agree to non-monetary terms that ensure PVCOA will only engage DRM, or any of its affiliates, as its Manager pursuant to a written Management Contract that complies with all "Management Requirements"[9] as listed in the Agreement. (*Id.* at 22). DRM will propose an amended Management Contract to the PVCOA Board on or before February 28, 2024 that (1) discloses the calculation of the "Management Fee" payable by the PVCOA to its Manger; (2) limits the Management Fee to not exceed 15%[10] of the total assessments assessed upon PVCOA members each Fiscal Year; (3) imposes reporting requirements in compliance with all Management Requirements with respect to the preparation of itemized annual operating and reserve budgets, and the provision of such budgets to PVCOA members; and (4) requires budgets and financial statements to disclose all common expenses and operating costs of the Collection, any related party transaction disclosures, and any material reimbursement or

---

[7] Defendants agree to certification of this Proposed Class for settlement purposes only. (Doc. 129-1 at 19).

[8] The Agreement exempts the Defendant Individuals from "funding any portion of the Settlement Fund, or paying any other cost, fee, tax or other charge arising out of or in connection with this Agreement." (*Id.* at 18).

[9] The Management Requirements are comprised of Arizona Timeshare Owners' Association and Management Act (A.R.S. § 33-2201 et. seq.); the Arizona Real Estate Timeshares Act (A.R.S. § 33-2197 et. seq.); and all Collection Instruments. (*Id.* at 22).

[10] This percentage cap is subject to amendment (*Id.* at 23).

absorption or allocation of internal expenses of the Manager. (*Id.* at 22–24).

Pursuant to the terms of the Agreement, Plaintiffs and the Proposed Class release all claims of any kind or nature, known or unknown, that they may have as a result of the costs, fees, expenses, and assessments charged or billed by the Corporate Defendants that are the subject of this lawsuit. (*Id.* at 40–41). While not a party to this lawsuit, PVCOA also agrees to be bound by this release. (*Id.* at 41).

## II.   Legal Standard

The Ninth Circuit has declared a strong judicial policy that favors settlement of class actions. *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992); *Hyundai and Kia Fuel Economy Litig.*, 926 F.3d 539, 556 (9th Cir. 2019).  Nevertheless, where, as here, "parties reach a settlement agreement prior to class certification, courts must peruse the proposed compromise to ratify both [1] the propriety of the certification and [2] the fairness of the settlement." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003); *see also In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 949 (9th Cir. 2011) (holding when parties seek approval of a settlement negotiated prior to formal class certification, "there is an even greater potential for a breach of fiduciary duty owed the class during settlement").

When parties seek class certification only for the purposes of settlement, the Court "must pay 'undiluted, even heightened, attention' to class certification requirements" because, unlike in a fully litigated class action suit, the court will not have future opportunities "to adjust the class, informed by the proceedings as they unfold." *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 620 (1997); *accord Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). The parties cannot "agree to certify a class that clearly leaves any one requirement unfulfilled," and consequently the court cannot blindly rely on the fact that the parties have stipulated that a class exists for purposes of settlement. *Berry v. Baca*, 2005 WL 1030248, at *7 (C.D. Cal. May 2, 2005); *see also Amchem*, 521 U.S., at 622 (observing that nowhere does Rule 23 say that certification is proper simply because the settlement appears fair). In conducting the second part of its inquiry, the "court must

carefully consider 'whether a proposed settlement is fundamentally fair, adequate, and reasonable,' recognizing that '[i]t is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness . . . .'" *Staton*, 327 F.3d at 952 (*quoting Hanlon*, 150 F.3d at 1026); *see also* Fed. R. Civ. P. 23(e) (outlining class action settlement procedures).

Procedurally, the approval of a class action settlement takes place in two stages. In the first stage of the approval process, "the court preliminarily approve[s] the Settlement pending a fairness hearing, temporarily certifie[s] the Class . . . , and authorize[s] notice to be given to the Class." *West v. Circle K Stores, Inc.*, 2006 WL 1652598, at *2 (E.D. Cal. June 13, 2006) (*quoting In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 227 F.R.D. 553, 556 (W.D. Wash. 2004)). Therefore, in this Order the Court will only "determine [ ] whether a proposed class action settlement deserves preliminary approval" and lay the groundwork for a future fairness hearing. *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004). At the fairness hearing, after notice is given to the Proposed Class members, the Court will entertain any of their objections to (1) the treatment of this litigation as a class action and/or (2) the terms of the Settlement Agreement. *See Diaz v. Trust Territory of Pac. Islands*, 876 F.2d 1401, 1408 (9th Cir. 1989) (holding that prior to approving the dismissal or compromise of claims containing class allegations, district courts must, pursuant to Rule 23(e), hold a hearing to "inquire into the terms and circumstances of any dismissal or compromise to ensure that it is not collusive or prejudicial"). Following the fairness hearing, the Court will make a final determination as to whether the parties should be allowed to settle the class action pursuant to the terms agreed upon. *DIRECTV*, 221 F.R.D. at 525.

## III.   Discussion

The Court will first consider whether the parties' Proposed Class meets all class certification requirements. The Court will then examine the fairness and adequacy of the parties' Proposed Settlement Agreement. Lastly, the Court will consider the proposed notice program set forth in the Agreement.

### A.      Preliminary Certification of the Settlement Class

A class action will only be certified if it meets the four prerequisites identified in Federal Rule of Civil Procedure ("Rule") 23(a) and additionally fits within one of the three subdivisions of Rule 23(b). Although a district court has discretion in determining whether the moving party has satisfied each Rule 23 requirement, *Califano v. Yamasaki*, 442 U.S. 682, 701 (1979); *Montgomery v. Rumsfeld*, 572 F.2d 250, 255 (9th Cir. 1978), the Court must conduct a rigorous inquiry before certifying a class. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982); *E. Tex. Motor Freight Sys. v. Rodriguez*, 431 U.S. 395, 403–05 (1977).

As noted above, despite the parties' agreement that a class exists for the purposes of settlement, this does not relieve the Court of its duty to conduct its own inquiry. *Mathein v. Pier 1 Imports (U.S.), Inc.*, 2017 WL 6344447, at \*7 (E.D. Cal. Dec. 12, 2017). Typically, when parties settle before the class is certified, the court is denied adversarial briefs on the class certification issue. *Id.* Therefore, although Defendant agrees that class treatment is appropriate for purposes of settlement only, the Court must nonetheless decide whether the issues in this case should be treated as class claims pursuant to Rule 23. *Id.*

#### 1.      Rule 23(a)

Rule 23(a) restricts class actions to cases where:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). These requirements are more commonly referred to respectively as numerosity, commonality, typicality, and adequacy of representation. *Hanlon*, 150 F.3d at 1019. The Court will address each requirement in turn.

#### a.      Numerosity

A proposed class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The numerosity requirement demands "examination of the specific facts of each case and imposes no absolute limitations." *Gen.*

*Tel. Co. of the Nw.*, *Inc. v. EEOC*, 446 U.S. 318, 330 (1980). While the numerosity requirement is not tied to any fixed numerical threshold, generally, a "class of 41 or more is usually sufficiently numerous." 5-23 Moore's Federal Practice—Civil § 23.22 (2016). "Although the absolute number of class members is not the sole determining factor, where a class is large in numbers, joinder will usually be impracticable." *Jordan v. Cty. of L.A.*, 669 F.2d 1311, 1319 (9th Cir. 1982), *vacated on other grounds*, 459 U.S. 810 (1982*); see also id.* (court is "inclined to find the numerosity requirement in the present case satisfied solely on the basis of the number of ascertained class members, i.e., 39, 64, and 71 . . . .").

Here, the parties agree there are approximately 26,500 current and former Owners and PVCOA members that make up the Proposed Class. (Doc. 129 at 3). Although the parties have not provided the Court with any official documentation identifying the 26,500 Class Members, the parties indicate that Plaintiffs' counsel obtained a Class Membership List through the State Inspection Action. (Doc. 129-1 at 25–26). On that account, the Court will assume the 26,500 Class members are ascertained and joinder would thus be impractical.

The Court, therefore, finds the numerosity requirement has been met.

### b.    Commonality

Rule 23(a) also requires that "questions of law or fact [be] common to the class." Fed. R. Civ. P. 23(a)(2). Because "[t]he Ninth Circuit construes commonality liberally," "it is not necessary that all questions of law and fact be common." *West*, 2006 WL 1652598, at *3 (citing *Hanlon*, 150 F.3d at 1019). The commonality requirement is met "when the common questions it has raised are apt to drive the resolution of the litigation . . . ." *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014) (internal quotation and citation omitted).

Plaintiffs bring Counts I and II against all Defendants for violation of the Federal and Arizona RICO (Doc. 109 at ¶¶ 130–180) and Count III against Defendant Individuals only for breach of fiduciary duty by creating and disseminating false and fraudulent annual budgets to further conflicting interests. (*Id.* at ¶ 181–85) "The Ninth Circuit has adopted a

class certification standard that favors class treatment of fraud claims stemming from a 'common course of conduct.'" *Facciola v. Greenberg Traurig LLP*, 281 F.R.D. 363, 372 (D. Ariz. 2012) (quoting *Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir. 1975)). When examining whether the class is united by a common question, this conduct test "is more than satisfied when a series of financial reports uniformly misrepresent a particular item in the financial statement." *Blackie*, 524 F.2d at 903 (finding that plaintiffs sufficiently alleged a source of artificial inflation common to every purchaser in the class). Courts have recognized a "common sense approach that the class is united by a common interest" when confronted with "a class of purchasers allegedly defrauded over a period of time by similar misrepresentations." *Id*. at 902. This remains true despite the slight differences in the class members' position. *Id*.

Here, Plaintiffs allege that each Class Member received the same series of annual budget and financial reports from 2011 through 2022 that misrepresented hidden corporate overhead expenses. (Doc. 129 at 8). Plaintiffs further claim each Class Member received electronically or via U.S. Mail respective assessment billing statements based on their number of Points owned, which also failed to adequately disclose the overhead expenses. (*Id.* at 8). Although each individual Class Member may own a different number of Points, these issued assessments form the basis for each Class Member's damages owed from the Fund. (Doc. 129-1 at 39). Thus, the Court recognizes the Proposed Class is united with a common interest because each were defrauded over a period of time by similar misrepresentations. *Blackie*, 524 F.2d at 902.

The Court, therefore, finds the commonality requirement has been met.

### c.    Typicality

Rule 23(a) further requires that the "claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality requires that the named plaintiff have claims "reasonably coextensive with those of absent class members," but the claims do not have to be "substantially identical." *Hanlon*, 150 F.3d at 1020. The test for typicality "is whether other members have the same or similar

injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (internal quotation and citation omitted). This ensures that "the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Falcon*, 457 U.S. at 158 n.13.

To maintain a civil RICO claim, a plaintiff must establish: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as predicate acts) (5) causing injury to [the] plaintiff's business or property." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017) (quoting *Living Designs, Inc. v. E.I. DuPont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005)). Accordingly, the typicality requirement in this context focuses on whether the Plaintiffs were injured by the same alleged pattern of racketeering as the other Class Members. *Id.* at 1119. For example, in *Just Film, Inc.*, the defendants, among other things, ran a faulty simulation to calculate fraudulent taxes and fees of merchants with expired leases, sent letters to the merchants that inaccurately stated an audit, and created another entity to ensure regulators would not learn the defendants were collecting payments. *Id.* at 1116. The Ninth Circuit found that typicality was sufficient in the class action RICO claim because plaintiffs alleged "a broader fraudulent scheme" in which defendants conspired to defraud former lessees through a course of conduct which injured the plaintiff as well as other class members. *Id.*

Here, Plaintiffs claim they were charged the same allegedly inflated annual assessments as other Class members based on their respective amount of Points owned and received the identical reporting documents as other Class members. (Doc. 129 at 9). Similar to the defendants in *Just Film, Inc.*, the Defendants in this case allegedly engaged in a pattern of racketeering by purportedly misrepresenting their calculation of assessments owed by PVCOA members (Doc. 109 at ¶¶ 152–55), sending billing statements to each PVCOA members that reflected those misrepresented assessments (*Id.* at ¶ 141), and collecting those assessments through expenses charged to an alternative entity – the

1    PVCOA . (*Id.* at ¶ ¶ 145–47). As explain above, Plaintiffs and Class members experience

2    the same alleged injury arising from the same accused course of racketeering carried out

3    by the Defendants. In other words, the class action is based on a broader scheme of conduct

4    that is not unique to the Plaintiffs. *Hanon*, 976 F.2d at 508.

5            To maintain a breach of fiduciary duty claim under Arizona law, Plaintiffs must

6    show that Defendant Individuals "owed a fiduciary duty, breached the duty, and damages

7    resulted." *KnightBrook Ins. Co. v. Payless Car Rental Sys., Inc.*, 43 F. Supp. 3d 965, 979

8    (D. Ariz. 2014), *on reconsideration*, CV12-1671 PHX DGC, 2014 WL 12672625 (D. Ariz.

9    Oct. 27, 2014) (citing *John E. Shaffer Enters. v. City of Yuma,* 904 P.2d 1252, 1256 (Ariz.

10   Ct. App. 1995). As previously stated, Plaintiffs and Class Members are all current and

11   former members of the PVCOA. As Officers on the PVCOA Board, the Defendant

12   Individuals owed the same fiduciary duty to Plaintiffs and Class Members alike, which

13   they allegedly breached. This is a sufficient showing that Plaintiffs' claims and injured

14   interests are identical to the Class Members in this regard.

15           The Court, therefore, finds the typicality requirement has been met.

16                          **d.      Adequacy of Representation**

17           Finally, Rule 23(a) requires "representative parties [who] will fairly and adequately

18   protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To resolve the question of legal

19   adequacy, the Court must answer two questions: (1) do the named plaintiff and her counsel

20   have any conflicts of interest with other class members and (2) has the named plaintiff and

21   her counsel vigorously prosecuted the action on behalf of the class? *Hanlon*, 150 F.3d at

22   1020. This adequacy inquiry considers a number of factors, including "the qualifications

23   of counsel for the representatives, an absence of antagonism, a sharing of interests between

24   representatives and absentees, and the unlikelihood that the suit is collusive." *Brown v.*

25   *Ticor Title Ins.*, 982 F.2d 386, 390 (9th Cir. 1992). "The adequacy-of-representation

26   requirement tend[s] to merge with the commonality and typicality criteria of Rule 23(a)."

27   *Amchem*, 521 U.S. at 626 n.20.

28           The first prong requiring examination of potential conflicts of interest in settlement

1  agreements "has long been an important prerequisite to class certification. That inquiry is
2  especially critical when [ ] a class settlement is tendered along with a motion for class
3  certification." *Hanlon*, 150 F.3d at 1020. Here, Plaintiffs argue there are no conflicts with
4  other Class Members for the same reasons regarding commonality and typicality because
5  the Plaintiffs suffered the same alleged injury as the rest of the Proposed Class.
6  (Doc. 129 at 10). Indeed, the definition of the Class avoids conflicts by excluding various
7  entities and individuals, namely ILX Acquisition; DRI, DRM, their parents, subsidiaries,
8  successors, affiliates, current officers and directors; and all judges assigned to the action
9  and their immediate family members. (Doc. 129-1 at 11).

10  The second prong of the adequacy inquiry examines the vigor with which Plaintiffs
11  and their counsel have pursued the common claims. "Although there are no fixed standards
12  by which 'vigor' can be assayed, considerations include competency of counsel and, in the
13  context of a settlement-only class, an assessment of the rationale for not pursuing further
14  litigation." *Hanlon*, 150 F.3d at 1021. Probing Plaintiffs and their counsel's rationale for
15  not pursuing further litigation, however, is inherently more complex. "District courts must
16  be skeptical of some settlement agreements put before them because they are presented
17  with a 'bargain proffered for . . . approval without the benefit of an adversarial
18  investigation.'" *Hanlon*, 150 F.3d at 1022 (quoting *Amchem*, 521 U.S. at 620).

19  Here, Plaintiffs persuasively point out that Zwicky has "championed the rights of
20  fellow timeshare owners" since August 2015 through his leadership in the State Inspection
21  Action. (Doc. 129 at 10). Moreover, three of the four attorneys serving as class counsel
22  represented Zwicky in the State Inspection Action and have continued to do so in this
23  present lawsuit. (*Id.* at 11). Plaintiffs' Counsel avows they have "vigorously protected, and
24  will continue to so protect, the interests of the class members." (Doc. 129-5 at 3, 7). Zwicky
25  and counsel's efforts to pursue the commons claims of the Proposed Class span a course
26  of seven years, and the Court views this as evidence of vigor. Additionally, Plaintiffs and
27  counsel and have filed three amended complaints before seeking an all-day mediation and
28  ultimately settlement. The Hon. Infante further attests to the parties' adequate

representation based on his observations during mediation. (Doc. 129-7 at 3–4). Plaintiffs assert the parties favor settlement due to the risks; expenses of forensic accountants and other expert costs estimated at $150,000–$200,000; complexity; and likely duration of further litigation until 2025. (Doc. 129 at 7). The Court thus finds the parties' process and reasons and process for pursing settlement are satisfactory.

The Court, therefore, finds that the adequacy of representation requirement has been met.

### 2.    Rule 23(b)

In addition to satisfying all four requirements of Rule 23(a), a plaintiff must show the proposed class meets one of three threshold requirements under Rule 23(b). *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 163 (1974). That is, a plaintiffs must show either: (1) prosecuting separate actions would create a risk of inconsistent or dispositive adjudications; (2) the opposing party's actions have applied to the class generally such that final relief respecting the whole class is appropriate; or (3) questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Fed. R. Civ. P. 23(b).

Here, Plaintiffs argue this case qualifies for certification under Rule 23(b)(3). (Doc. 129 at 7).  A class action may be maintained under Rule 23(b)(3) if (1) "the court finds that questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

### a.    Predominance

Because Rule 23(a)(3) already considers commonality, the focus of the Rule 23(b)(3) predominance inquiry is on the balance between individual and common issues. *Hanlon*, 150 F.3d at 1022; *see also Amchem*, 521 U.S. at 623 ("The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant

adjudication by representation."). Predominance requires that questions common to the Proposed Class predominate over individualized inquiries. Fed. R. Civ. P. 23(b)(3). The United States Supreme Court distinguishes an individual question, "where 'members of a proposed class will need to present evidence that varies from member to member,'" from a common question, "where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting 2 W. Rubenstein, Newberg on Class Actions § 4:50, pp. 196–197 (5th ed. 2012)). The Supreme Court further clarified that Rule 23(b)(3) requires a threshold "showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013).

Here, Plaintiffs argue the predominance requirement is satisfied for two reasons: (1) all Class Members' annual assessments were allegedly inflated by Defendants in the same manner "by including hidden corporate overhead subsidies in the [a]ssessments levied by the same DRI employed [PVCOA] Directors and the same property management company"; and (2) all Class Members were given the same allegedly misleading budgets, annual financial reports, and standardized billing statements that were generated from identical forms. (Doc. 129 at 13). As set forth in Plaintiffs' TAC, the Court agrees there are several common questions at issue here, including: whether the Defendants' conduct constitutes the requisite pattern of racketeering activity for the purposes of the Federal and Arizona RICO; whether the annual reporting documents fraudulently concealed a practice of imposing hidden corporate overhead charges to the Class; whether PVCOA is a RICO "enterprise"; and whether Defendants' alleged misconduct involved substantial use of the U.S. Mail or wires. (Docs. 109 at ¶ 213); 129 at 13). These overarching questions predominate over any possible individual questions among the Proposed Class.

The Rule 23(b)(3) predominance inquiry also considers questions of damages and requires plaintiffs to show their damages are: (1) capable of being measured on a class wide basis; and (2) traceable to the defendant's action that created the legal liability. *Just Film,*

*Inc.*, 847 F.3d at 1120. In a civil RICO action, the measure of damages "is the harm caused by the predicate acts constituting the illegal pattern [of racketeering]." *Id.* (quoting *Ticor Title Ins. Co. v. Florida*, 937 F.2d 447, 451 (9th Cir. 1991)). To obtain class certification, plaintiffs "need not show that each members' damages from that conduct are identical." *Id.* In terms of traceability, the Ninth Circuit has emphasized that "causation lies at the heart of a civil RICO claim . . . . It is well settled that, to maintain a civil RICO claim predicated on mail fraud, a plaintiff must show that the defendants' alleged misconduct proximately caused the injury." *Poulos v. Caesars World, Inc.*, 379 F.3d 654 (9th Cir. 2004). Consequently, courts have paid close attention to individualized reliance issues relating to proof of causation in comparison to common questions when considering whether a RICO class action meets the predominance requirement. *E.g.*, *id*. at 664–666; *Just Film, Inc.*, 847 F.3d at 1121.

Here, Plaintiffs argue "individual damages are readily calculable on a class-wide basis pursuant to a uniform pro rata apportionment formula." (Doc. 129 at 13). Specifically, the formula would consider the total dollar amount of assessments assessed to all Class Members from 2011 to 2022 and the total assessments assessed to each individual Class Member for that same time period to calculate each Class Member's percentage of the total dollar amount of assessments assessed. (Doc. 129-1 at 39). That percentage will determine each Class member's *pro rata* interest in the Settlement Fund. (*Id*.) The Court views this methodology as sufficient given that damages can be calculated utilizing data maintained by the Corporate Defendants. (*Id*.) In terms of traceability, there is an obvious link between the alleged misconduct and harm because Plaintiffs and Class Members' payment of assessments were prompted by the allegedly fraudulent assessments and billing statements issued by the Defendants.

The Court, therefore, finds that common questions of law and fact predominate.

### b.    Superiority

To satisfy Rule 23(b)(3), Plaintiff must also prove class resolution of the case is "superior to other available methods for the fair and efficient adjudication of the

controversy." Fed. R. Civ. P. 23(b)(3). "The superiority inquiry under Rule 23(b)(3) requires determination of whether the objectives of the particular class action procedure will be achieved in the particular case." *Hanlon*, 150 F.3d at 1023. "Where classwide litigation of common issues will reduce litigation costs and promote greater efficiency, a class action may be superior to other methods of litigation." *Valentino v. Carter-Wallace*, *Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).

The Court agrees with Plaintiffs that the individual recoverable damages are likely too small to justify individual litigation. *See Just Film, Inc.*, 847 F.3d at (explaining the "risks, small recovery, and relatively high costs of litigation" are considerations that are at "the heart of why the Federal Rules of Civil Procedure allow class actions in cases where Rule 23's requirements are satisfied"); *see also Chapman v. Bowman, Heintz, Boscia & Vician, P.C.*, 2015 WL 9478548, at *5 (N.D. Ind. Dec. 29, 2015) ("[I]t is doubtful that many individual claims would be pursued in light of the expense of litigation and the fact that separate lawsuits would be uneconomical for potential class members."). Moreover, the Court finds a class action is superior because litigation on a class wide basis would promote greater efficiency in resolving the claims of a Proposed Class comprised of 26,500 members. *Valentino*, 97 F.3d at 1234.

For the foregoing reasons, the Court finds that class treatment of the claims appears to be warranted and, therefore, will preliminarily certify this matter as a class action.

**B.  Preliminary Evaluation of Fairness of Proposed Class Action Settlement**

Having determined that class treatment appears to be warranted, the Court must now decide whether to preliminarily approve the Proposed Settlement Agreement. *Gonzalez*, 2016 WL 3360700, at *4. Under Rule 23(e), a court must evaluate a proposed settlement for fundamental fairness, adequacy, and reasonableness before approving it. Fed. R. Civ. P. 23(e)(2). Ultimately, a determination of the fairness, adequacy, and reasonableness of a class action settlement involves consideration of:

(1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent

of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement.

*Churchill Vill., L.L.C. v. Gen. Elec.,* 361 F.3d 566, 575 (9th Cir.2004) (citation omitted). Plaintiffs indeed confine their analysis of fairness and adequacy of the settlement to these eight *Churchill* factors. However, when "a settlement agreement is negotiated *prior* to formal class certification, consideration of these eight . . . factors alone" are insufficient. *In re Bluetooth*, 654 F.3d at 946. In these cases, courts must show not only a comprehensive analysis of the above factors, but also that the settlement did not result from collusion among the parties. *Id.* at 947. Accordingly, such agreements must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair. *Hanlon*, 150 F.3d at 1026; *accord In re Gen. Motors*, 55 F.3d at 805 (courts must be "even more scrupulous than usual in approving settlements where no class has yet been formally certified").

However, some of the eight *Churchill* factors cannot be fully assessed until the court conducts its fairness hearing. *Alberto v. GMRI, Inc.*, 252 F.R.D. 652, 665 (E.D. Cal. 2008). Thus, at the preliminary approval stage, courts need only evaluate "whether the proposed settlement [1] appears to be the product of serious, informed, non-collusive negotiations, [2] has no obvious-deficiency, [3] does not improperly grant preferential treatment to class representatives or segments of the class and [4] falls within the range of possible approval." *Horton v. USAA Cas. Ins. Co.*, 266 F.R.D. 360, 363 (D. Ariz. 2009) (internal quotation and citation omitted). The Court is cognizant that "[s]ettlement is the offspring of compromise; the question . . . is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion." *Hanlon*, 150 F.3d at 1027.

At this juncture, the Court will review the parties' Proposed Settlement Agreement according to the four considerations listed above and conduct a cursory review of its terms in deciding whether to order the parties to send the proposal to Class Members and conduct the final fairness hearing. *Alberto*, 252 F.R.D. at 665. Because it is provisional, courts grant preliminary approval of a class action settlement where the proposed settlement does not

disclose grounds to doubt its fairness and lacks "obvious deficiencies." *In re Vitamins Antitrust Litig.*, 2001 WL 856292, at *4 (D.D.C. July 25, 2001) (quoting Manual for Complex Litigation (Third) § 30.41 (1995)).

### 1. Settlement Process

The Court must look at the means and negotiations by which the parties settled the action in addition to reviewing the Proposed Settlement Agreement for obvious deficiencies. *Horton*, 266 F.R.D. at 363. Here, the parties' Agreement arrived after an all-day, in-person mediation session with an experienced private mediator and former Chief Magistrate Judge (Doc. 129-7 at 3). The Hon. Infante explained that prior to mediation, the parties submitted "high quality" mediation statements "detailing their respective claims and defenses, summarizing the prior court rulings on salient issues, analyzing the class certification issues, and candidly assessing the strengths and weaknesses of their positions." (*Id*.) After exchanging "numerous offers and counteroffers," the parties agreed to a settlement term sheet at the end of mediation (*Id*. at 4). The Hon. Infante further testified the parties' negotiations "were based on detailed analyses of the relevant facts and legal principles, and counsel for all parties negotiated vigorously, effectively and at arm's length." (*Id.*).

Particularly with settlements reached prior to class certification, enough information must exist for the Court to assess "the strengths and weaknesses of the parties' claims and defenses . . . and consider how class members will benefit from settlement" to determine if it is fair and adequate. *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 397 (C.D. Cal. 2007) ("Federal courts are inherently skeptical of pre-certification settlements, precisely because such settlements tend to be reached quickly before the plaintiffs' counsel has had the benefit of the discovery necessary to make an informed evaluation of the case and, accordingly, to strike a fair and adequate settlement."); *see also Hanlon*, 150 F.3d at 1026 ("The dangers of collusion between class counsel and the defendant, as well as the need for additional protections when the settlement is not negotiated by a courtdesignated [sic] class representative, weigh in favor of a more probing inquiry than may normally be

required under Rule 23(e)."). In considering a proposed settlement, a court therefore bears an obligation to first evaluate the scope and effectiveness of the investigation plaintiff's counsel conducted prior to reaching an agreement. *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000).

The parties' attestations regarding the process of mediation evinces good faith negotiations and a thorough process for arriving at settlement. However, Plaintiffs do not provide any supplemental documents that concretely show what their "numerous offers and counter offers" and initial term sheet entailed. This absence of information limits the Court's means of assessing the strengths and weaknesses of the parties' claims and defenses at mediation. *Acosta*, 243 F.R.D. at 397.

In terms of discovery, Plaintiffs concede that at the time of settlement they "still had to complete discovery" (Doc. 129 at 17), and "[a]ctual formal discovery in this Action . . . has been limited." (Doc. 129 at 23). Plaintiffs then proceed to claim they "are convinced that they have sufficient evidence" to engage in settlement negotiations that "provides a good benefit to the Class" for two reasons: (1) they obtained some discovery in the prior State Inspection Action; and (2) Defendants agreed to provide a summary of "indirect corporate costs" for the years 2017 to present. However, Plaintiffs do not include any of these documents in their Unopposed Motion, which calls into question the parties' ability "to strike a fair and adequate settlement." *Acosta*, 243 F.R.D. at 397. Plaintiffs' vague mentioning of "disclosures mandated by the Superior Court" in the State Inspection Action, without more, is insufficient evidence of discovery. (Doc. 129 at 23). Although Plaintiffs have attached a transcript of proceedings from the State Inspection Action (Doc. 129-8 at 9–36), Plaintiffs do not cite to specific portions of the transcript anywhere in their Motion, nor do they provide any documents discussed in the State Inspection Action. This absence of information limits the Court's means of assessing how class members will benefit from settlement. *Acosta*, 243 F.R.D. at 397.

Although it appears the Proposed Settlement Agreement is the product of a serious, good-faith mediation session, without more, the Court does not have enough information

before it to evaluate the sufficiency of the evidence utilized by the parties or the content of the parties' negotiations.

### 2.   Obvious Deficiencies

Next, the Court will review the terms of the Proposed Settlement Agreement for obvious deficiencies. The Agreement provides that Corporate Defendants would create a Settlement Fund of $13,000,000.00. (Doc. 129-1 at 18). The Fund will first be used to pay (1) four Service Awards to Plaintiffs — $10,000.00 to Zwicky and $1,500.00 each to Abarca, Osborn, and Stryks-Shaw; costs of class notice settlement administration costs currently estimated at $100,000; and attorneys' fees and litigation costs. (Docs. 129 at 4; 129-1 at 18–19). If approved, these initial payments would leave the Settlement Fund at approximately $9,535,500. Only after the initial payments are made will all Proposed Class members who do not opt out receive a pro-rated share of the remainder of the Settlement Fund based on the total dollar amount of assessments each Class member was assessed for calendar years 2011 through and including 2022. (Doc. 129-1 at 38). After factoring historical opt-out rates in similar actions, the parties expect the average recovery to be $370 for each Proposed Class member. (129 at 4–5). All distribution checks to the Proposed Class will expire after 180 days of issuance, and any undistributed funds represented by any uncashed checks will be distributed as a *cy pres* distribution to Habitat for Humanity. (129-1 at 39–40).

Obvious deficiencies in a settlement agreement include "any subtle signs that class counsel have allowed pursuit of their own self-interests to infect the negotiations." *McKinney-Drobnis v. Oreshack*, 16 F.4th 594 (9th Cir. 2021) (quoting *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1043 (9th Cir. 2019). The Ninth Circuit has identified three such "subtle signs," which it refers to as the *Bluetooth* factors: "(1) when counsel receives a disproportionate distribution of the settlement; (2) when the parties negotiate a clear-sailing arrangement, under which the defendant agrees not to challenge a request for an agreed-upon attorney's fee; and (3) when the agreement contains a kicker or reverter clause that returns unawarded fees to the defendant, rather than the class." *McKinney-Drobnis*, 16

F.4th at 607–08 (citation omitted); *In re Bluetooth*, 654 F.3d at 947 (internal quotation and citation omitted). District courts must apply the *Bluetooth* factors in examining pre-certification settlements "to smoke out potential collusion." *Briseno v. Henderson*, 998 F.3d 114, 1023 (9th Cir. 2021).

     **a.**  **Disproportionate Distribution of the Settlement to Counsel**

  In respect to the *Bluetooth* first factor, Plaintiffs argue the requested attorneys' fees is fair and equitable because the Ninth Circuit recognizes "25% of the fund as the benchmark for a reasonable fee award." (Doc. 129 at 26 (quoting *In re Bluetooth*, 654 F.3d at 942)). But when an award of 25% of the fund would "yield windfall profits for class counsel in light of the hours spent on the case, courts should adjust the benchmark percentage or employ the lodestar method[11] instead." *In re Bluetooth*, 654 F.3d at 942 (citations omitted). Plaintiffs claim the proportionality between the fees charged and the results obtained is justified by (a) the prolonged time and efforts expended since the State Inspection Action in 2015; (b) counsel's undertaking of this matter on a contingency basis; and (c) the nonmonetary relief provided for in the Agreement. (Doc. 129 at 27). Plaintiffs cite to *Torrisi v. Tucson Elec. Power Co.* for further support, where the Ninth Circuit affirmed this Court's award of a 25% contingency fee from a $30,000,000 settlement fund even when the lodestar calculation was substantially less. 8 F.3d 1370, 1376–77 (9th Cir. 1993).

  Although 25% of a settlement is generally accepted as a reasonable award of attorneys' fees in common fund cases, the Ninth Circuit further cautioned that this "benchmark percentage should be adjusted, or replaced by a lodestar calculation, when special circumstances indicate that the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors." *Id.* at 1376. Though courts have discretion to choose which calculation method they use, their discretion must be exercised so as to achieve a reasonable result. *In re Bluetooth*, 654 F.3d

---

[11] The lodestar figure is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation (as supported by adequate documentation) by a reasonable hourly rate for the region and for the experience of the lawyer. *Staton,* 327 F.3d at 965.

at 942.

The Court finds the facts of *Torrisi* are distinguishable here for two reasons. First, the *Torrisi* court found there were no special circumstances indicating the 25% benchmark award was either too large or too small. *Torrisi*, 8 F.3d at 1376. Here, Plaintiffs request 25% of the Settlement Fund ($3,250,000) as payment of attorneys' fees (Doc. 129-1 at 44), notwithstanding their statement that fees are currently estimated at $25,000. (Doc. 129 at 4). This agreement would effectively award attorneys' fees that are 134 times the amount of actual fees currently estimated, suggesting a windfall of profits to counsel. According to the parties, each Class Member would receive an average award of $370, which is just 0.0028% of the total Settlement Fund as compared to the 25% award of attorneys' fees. This immense facial disparity is concerning because "[i]f fees are unreasonably high, the likelihood is that the defendant obtained an economically beneficial concession with regard to the merits provisions, in the form of lower monetary payments to class members or less injunctive relief for the class than could otherwise have obtained." *Staton*, 327 F.3d at 964.

Second, the *Torrisi* court calculated the alternative lodestar amount to cross-check the benchmark percentage. *Torrisi*, 8 F.3d at 1377; *accord Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050–1051 (9th Cir. 2002) (finding it was within the district court's discretion to apply a lodestar cross-check). Here, Plaintiffs do not provide any documentation of actual hours billed to allow for a lodestar amount calculation and cross-check. There is only one instance in the Motion where Plaintiffs mention, in passing, an estimated amount of $25,000 in fees. (Doc. 129 at 4). Plaintiffs do not support this figure with any calculations or billing statements. Rather, Plaintiffs urge the Court to accept their word that class counsel has "invested massive time and effort" and "bore the risk that their massive investment of time and significant costs and expenses would go uncompensated." (*Id.* at 27). Yet, without more, the Court cannot make a definitive ruling on the equity of the fees sought.

**b.**   **Clear-sailing Arrangement for Attorneys' Fees**

Another "subtle sign" of collusion that troubles the Court is the presence of a clear-

sailing agreement in the Proposed Settlement Agreement, namely, Defendants' promise not to oppose Plaintiffs' request for attorneys' fees of 25% of the Settlement Fund. (Doc. 129-1 at 44). This promise "increases the likelihood that class counsel will have bargained away something of value to the class." *In re Bluetooth*, 654 F.3d at 942 (citation omitted). This is especially so because the attorneys' fees are to be made as an initial payment out of the Settlement Fund before the recovery awards are distributed to the Class Members. *Cf. Schuchardt*, 2016 WL 232435, at *9 (finding that clear sailing provisions do not necessarily signal collusion where the attorneys' fees award does not come out of a common fund apportioned between relief for the class and attorneys' fees). The Court is concerned with "the potential that [Defendants] agreed to pay class counsel excessive fees in exchange for counsel accepting a lower amount for the class members." *McKinney-Drobnis*, 16 F.4th at 610 (quoting *Henderson*, 998 F.3d at 1027).

### c.     Reversion of Unawarded Fees to the Defendant

The third *Bluetooth* factor recognizes a sign of collusion when fees not awarded revert back to the defendant. *In re Bluetooth*, 654 F.3d at 947. Here, the Proposed Settlement Agreement provides that all distribution checks to the Proposed Class will expire after 180 days of issuance, and any undistributed funds shall first be re-distributed to Class Members who accept their share of initial distribution. (Doc. 129-1 at 40). If such re-distribution is not economically feasible and/or any monies otherwise remain, the residual funds are to be distributed to Habitat for Humanity as the *cy pres* recipient. (*Id.* at 40).

A *cy pres* award must qualify as "the next best distribution" to giving the funds directly to class members. *Dennis v. Kellogg Co.*, 697 F.3d 858, 865 (9th Cir. 2012). As a result, "[n]ot just any worthy recipient can qualify as an appropriate *cy pres* beneficiary." *Id*. The Ninth Circuit "require[s] that there be a driving nexus between the plaintiff class and the *cy pres* beneficiaries." *Id.* (citation omitted). A *cy pres* award must be "guided by (1) the objectives of the underlying statute(s) and (2) the interests of the silent class members, and must not benefit a group too remote from the plaintiff class[.]" *Id*. (internal

quotation marks and citations omitted). Habitat for Humanity is a nonprofit that advocates for affordable housing and helps homeowners build their own homes alongside volunteers and pay an affordable mortgage.[12] Accordingly, the Court is satisfied that the chosen *cy pres* recipient has a close enough nexus to the Proposed Class here. This third *Bluetooth* factor weighs in the parties' favor and against collusion.

In sum, there appears to be a facial inequity when comparing the relief provided to the Proposed Class and the amount of attorneys' fees requested. "When a large attorney's fee means a smaller recovery to plaintiff, a significant conflict of interest between client and attorney is created. Even if the plaintiff's attorney does not consciously or explicitly bargain for a higher fee at the expense of the beneficiaries, it is very likely that this situation has indirect or subliminal effects on the negotiations. And, in any event, there is an appearance of a conflict of interest." *Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003) (quoting *See Court Awarded Attorney Fees, Report of the Third Circuit Task Force,* 108 F.R.D. 237, 266 (1985)). The Court does not have enough information before it to adequately assess the parties' rationale when proposing this fee award. Thus, the Court finds there are deficiencies in the Proposed Settlement Agreement that need to be addressed with appropriate documentation in order to resolve the appearance of inequity and conflicts of interest with regard to attorneys' fees.

### 2.    Preferential Treatment for Plaintiff

The Ninth Circuit has instructed that district courts must be "particularly vigilant" for signs that counsel has allowed the "self-interests" of "certain class members to infect negotiations." *In re Bluetooth.*, 654 F.3d at 947. For that reason, preliminary approval of a class action settlement is inappropriate where the proposed agreement "improperly grants preferential treatment to class representatives." *Tableware*, 484 F. Supp. 2d at 1079.

"[N]amed plaintiffs . . . are eligible for reasonable incentive payments." *Staton*, 327 F.3d at 977. The Court, however, must "evaluate their awards individually" to detect

---

[12] *See* Habitat for Humanity, *About Habitat for Humanity*, https://www.habitat.org/about/mission-and-vision (last visited Nov. 7, 2022).

"excessive payments to named class members" that may indicate "the agreement was reached through fraud or collusion." *Id.* at 975. To assess whether an incentive payment is excessive, district courts balance "the number of named plaintiffs receiving incentive payments, the proportion of the payments relative to the settlement amount, and the size of each payment." *Id.*

Here, Proposed Class Members stand to recover $370 on average, and there are four Plaintiffs that also stand to receive additional Service Awards totaling $14,500– $10,000.00 to Zwicky and $1,500.00 each to Abarca, Osborn, and Stryks-Shaw. These awards are reasonable under Ninth Circuit Case law, namely *In re Online DVD-Rental Antitrust Litig.* 779 F.3d 934 (9th Cir. 2015) (approving incentive payments when applying the *Staton* framework). First, there are only four class representatives here, as compared to the nine representatives approved in *In re Online DVD-Rental. Id.* at 947. Second, the four incentive payments amount to 0.11% of the total settlement fund, as compared to the approved incentive payments totaling to 0.17% of the settlement fund in *In re Online DVD-Rental. Id.* at 948. Lastly, while majority of the incentive awards to Abarca, Osborn, and Stryks-Shaw amount to only four times the average individual award, the *In re Online DVD-Rental* Court approved incentive awards up to 417 times larger than the relevant individual award. *Id.* at 947.

The outlier in this inquiry is Zwicky, who is proposed to receive $8,500 more than the other Plaintiffs. Even so, Zwicky's award amounts to only 27 times larger than the relevant individual award, which is still reasonable under *Online DVD-Rental. Id.* Moreover, Zwicky in particular has advocated for the rights of his fellow Class Members since 2015 through the State Inspection Action, which exhibits leadership through litigation spanning over the past seven years. *See e.g., Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998) (approving, in the context of a recovery of more than $14 million, an incentive payment of $25,000 to one named plaintiff who "spent hundreds of hours with his attorneys and provided them with 'an abundance of information'") (cited to with approval by *Staton*, 327 F.3d at 976). Thus, a higher incentive payment to Zwicky is

reasonable.

The Court, therefore, finds that the Proposed Settlement Agreement does not improperly grant preferential treatment to class representatives or segments of the class.

### 3. Settlement Fund Within Range of Possible Approval

To determine whether a settlement "falls within the range of possible approval," courts focus on "substantive fairness and adequacy" and "consider plaintiffs' expected recovery balanced against the value of the settlement offer." *Tableware*, 484 F. Supp. 2d at 1080. The Agreement establishes a fund of $13,000,000 and, after initial proposed payments are made, the remaining $9,535,500 of the Fund will be distributed *pro rata* to all Proposed Class members who do not opt out.

At the outset, the parties cite to the Manual for Complex Litigation (Third) ("the Manual") to emphasis that a general "presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery." Manual for Complex Litigation (Third) § 30.42 (1995). As explained above, although it appears the Proposed Settlement Agreement is the product of a serious, good-faith mediation session, the parties do not provide the Court with enough information (i.e., the details of the initial offers, counter offers, and term sheet) for it to evaluate the sufficiency of the evidence utilized or content of the negotiations at mediation. *See supra* Section III.B(1).

In assessing the Proposed Settlement fund amount, Plaintiffs represent in their TAC and Unopposed Motion that Federal and Arizona RICO damages are subject to trebling under 18 U.S.C. § 1964(c) and A.R.S. § 13– 2314(D)(4) respectively. (Docs. 109 at ¶ ¶ 167, 180; 129 at 21–22). Thus, Plaintiffs represent the "maximum, reasonable, non-trebled" recovery award for this lawsuit is $35,000,000. (Doc. 129 at 21–22). Plaintiffs then conclude the $13,000,000 fund, which is roughly 37% of estimated damages, is well within reason because even a fractional recovery may be fair in light of the uncertainties, delay, and expense of trial. *Id.* (citing *Millan v. Cascade Water Servs., Inc*., 310 F.R.D. 593, 611 (E.D. Cal. 2015).

However, "the settlement cannot be evaluated simply by reference to a mathematical yardstick." Manual for Complex Litigation (Third) § 30.42 (1995). As noted by the parties, these calculations are indeed readily calculable pursuant to a uniform pro rata apportionment formula. *See supra* Section III.A(2)(a). Rather than submitting these concrete calculations, the only evidence Plaintiffs represent before the Court are vague and conclusory statements that these numbers are "[b]ased upon essential evidence acquired in the [State] Inspection Action and in discovery in this Action." (Doc. 129 at 21).

First, the parties have not provided the Court with information regarding how they calculated the estimated $35,000,000 recovery amount. For example, Plaintiffs indistinctly explain that "[c]ertain internal corporate documents" uncovered through the State Inspection Action and "computer-generated summaries produced by Defendants in this case, show that the amount of 'indirect corporate costs' charged . . . was approximately $35 million." (*Id*. at 16). This conclusory statement is insufficient to support their argument of fairness. Second, the parties do not explain how they arrived at the agreed upon $13,000,000 Settlement Fund. Plaintiffs simply state that their modifications to the term sheet at the end of mediation, which are memorialized in the Proposed Settlement Agreement, "represent even a better benefit to the Class" than that reached during mediation. (*Id*. at 20). Plaintiffs, however, do not attach any of the above identified documents to their Motion to support their proposition that the settlement fund represents "a better benefit to the Class."

The Court, therefore, cannot find at this time that the proposed settlement fund amount is adequately justified.

### C.    Proposed Class Notice and Administration

Because the Court will not approve the terms of the parties' Proposed Settlement Agreement as currently presented, *see supra* Section III.B, the Court will not yet consider the parties' proposed class action notice program.

### IV.    Conclusion

The Court preliminarily finds that the Proposed Class meets the requisite

- 28 -

certification standards and grants conditional certification of the Proposed Class for settlement purposes. However, the Court denies the Proposed Settlement Agreement without prejudice because it is unsupported by appropriate documentation so as to give the appearance of unfairness. First, there is insufficient documentation from which the Court can adequately assess the sufficiency of the evidence utilized by the parties to arrive at the Agreement. Second, given the dearth of information provided, there appears to be a facial inequity when comparing the relief provided to the Proposed Class and the amount of attorneys' fees requested. Thus, the Court cannot adequately assess the parties' rationale for proposing this fee award. Lastly, the parties do not provide any documents to support their calculation of (a) the maximum estimated recovery amount in this case; or (b) the reasonableness of the proposed Settlement Fund.

The parties may refile their Motion for Preliminary Approval of Settlement, and Approval of Notice with either (1) supplemental documentation that adequately resolves the deficiencies identified in this Order; or (2) a revised settlement agreement. *See e.g., Staton*, 327 F.3d at 978 (affirming the district court's certification of class action but reversing its approval of the settlement agreement) ("On remand, the parties will have a choice concerning whether to attempt to justify the present proposed agreement under the principles outlined above or, instead, to renegotiate the aspects of the agreement we have indicated are questionable.").

Accordingly,

**IT IS ORDERED as follows:**

**I.** The lawsuit is preliminarily certified, for settlement purposes only, as a class action on behalf of the following class of with respect to the claims asserted in the lawsuit:

> All current and former members of the Premiere Vacation Collection Owners Association who were assessed Assessments for any Calendar year(s) from 2011 through and including 2022, excluding ILX Acquisition and any entity that received any bulk transfer/assignment of ILX Acquisition's Bulk Membership in the Premiere Vacation Collection Owners Association. Excluded from the Class are Diamond Resorts International, Inc., Diamond Resorts Management, Inc., their parents, subsidiaries, successors, affiliates,

current officers and directors and all judges assigned to this litigation and their immediate family members.

The Court expressly reserves the right to determine, should the occasion arise, whether the above-captioned lawsuit may continue to be certified as a class action for purposes other than settlement, and Defendants retain all rights to assert that the lawsuit may not be certified as a class action except for purposes of this settlement.

**II.** The Court appoints as Class Representatives: Plaintiffs Norman Zwicky, George Abarca, Vikki Osborn, and Elizabeth Stryks-Shaw.

**III.** The Court appoints as Class Counsel: Edward Louis Barry, Law Office of Edward L. Barry, 2120 Company St., Third Floor, Christiansted, VI 00820; Jennie Tetreault and Robert Matin Moore, Law Offices of Phelps & Moore, PLC, 4045 E Union Hills Rd., Ste. A102, Phoenix, AZ 85050; and Jon Laurence Phelps, Phelps Law Group, 4045 E Union Hills Dr., Ste. 104A, Phoenix, AZ 85050.

**IV.** The Court preliminarily finds that the lawsuit satisfies the applicable prerequisites for class action treatment under Fed. R. Civ. P. 23, for purposes of settlement only, namely:

**A.** The Class Members are so numerous that joinder of all of them in the Lawsuit is impracticable;

**B.** There are questions of law and fact common to the Class Members, which predominate over any individual questions;

**C.** The claims of Plaintiff are typical of the claims of the Class Members;

**D.** Plaintiff and Class Counsel have fairly and adequately represented and protected the interests of all of the Class Members; and

**E.** Class treatment of these claims will be efficient and manageable, thereby achieving an appreciable measure of judicial economy, and a class action is superior to other available methods for a fair and efficient adjudication of this controversy.

**VI.** The Court denies the Proposed Settlement Agreement (Doc. 129-1) without prejudice because it is unsupported by appropriate documentation so as to give the

appearance of unfairness.

**IT IS FURTHER ORDERED** Plaintiffs' Unopposed Motion for Preliminary Certification of Class for Settlement Purposes Only, Preliminary Approval of Settlement, and Approval of Notice (Doc. 129) is **GRANTED** as to the preliminary certification of class for settlement purposes only, and **DENIED** as to the proposed Settlement Agreement and Release.

Dated this 14th day of November, 2022.

Honorable Diane J. Humetewa
United States District Judge