LAW OFFICES
PHELPS & MOORE
PROFESSIONAL LIMITED LIABILITY COMPANY
6424 EAST GREENWAY PARKWAY, SUITE 100
SCOTTSDALE, ARIZONA 85254
(480) 534-1400

Jon L. Phelps (027152)
jon@phelpsandmoore.com
Robert M. Moore (013338)
rob@phelpsandmoore.com

Edward L. Barry (005856)
2120 Company Street, Third Floor
Christiansted, Virgin Islands 00820
(340) 719-0601
ed.barry.legal@gmail.com
*Counsel for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Norman Zwicky; George Abarca; Vikki Osborn; and Elizabeth Stryks-Shaw, for themselves and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>v.<br><br>Diamond Resorts International, Inc.; Diamond Resorts Management, Inc.; Troy Magdos; and Kathy Wheeler,<br><br>                    Defendants. | Case No.: 2:20-cv-02322-DJH<br><br>**UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLMENT**<br><br>Date:       February 8, 2023<br>Time:      10:00 a.m.<br>Courtroom:  605<br><br>(ASSIGNED TO THE **HONORABLE DIANE J. HUMETEWA**) |

Pursuant to Federal Rule of Civil Procedure 23(e), plaintiffs Norman Zwicky, George Abarca, Vikki Osborn, and Elizabeth Stryks-Shaw, (collectively, "Plaintiffs") move the Court for final approval of the Class Action Settlement Agreement with defendants Diamond Resorts International, Inc. ("DRI"), Diamond Resorts Management, Inc. ("DRM"), Troy Magdos ("Magdos") and Kathy Wheeler ("Wheeler") (collectively "Defendants"), and for final certification of the Settlement Class.

## I.      **INTRODUCTION**

The Court should issue an order of final approval of the Settlement as fair, reasonable, and adequate because it provides for a total cash payment of $13 million to the Settlement Fund, and substantial non-monetary relief in the form of reforms in the imposition and disclosure of assessments. The size of the financial recovery is high relative to actual (non-trebled) damages that Class Counsel calculate could be recoverable stemming from Defendants' alleged misconduct, i.e., Indirect Corporate Costs shifted to Class Members. Not factoring in the value of the non-monetary relief, the settlement amount is equal to approximately 37 percent of the maximum total damages, as calculated by Plaintiffs' counsel, which is an excellent result for the Settlement Class by any measure.

The Settlement Amount is particularly impressive given the substantial risks that Plaintiffs would have faced in continuing to litigate this case through class certification, trial and appeal. Had litigation continued, Defendants would have continued to deny liability (as they still do) and, in any event, would have challenged Plaintiffs' damage calculations and vigorously opposed certification of a class. If Plaintiffs had nonetheless succeeded in certifying a class and defeating summary judgment, they would have faced substantial risk at trial, where a jury would be asked to reach the somewhat counter-intuitive conclusion that the Premiere Vacation Collection Owners' Association (the "Association") engaged in conduct that was adverse to the interests of their members. And, even if Plaintiffs prevailed at trial, an appeal might have resulted in a verdict being overturned for any of multiple reasons, from standing to statutes of limitations.

Final approval of the Settlement should also be ordered because it was reached by experienced lawyers only after they vigorously investigated and litigated Plaintiffs' claims and reached an accord only after extensive mediation with a highly experienced mediator and other arms-length negotiations.

Class Representative Zwicky has been pursuing the claims brought in this action for nearly nine years. During that time, Class Counsel litigated an Inspection Action in the Maricopa County Superior Court (the "Inspection Action") against the Association to

determine if there was a factual basis for the claims brought in this action; largely prevailed on an appeal in the Inspection Action as to entry of summary judgment; largely defeated multiple motions to dismiss this action (with the Court granting motions to dismiss as to certain defendants but not the claims in their entirety); and conducted extensive discovery in this case and the Inspection Action, including reviewing over 4,800 pages of records in the two actions plus over 2,000 pages of additional public records, including SEC filings, Arizona Department of Real Estate filings, documents generated in connection with proceedings brought by the Arizona Attorney General's Office, documents from the Chapter 11 proceedings of Defendant's predecessor, and related inquiries. As a result, Plaintiffs and their counsel entered into the Settlement Agreement with a full understanding of the strengths and weaknesses of the case.

The highly favorable reaction of Settlement Class Members to the proposed Settlement, as evidenced by the fact that, as of December 18, 2023, *only three* Class Members have requested exclusion (opt-outs) from the Settlement Class and no one has objected to the Settlement, also strongly supports final approval.

Accordingly, Plaintiffs respectfully request that the Court take the final step in the approval process by granting this motion.

## II.    BACKGROUND

### A.    Litigation Prior to Settlement.

Plaintiffs provided a detailed summary of the claims, allegations, and procedural history in their Unopposed Motion for Preliminary Certification of Class for Settlement Purposes Only, Preliminary Approval of Settlement, and Approval of Notice (Doc. 129) and their Unopposed Renewed Motion for Preliminary Approval of Settlement, Approval of Notice (Doc. 144), which Plaintiff incorporates herein by reference.[1]

As succinctly summarized by the Court:

> At the crux of the [Third Amended Complaint] is Plaintiffs' claim that Defendants imposed hidden corporate overhead expenses upon Plaintiffs

---

[1] Additionally, the Court discussed the background of the claims brought in this case at length in its prior orders (Docs. 102 at 1-5; 136 at 1-4; 149 at 2-3).

through fraudulent annual budgets and reports, which ultimately rendered Plaintiffs' timeshare interests as worthless. Plaintiffs . . . are among approximately 25,000 current or former owners of timeshare interests ("Owners") acquired or sold by Defendant Diamond Resorts International, Inc. ("DRI"). (Doc. 109 at ¶ 12). These timeshares are part of DRI's Premier Vacation Collection (the "Collection"), a group of resorts located in Arizona, Colorado, Indiana, Nevada, and Baja, Mexico. (*Id.* at ¶ 14–15). The Owners are also members of the Premiere Vacation Collection Owners Association ("PVCOA"). (*Id.* at ¶ 13).

ILX Acquisition, a subsidiary of Defendant DRI, is a member of the PVCOA that holds a "Bulk Membership" consisting of DRI's unsold timeshare inventory. (*Id.* at ¶ 61). Defendant Diamond Resorts Management, Inc. ("DRMI") is a property management company and wholly owned subsidiary of DRI that continues to serve as the managing agent ("Manager") of PVCOA. (*Id.* at ¶ 77). Defendants Troy Magdos and Kathy Wheeler (collectively the "Defendant Individuals") are employees of DRI who also served as Officers on the Board of Directors of PVCOA (the "PVCOA Board"). (*Id.* at ¶¶ 4, 97, 99).

(Doc. 136 at 1-2) (footnotes omitted).

On November 15, 2022, in a comprehensive order analyzing the settlement, claims and class, this Court granted "preliminary certification of [the] class for settlement purposes only." (Doc. 136 at 31). On September 6, 2023, the Court Granted Plaintiffs' Unopposed Renewed Motion for Preliminary Approval of Settlement, Approval of Notice. (Doc. 149 at 14-17).

**B.    Settlement Negotiations.**

The Settlement Agreement is the product of good faith and arm's-length negotiations. The initial Terms Sheet was reached at the conclusion of an all-day private mediation session with an experienced JAMS mediator, Retired Magistrate Judge Edward Infante. After attending the mediation session, the parties continued to engage in intensive negotiations, ultimately reaching the final Settlement Agreement, which the Court preliminarily approved. (*Id.*).[2]

**C.    Settlement Terms.**

**1.    Settlement Class**

On November 15, 2022, the Court ordered "[t]he lawsuit is preliminarily certified,

---

[2] The entire settlement process, including post mediation refinements to the Settlement Agreement, are addressed in detail in the Unopposed Renewed Motion for Preliminary Approval of Settlement, Approval of Notice. (Doc. 144 at 26-34).

for settlement purposes only, as a class action on behalf of the following class . . . with respect to the claims asserted in the lawsuit:"

> All current and former members of the Premiere Vacation Collection Owners Association who were assessed Assessments for any Calendar year(s) from 2011 through and including 2022, excluding ILX Acquisition and any entity that received any bulk transfer/assignment of ILX Acquisition's Bulk Membership in the Premiere Vacation Collection Owners Association. Excluded from the Class are Diamond Resorts International, Inc., Diamond Resorts Management, Inc., their parents, subsidiaries, successors, affiliates, current officers and directors and all judges assigned to this litigation and their immediate family members.

(Doc. 136 at pp. 29-30). The Settlement Class is as defined in the Settlement Agreement. (Doc. 129-1 at ¶ 11).

## 2. The Settlement Consideration

Defendants have agreed to a total payment of $13 million to the Settlement Fund, made in two installments: $75,000.00 and $12,925,000.00. (*Id.* at ¶¶ 55, 80-81). This payment is the full amount owed under the Settlement Agreement, and is inclusive of any and all attorneys' fees, expenses, service awards and administration costs that might be ordered by this Court. The first payment of $75,000.00 was made promptly after the Court granted preliminary approval of the Settlement Agreement and applied to the administrative expenses of JND Legal Administration incurred in providing notice to Settlement Class Members and related initial services. The second payment of $12,925,000.00 is to be made no later than thirty (30) days after entry of the Final Approval Order. (*Id.* at ¶ 81).

Additionally, the Settlement Agreement provides for the following non-monetary benefits to current Members of the Association (even those that opt-out of the Settlement): future management services provided to the Association by DRM, DRI, or any affiliate must be performed under a written contract (to be executed in or before February of 2024) that must comply with all applicable law and the Association's organic documents, including the presumptive 15% cap on management fees. It must also contain a complete disclosure of fees and payment or reimbursement of any material expenses of DRM or affiliate. Any intent to exceed the 15% cap on fees must be clearly disclosed, in advance,

to current Association members, and must comport with standards of commercial reasonableness. All future budgets and annual financial reports of the Association must disclose all material costs included in the determination of common expenses of the Association. Specifically, "any material reimbursement or absorption or allocation of internal expenses of the Manager or affiliate, and/or direct or indirect corporate costs thereof" must be disclosed to current members in a "clear, specific, conspicuous, and readily understandable manner." (*Id.* at ¶ 62).

### 3.    Release of Claims

Pursuant to the Settlement Agreement, Defendants and all Released Parties, as defined by the Settlement Agreement, are to be finally and forever released of and from any and all liabilities, rights, claims, actions, causes of action demands, damages, costs, attorneys' fees, losses and remedies, whether known or unknown, existing or potential, suspected or unsuspected, liquidated or unliquidated, legal, statutory, or equitable, based on contract, tort or any other theory, including, but not limited to, conduct which is negligent, intentional, with or without malice or a breach of any duty, law, or rule, of any nature whatsoever through the Effective Date related to the claims that were raised or could have been raised in the Action, specifically (but not limited to) claims related to any and all improper or excessive charges, costs, fees, expenses, including Assessments, assessed, charged or billed by the Corporate Defendants and any actions taken by any of the Defendants relating to the charging, assessing or billing of any and all such charges, fees, and costs to the Association or Members in the Association, including any Assessments or other charges related to the Association's interests in component sites within the Collection from the beginning of time up to the date of notice to the Settlement Class. (*Id.* at ¶¶ 46, 90).

### D.    Notice of the Settlement

The Settlement Agreement provides for the best possible form of notice: actual and direct notice to Settlement Class Members. (*Id.* at ¶¶ 68-76). Specifically, the notice plan in the Settlement Agreement provides that: (1) Email Notice be sent to all Settlement Class

Members for whom DRM has provided email addresses; (2) Postcard Notice be sent by U.S. mail only to Settlement Class Members for whom DRM does not have valid email addresses or for whom Email Notice bounces back as undeliverable; and (3) Long Form Notice, which shall be written in both English and Spanish, and shall be available on the Settlement Website and via mail upon a Settlement Class Member's request to the Settlement Administrator. (*Id.* at ¶ 72).

By the order granting preliminary approval of the Settlement Agreement, the Court authorized dissemination of Notice in the manner stipulated in the Settlement Agreement. (Doc. 149 at 13-14). Pursuant to that order, Email Notice was sent directly to 26,837 email addresses (representing 22,842 unique Settlement Class Members) for the Settlement Class. (Exhibit 1, Declaration of Ryan Bahry regarding Settlement Administration ("Bahry Decl.") at ¶ 8). Of the Email Notice, 23,113 were delivered (representing 19,750 unique Settlement Class Members), thus attempted Email Notice was unsuccessful to 3,092 Settlement Class Members. (*Id.* at ¶ 9). Postcard notice was sent to the 3,933 Settlement Class Members without a valid email address on file and to the 3,092 Settlement Class Members to whom Email Notice was unsuccessful. (*Id.* at ¶ 10). Of the Postcard Notices, 1,679 were returned as undeliverable, with 9 remailed to forwarding addresses and 569 remailed after additional research. (*Id.* at ¶ 11). Of the 579 remailed Postcard Notices, 160 were returned of which 1 was remailed to a forwarding address. (*Id.*) As of December 18, 2023, 25,615 unique Settlement Class Members were sent Email Notice or Postcard Notice that was not returned as undeliverable, representing 95.7% of Settlement Class Members. (*Id.* at ¶ 13).

The Notice informed Settlement Class Members of the material terms of the Settlement; the proposed plan of distribution of settlement proceeds; Plaintiffs' request for payment of attorneys' fees, reimbursement of litigation expenses, and Service Awards to Class Representatives; the date, time, and place of the final fairness hearing; the procedures for opting out of the Settlement Class or submitting objections to the Settlement; and that, if Settlement Class Members did not opt out, they would be bound by any final judgment

in this case, including a release of claims. (Doc. 149 at 13-17). The Long Form Notice and other important documents were also posted on www.zwickyassessmentsettlement.com, a website dedicated to this litigation that provides detailed information about the Settlement and the rights of Settlement Class Members. (Bahry Decl. at ¶ 14).

Finally, the Settlement Administrator timely provided the required CAFA notices. 28 U.S.C. § 1715, (*Id.* at ¶¶ 4-5).

### E.    Motion for Attorney Fees, Costs, and Service Awards

Plaintiffs submitted their motion for attorneys' fees, reimbursement of litigation expenses, and service awards for class representatives on December 12, 2023. (Doc. 151). Additionally, the motion was posted to the case website to enable Settlement Class Members to easily review it.

### F.    Response of the Settlement Class to the Settlement

As of December 18, 2023, 25,615 Settlement Class Members were sent Email Notice or Postcard Notice that was not returned as undeliverable, representing 95.7% of the Settlement Class Members. (Bahry Decl. at ¶ 13).

The Email Notice, Postcard Notice, Longform Notice, and website stated that objections to the Settlement had to be submitted to the Court and counsel for the parties and postmarked no later than December 26, 2023, and requests for exclusion from the Settlement Class had to be postmarked no later than December 26, 2023. (*Id.* at ¶¶ 14-15, 18, 20). As of December 18, 2023, only three Settlement Class Members have requested exclusion from the Settlement Class, and none has objected. (*Id.* at ¶¶ 19, 21).

### G.    Plan of Distribution

Prior to distribution, the Settlement Amount will be held in an interest-bearing account that is a "Qualified Settlement Fund" pursuant to applicable IRS regulations. (Doc. 129-1 at ¶ 61). This escrow account has already been established and the first installment has been deposited into that account. (*Id.* at ¶ 80). The Settlement Agreement defines the Net Settlement Amount to be distributed to Settlement Class Members as the Settlement Amount less any amounts approved by the Court for payment of attorneys' fees and costs, any Court-approved Service Awards to the Class Representatives, and all Settlement

8

Administration Costs. (*Id.* at ¶ 31). The plan of distribution of the Net Settlement Amount is to Settlement Class Members on a pro rata basis. A Settlement Class Member's pro rata share will be determined by calculating "each Settlement Class Member's percentage of the total amount of Assessments assessed to Settlement Class Members for the calendar years 2011 through 2022 to determine each Settlement Class Member's pro rata interest in the Settlement Fund." (*Id.* at ¶¶ 86-87).

## III.  LEGAL STANDARD

"At the final approval stage, the primary inquiry is whether the proposed settlement 'is fundamentally fair, adequate and reasonable.'" *Taylor v. FedEx Freight, Inc.*, 2016 WL 6038949, at \*2 (E.D. Cal. Oct. 13, 2016) (quoting *Lane v. Facebook, Inc.*, 696 F.3d 811, 818 (9th Cir. 2012)). In deciding whether a proposed settlement is fair, adequate and reasonable, Rule 23(e)(2), as amended in 2018, requires the Court to consider numerous factors set forth in the Rule:

> (A) the class representatives and class counsel have adequately represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
> (i) the costs, risks, and delay of trial and appeal;
> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
> (iv) any agreement required to be identified under Rule 23(e)(3); and
> (D) the proposal treats class members equitably relative to each other.

These factors (albeit couched in varied phraseology) were recognized and applied by courts in the Ninth Circuit in deciding whether to approve class action settlements, long before the 2018 Amendments. *See Pena v. Taylor Farms Pac., Inc.*, 2019 WL 13180178, at \*2 (E.D. Cal. Aug. 23, 2019) ("[T]he newly codified factors [of subdivision (e)(2)] are not intended 'to displace any factor, but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal.'" (quoting Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendment) (quoting 4 Newberg on Class Actions § 13:14 (5th ed.) (noting Rule 23(e) "essentially codified [federal courts'] prior practice" (alteration in original)))). Thus, the

Court may properly "draw[] on longstanding precedent in applying these newly amended rules." *Pena*, 2019 WL 13180178, at *2.

Accordingly, the Ninth Circuit continues to consider the following factors:

> the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Ross v. Bar None Enters.*, 2015 WL 1046117, at *4 (E.D. Cal. Mar. 10, 2015) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)). Ultimately, the court must reach "a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Officers for Justice v. Civil Serv. Comm'n of S.F.*, 688 F.2d 615, 625 (9th Cir. 1982). The review should be undertaken with due regard for the strong legal policy favoring compromise and settlement of class actions. *See In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008); *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 576 (9th Cir. 2004).

## IV.    THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE

### A.    Strength of Plaintiffs' Case and the Risk of Continued Litigation Supports Final Approval

"When assessing the strength of plaintiff's case, the court does not reach 'any ultimate conclusions regarding the contested issues of fact and law that underlie the merits of [the] litigation.'" *Vanwagoner v. Siemens Indus., Inc.*, 2014 WL 7273642, at *5 (E.D. Cal. Dec. 17, 2014) (quoting *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 720 F. Supp. 1379, 1388 (D. Ariz. 1989) ("*WPPSS*") (alteration in original)). "Instead, the court is to 'evaluate objectively the strengths and weaknesses inherent in the litigation and the impact of those considerations on the parties' decisions to reach these agreements.'" *Emmons v. Quest Diagnostics Clinical Labs., Inc.*, 2017 WL 749018, at *4 (E.D. Cal. Feb. 27, 2017) (quoting *WPPSS*, 720 F. Supp. at 1388).

Plaintiffs allege claims for violations of Federal Civil Racketeer Influenced and

Corrupt Organizations Act ("RICO"), Arizona Civil Racketeering ("AZRAC"), and Breach of Fiduciary Duties. Their case features several compelling strengths that support those claims. Plaintiffs' claims, however, also face many potential vulnerabilities, any one of which could have resulted in no recovery by the Settlement Class had litigation continued.

First, if litigation had continued, Defendants would have strenuously opposed certification of a litigation class. The Ninth Circuit requires courts to conduct a "rigorous analysis" when determining whether the elements of Rule 23 have been satisfied in complex class actions, which often generates a battle between respected experts with the outcome highly uncertain. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 980 (9th Cir. 2011). As previously discussed, Defendants vigorously argued that the claims at issue here are derivative belonging to the Association on an entity level. (Docs. 39 at 4-6; 51 at 3-8; 64 at 2-5; 102 at 6).  Plaintiffs prevailed at the trial court level when Defendants sought dismissal on this basis in their motions to dismiss.  However, any future successful challenge by Defendants to class certification—by way of interlocutory appeal or otherwise—asserting Plaintiffs' lack of "standing" could defeat all direct financial recovery by the Settlement Class Members.

Second, to prevail on their RICO claims, Plaintiffs must demonstrate that Defendants had a specific intent to defraud. *Schreiber Distrib. Co. v. Serv-Well Furniture Co., Inc.*, 806 F.2d 1393, 1400 (9th Cir. 1986). Defendants would have vigorously contested this point. Defendants would have likely also presented the testimony of numerous executives denying any intent to conceal any charges for common expenses; and would further assert that the charges for Indirect Corporate Costs were authorized by the management agreement then in effect, supported by abundant consideration, and in no way fraudulent or improper. Moreover, Defendants, in contesting the allegations of fraudulent concealment, would likely cite to multiple SEC filings in which the imposition of internal overhead charges—the Indirect Corporate Costs Plaintiffs assert were wrongfully concealed—were publicly and explicitly disclosed.  At worst, Defendants may have

11

argued, the assessments merely reflected a mistake that did not rise to the level of specific intent to defraud necessary to establish a RICO violation.

Third, proving all the various elements of a civil claim for RICO is challenging. Defendants disputed that the Association constitutes a RICO "enterprise"; that DRI operated that enterprise to engage in a pattern of racketeering; and that Defendants participated in a conspiracy. If the jury had ruled against Plaintiffs on any one of these disputed issues, the RICO claim would have failed. *See, e.g., Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 993-94 (9th Cir. 2014).

Fourth, and generally, juries are always capable of surprising the most experienced counsel. *See, e.g., In re Auto. Refinishing Paint Antitrust Litig.*, 617 F. Supp. 2d 336, 343 (E.D. Pa. 2007) ("[L]itigation is always inherently unpredictable. '[N]o no [sic] matter how confident one may be of the outcome of litigation, such confidence is often misplaced.'" (quoting *State of W. Va. v. Chas. Pfizer & Co.*, 314 F.Supp. 710, 743-44 (S.D.N.Y.1970)) (second alteration in original)).

Fifth, an appeal by Defendants to any adverse ruling was likely. Indeed, Defendants have vigorously defended this case on a range of grounds, any one of which—from standing to statutes of limitations—could have resulted in zero recovery by the Class on appeal.

Overall, the hurdles that Plaintiffs face in proving their claims are significant. In light of the strengths and weaknesses of Plaintiffs' case, the Settlement Agreement provides what Counsel respectfully submit is an excellent recovery for the Settlement Class.

**B.    Expense, Complexity and Likely Duration of Continued Litigation Support Final Approval**

"Approval of settlement is 'preferable to lengthy and expensive litigation with uncertain results.'" *Morales v. Stevco*, 2011 WL 5511767, at *10 (E.D. Cal. Nov. 10, 2011) (quoting *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 526 (C.D. Cal. 2004)). The Ninth Circuit has explained "there is a strong judicial policy that favors

settlements, particularly where complex class action litigation is concerned." *In re Syncor*, 516 F.3d at 1101 (citing *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992)).

It is evident that this case, which includes claims for RICO, AZRAC, and Breach of Fiduciary Duty is inherently complex. Indeed, this Court cited "complexity" as a factor considered in finding that "the parties' process and reasons . . . for pursuing settlement are satisfactory." (Doc. 136 at 14). Plaintiffs contend Defendants colluded to intentionally misreport data to Class Members, which requires expert testimony for a jury to understand the alleged wrongdoing. Further, to prove the intentional and collusive aspects of their claims, Plaintiffs would be required to present reliable evidence demonstrating Defendants' intent to misreport Indirect Corporate Costs to the Class Members.

Moreover, although the claims at issue here have been litigated for nearly nine years, Plaintiffs are still several years away from recovery absent a settlement. The case was only in the class discovery stage at the time the parties requested a stay to mediate the case with merits discovery to follow.   Plaintiffs would then have several challenging, time-consuming, and costly steps to complete before any litigated recovery might be obtained: not only expert discovery, including expert depositions and *Daubert* challenges, but also class certification briefing, summary judgment, a potential petition for interlocutory appeal under Rule 23(f), trial preparation and motions in limine, the trial itself, and post-judgment motions and appeals. *See Emmons*, 2017 WL 749018, at *5 ("All of these proceedings could take years to fully resolve."). Given these hurdles, any recovery outside of this Settlement would be several years away, and the costs and detriments of delay would continue to accumulate.

This long and expensive path to an uncertain recovery strongly supports the fairness of the Settlement, which provides a concrete and substantial payment to over 26,000 Settlement Class Members. Indeed, in its preliminary order certifying the Settlement Class, this Court recognized that "[t]he history of his lawsuit began in August 2015 when Zwicky filed suit in the Maricopa County Superior Court seeking to enforce his statutory and

common law inspection rights as a PVCOA member." (Doc. 136 at 3). Litigation regarding the assessments at issue in this action has been ongoing for nearly nine years including an appeal in the Inspection Action. *Zwicky v. Premiere Vacation Collection Owners Ass'n*, 418 P.3d 1001 (Ariz. Ct. App. 2018). After initiating this action, Plaintiffs faced no less than seven Motions to Dismiss. (Doc. 102). If this case is ultimately tried, an appeal would occur regardless of who won at trial, thereby delaying any relief to the Class Members for several more years. Accordingly, the risks and costs of continued litigation weigh heavily in favor of approval of the Settlement Agreement.

### C.    Amount Offered in Settlement Supports Final Approval

The $13 million Settlement Fund constitutes a significant share of the alleged damages to the Settlement Class. To calculate the damages incurred by the Settlement Class, Class Counsel undertook a detailed quantitative analysis and estimated that the maximum non-trebled damages was approximately $35 million. That analysis, together and supporting documentation comprised the Indirect Corporate Cost Work-Up. (Doc. 145-2). The methodology used in preparing the Indirect Corporate Cost Work-Up is addressed in detail in the Unopposed Renewed Motion for Preliminary Approval of Settlement, Approval of Notice (Doc. 144 at 15-17).

In sum, the calculated maximum, nontrebled, compensatory damages to the Settlement Class during the entire Class Period, as calculated by Class Counsel, totaled approximately $35 million. (*Id.* at 15). This calculation included the total of all non-trebled damages that could be reliably calculated stemming from all alleged theories of misreporting in the case. Defendants, however, argued that they were entitled to an equitable offset for their Inventory Recovery and Assignments ("IRAA") contributions. (*Id.* at 12-13). If accepted by a jury, this would reduce the maximum damages to the Class to $17 million.  Moreover, Defendants have contended that the Indirect Corporate Costs were legitimately imposed under the existing management contract, represent fair and reasonable charges for services rendered, and are not fraudulent in any way.  If the jury were to accept these contentions the result would be a zero verdict.

14

Thus, the Settlement Amount of $13 million is equal to approximately 37 percent of the maximum alleged damages incurred by Settlement Class Members. If Defendants established entitlement to an offset for their IRAA contributions, the Settlement Amount represents over 76 percent of the damages. This is an excellent result. Indeed, courts routinely approve class settlements where class members recover less than one third of the maximum potential recovery amount. Moreover, courts in the Ninth Circuit have characterized settlements as "an excellent recovery for the class" when it represented "almost 30% of total damages suffered." *Edwards v. Nat'l Milk Producers Fed'n*, 2017 WL 3623734, at *7 (N.D. Cal. June 26, 2017); *see also In re Anthem, Inc. Data Breach Litig.*, 2018 WL 3960068, at *9-10 (N.D. Cal. Aug. 17, 2018) (holding that "results obtained in the Settlement are exceptional" when it provided "14.5% of the projected recovery that Settlement Class Members would be entitled to if they prevailed"); *In re Veritas Software Corp. Sec. Litig.*, 2005 WL 3096079, at *5, 13 (N.D. Cal. Nov. 15, 2005) (holding that class counsel "achieved an excellent settlement for the class members" when it represented "approximately 20%" of damages), *aff'd in part and vacated in part (on other grounds)*, 496 F.3d 962 (9th Cir. 2007). Similarly, the Central District of California described a settlement providing "36% of the class' total net loss" as nothing less than "exceptional." *In re Heritage Bond Litig.*, 2005 WL 1594403, at *19 (C.D. Cal. June 10, 2005).

Under Rule 23(e)(2), the Court is to consider the amount of attorneys' fees and expenses claimed in determining whether the net result to Settlement Class Members is "fair adequate and reasonable." *Briseno v. Henderson,* 998 F.3d 1014, 1024 (9th Cir. 2021) ("[T]he new Rule 23(e) makes clear that courts must balance the 'proposed award of attorney's fees' vis-à-vis the 'relief provided for the class' in determining whether the settlement is 'adequate' for class members." (quoting Fed. R. Civ. P. 23(e)(2)(C))). Courts must be satisfied that the class is not being "shortchange[d]" in the process. *Briseno,* 998 F.3d at 1024 (citing Fed. R. Civ. P. 23(e)(2)(C)).

This Court stated, in its Order of September 6, 2023 (Doc.149): "In light of

Plaintiffs' clarification [of the actual time counsel expended] and the Ninth Circuit recognition that '25% of the fund as the benchmark for a reasonable fee award,' the Court is preliminarily assured there is no danger of disproportionate distribution of the settlement to Counsel." (*Id.* at 9 (quoting *In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011))). The award of attorney's fees is a matter solely entrusted to the Court's discretion—there is no "clear sailing agreement" that purports to bind the Court's discretion in any way—and for all of the reasons set forth in Plaintiffs' Motion for Fees, Costs and Service Awards filed December 12, 2023 (Doc.151), Plaintiffs submit that an award of 25% is fair and equitable to Counsel and to the Settlement Class.

In sum, the Settlement Agreement provides an excellent financial recovery for the Settlement Class and important remedial measures enhancing fiduciary standards in the imposition of assessments for common expenses. Thus, this Court should enter final approval of the Settlement Agreement.

### D. Extent of Discovery Completed and Stage of Proceedings Support Final Approval

The Court evaluates whether Class Counsel had sufficient information to evaluate the strengths and weaknesses of the case. *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000). Given the procedural and litigation history, there can be no doubt that Class Counsel had more than sufficient discovery and information to make an informed decision about the reasonableness and adequacy of the Settlement. Plaintiffs' attorneys have prosecuted the claims ultimately brought in this action vigorously for nearly nine years and Defendants and the Association have equally vigorously pursued numerous defenses during that time. (Docs. 102 at 1; 136 at 3).

Specifically, Class Counsel conducted a comprehensive investigation including serving requests for production and interrogatories in the Inspection Action; searching and reviewing over 1,300 pages of electronic documents produced by the Association in the Inspection Action; searching and reviewing over 2,000 pages of public records documents; serving requests for admission, interrogatories, and requests for production in this action; and reviewing more than 3,500 pages of electronic documents produced by Defendants in

this action.[3] As a result, when Plaintiffs negotiated and entered into the Settlement Agreement, they were fully informed about the potential risks and rewards of continued litigation. Indeed, this Court noted in its preliminary approval order "the discovery obtained in the State Inspection Action and this matter demonstrates the parties' efforts to investigate before settlement are satisfactory." (Doc. 149 at 8).

Additionally, the Settlement Agreement was reached only after arm's-length negotiations through a private mediation session with a highly experienced mediator at JAMS—Retired Magistrate Judge Edward Infante. In the private mediation session "both sides were well-prepared to discuss the applicable legal standards and the relative strengths and weaknesses of the parties' positions." (Doc. 129-7 at ¶ 8). Moreover, "[t]he negotiations were based on detailed analyses of the relevant facts and legal principles, and counsel for all parties negotiated vigorously, effectively and at arm's length." (*Id.* at ¶ 11). Even after the mediation session, the parties engaged in intensive negotiations for approximately three months, resulting in substantial enhancements to the Terms Sheet (from Plaintiffs' perspective) negotiated in the mediation, all as detailed at length in Plaintiffs' Renewed Motion for Preliminary Approval of Settlement. (Doc.144 at 31-34).

"A settlement following sufficient discovery and genuine arms-length negotiation is presumed fair." *Ross*, 2015 WL 1046117, at *6 (quoting *Nat'l Rural Telecomms.*, 221 F.R.D. at 528). Accordingly, the stage of the proceedings at which the Settlement Agreement was reached strongly favors final approval.

**E.    Experience and Views of Counsel Support Final Approval**

The two law firms that were appointed Class Counsel are comprised of highly experienced and skilled attorneys who have litigated many complex actions through trial and appeal. Indeed, when appointing Class Counsel, the Court recognized that "three of the four attorneys serving as class counsel represented Zwicky in the Inspection Action and

---

[3] While numerous depositions would have been required related to contested class certification and merits discovery for the case to proceed to trial, the information necessary for Class Counsel to calculate damages was in the documents Class Counsel obtained in the Inspection Action and this matter.

have continued to do so in this present lawsuit." and that "[t]he Hon. Infante further attests to the parties' adequate representation based on his observations during mediation." (Doc. 136 at 13).

"With regard to class action settlements, the opinions of counsel should be given considerable weight both because of counsel's familiarity with this litigation and previous experience with cases." *Turk v. Gale/Triangle, Inc.*, 2017 WL 4181088, at *3 (E.D. Cal. Sept. 21, 2017) (quoting *West v. Circle K Stores, Inc.*, 2006 WL 8458679, at *5 (E.D. Cal. Oct. 20, 2006)). As stated in their motion for preliminary approval, Class Counsel believe the Settlement Agreement is fair, reasonable, and adequate and strongly recommend its approval. (Exhibit 2, Declaration of Edward L. Barry at ¶ 10; Doc. 129-5 at ¶¶ 17, 25).

Their considered judgment—after nearly nine years of litigation, voluminous discovery, and extensive motion practice—is entitled to substantial deference. (Doc. 144 at 25-26); *see also Pointer v. Bank of Am., N.A.*, 2016 WL 7404759, at *12 (E.D. Cal. Dec. 21, 2016) ("In considering the adequacy of the terms of a settlement, the trial court is entitled to, and should, rely upon the judgment of experienced counsel for the parties.").

Additionally, the four Class Representatives strongly support the Settlement and believe it best serves the interests of the Settlement Class.

### F.    Lack of Collusion

The Settlement was reached after years of litigation and after an intensive mediation under the direction of the Hon. Edward Infante. This process facilitated by a neutral third party shows that the settlement is the product of good faith and arm's-length negotiations. *See, e.g., In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d at 948 ("[The] presence of a neutral mediator [is] a factor weighing in favor of a finding of non-collusiveness.").

There are three *Bluetooth* factors this Court must weigh when considering collusion: (1) a disproportionate distribution of the settlement fund to counsel; (2) a negotiation of a "clear sailing" provision, which allows for the payment of attorneys' fees independent of payments to the class; and (3) an arrangement for funds not awarded to revert to Defendants rather than to be added to the settlement fund. *Id.* at 947.

First, the Settlement Agreement requires Class Counsel to submit a fee request to the Court to obtain any award of attorneys' fees so that the Court, not the parties, determines and approves the distribution of attorneys' fees to Class Counsel. (Doc. 129-1 at ¶ 97). Moreover, "the Court's failure to approve, in whole or in part, any award for attorneys' fees shall not prevent the Settlement Agreement from becoming effective, nor shall it be grounds for termination." (*Id.*) These provisions protect against a disproportionate award of the Settlement Fund to Class Counsel.

Second, while the Settlement Agreement provides that "Defendants agree not to oppose Class Counsel's request for attorneys' fees of up to *25% of the Settlement Fund*," this is not the type of "clear sailing" provision that concerned the *Bluetooth* court. (*Id.* (emphasis added)). The *Bluetooth* court was specifically concerned with "a 'clear sailing' arrangement *providing for the payment of attorneys' fees separate and apart from class funds*, which carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class." 654 F. 3d at 947 (internal quotations and citations omitted) (emphasis added); *see also Terry v. Hoovestol, Inc.*, 2018 WL 4283420, at *3 (N.D. Cal. Sept. 7, 2018) ("While a clear sailing provision may be considered a sign of collusion under some circumstances, it 'does not signal the possibility of collusion' where, as here, class counsel's fees and costs are awarded from the same gross settlement amount as the class.") (quoting *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 961 n.5 (9th Cir. 2009)); *Ruch v. AM Retail Grp., Inc.*, 2016 WL 5462451, at *8 (N.D. Cal. Sept. 28, 2016) ("[B]ecause the fee will be awarded from the same common fund as the recovery to the Class, this particular clear sailing provision does not signal the possibility of collusion."). Other courts in the Ninth Circuit have also recognized that "*In re Bluetooth* itself made clear that the court's concern was with 'when the parties negotiate a "clear sailing" arrangement providing for the *payment of attorneys' fees separate and apart from class funds*.'" *Livingston v. MiTAC Digital Corp.*, 2019 WL 8504695, at *8 (N.D. Cal. Dec. 4, 2019) (emphasis added) (quoting *In re Bluetooth*, 654 F.3d at 947). While Defendants agreed "not to oppose Class Counsel's

request for attorneys' fees of up to [the Ninth Circuit benchmark of] 25% of the Settlement Fund," (Doc. 129-1 at ¶ 97), where the fee request is for a percentage of a common fund rather than separate and apart from class funds, the clear sailing provision does not signal collusion. *Bluetooth*, 654 F.3d at 947; *see also Terry*, 2018 WL 4283420, at *3.

Third, the Settlement does not permit any funds to revert to Defendants. After the initial distribution, any funds remaining in the Escrow Account, "shall be re-distributed *pro-rata* to Settlement Class Members who accepted their share of the initial distribution." (Doc. 129-1 at ¶ 89). Should re-distribution not be economically feasible, or if funds otherwise remain in the Escrow Account, the Parties will move for the Court's approval to order distribution of residual funds to Habitat for Humanity as the *cy pres* recipient. (*Id.*) Indeed, this Court previously held that "the chosen *cy pres* recipient has a close enough nexus to the Proposed Class" and this "factor weighs in the parties' favor and against collusion." (Doc. 136 at 25). In sum, Class Counsels' interests are fully aligned with the Settlement Class's interests, and there is no reason to fear self-dealing, let alone collusion.

### G. Presence or Absence of a Government Participant

Where, as here, there is no governmental participant in a case, "[t]his factor . . . is irrelevant to the court's analysis." *Castillo v. ADT, LLC*, 2017 WL 363108, at *6 (E.D. Cal. Jan. 25, 2017).

Nevertheless, while no governmental agency is a party to this lawsuit, the Settlement Administrator notified all pertinent government officials of the settlement as required by CAFA. (Bahry Decl. at ¶¶ 4-5). Additionally, the Arizona Attorney General's office was served the original and amended Complaints, with a corresponding opportunity to seek intervention, as required by A.R.S. § 13-2314.04(H).  No governmental agency raised objections or concerns about the settlement which supports final approval.

### H. Reaction of Settlement Class Members to the Settlement

#### 1. Notice Satisfied Rule 23 and Constitutional Due Process

Before a court determines whether to finally approve a settlement, it must also conclude that notice was appropriate. Under Rule 23(e) of the Federal Rules of Civil

Procedure, a court must direct notice in a reasonable manner to class members who would be bound by a proposed class settlement. To satisfy the requirements of Rule 23 and constitutional due process, the "content and method of the notice should be designed to apprise class members of the settlement terms and class members' rights." *Van Ba Ma v. Covidien Holding, Inc.*, 2014 WL 360196, at *5 (C.D. Cal. Jan. 31, 2014) (citing *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

The "Postcard and Email Notices are identical and summarize the Proposed Long Form Notice." (Doc. 149 at 13). Once updated the Court previously found (upon updating with the Court's address and courtroom number) these short-form notices satisfy Rule 23(c)(2)(B) because they:

> describe the nature of the action; define the Class; state the issues; outline recovery and release under the Proposed Settlement Agreement; inform Class Members they can appear at the fairness hearing; and refer Class Members to the Proposed Long Form Notice on the Settlement Website for instructions on how to opt out of the settlement or object at the fairness hearing.

(*Id.*) The method of notice likewise satisfied the requirements of Rule 23 and due process. Here, as of December 18, 2023, 25,615 Settlement Class Members were sent Email Notice or Postcard Notice that was not returned as undeliverable, representing over 95% of the Settlement Class Members. (Bahry Decl. at ¶ 13). This notice program clearly satisfies the recommendations of the Federal Judicial Center, which states that a notice should have an effective "reach" to its target audience of 70-95%. *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 721680, at *31 (N.D. Cal. Jan. 28, 2016) (finding notice "reach[ing] an estimated 83% of class members . . . is well-within the acceptable range." (Citing "Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide," Federal Judicial Center (2010) at 3)).

Thus, as this Court preliminarily found, "the parties' Notice Program, Proposed Postcard Notice, Proposed Email Notice, and Proposed Long Form Notice . . . [provides] the 'best notice that is practicable under the circumstances.'" (Doc. 149 at 14) (quoting Fed. R. Civ. P. 23(c)(2)(B)).

**2.      A Minimal Number of Exclusions and No Objections Were Filed**

The absence of large numbers of exclusions and objections "raises a strong presumption that the terms of the [Settlement] are favorable to the class." *Avila v. Cold Spring Granite Co.*, 2018 WL 400315, at *7 (E.D. Cal. Jan. 12, 2018). Here, only three Settlement Class Members have requested exclusion, which is less than 0.02 percent of Settlement Class Members identified by DRM. (Bahry Decl. at ¶¶ 7, 18-19). This is a miniscule figure, and courts in the Ninth Circuit routinely approve settlements featuring far higher opt-out rates. *See, e.g., Churchill Vill., L.L.C.*, 361 F.3d at 577 (opt-out rate of 0.55%); *Rodriguez v. Kraft Foods Grp., Inc.*, 2016 WL 5844378, at *9 (E.D. Cal. Oct. 5, 2016) (opt-out rate of 2.74%); *Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 852 (N.D. Cal. 2010) (opt-out rate of 4.86%).

There have been no objections to date. (Bahry Decl. at ¶ 21). Nevertheless, settlements triggering objections are routinely approved by courts in the Ninth Circuit. *See, e.g., Churchill*, 361 F.3d at 577 (approving settlement with 90,000 notices and 45 objections, equaling 0.05% objection rate). The "absence of a large number of objections to" the Settlement "raises a strong presumption that the terms of" the Settlement "are favorable to the class members." *Ross*, 2015 WL 1046117, at *7 (quoting *Nat'l Rural Telecomms.*, 221 F.R.D. at 529); s*ee also* Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 11.41, at 108 (4th ed. 2002) ("[A] certain number of objections are to be expected in a class action with an extensive notice campaign and a potentially large number of class members. If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement.").

**V.      FINAL CERTIFICATION OF THE SETTLEMENT CLASS IS APPROPRIATE**

In its preliminary approval order, the Court conditionally certified the following Settlement Class:

> All current and former members of the Premiere Vacation Collection Owners Association who were assessed Assessments for any Calendar year(s) from 2011 through and including 2022, excluding ILX Acquisition and any entity that received any bulk transfer/assignment of ILX

> Acquisition's Bulk Membership in the Premiere Vacation Collection Owners Association. Excluded from the Class are Diamond Resorts International, Inc., Diamond Resorts Management, Inc., their parents, subsidiaries, successors, affiliates current officers and directors and all judges assigned to this litigation and their immediate family members.

(Doc. 136 at 29-30). The Court applied a standard of "rigorous scrutiny" in granting preliminary approval for class certification (for settlement purposes only). (Doc. 136 at 8 (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982); *E. Tex. Motor Freight Sys. v. Rodriguez*, 431 U.S. 395, 403– 05 (1977))). The Court, in a thorough and exhaustive analysis, determined that the Settlement Class satisfied all requirements of Rule 23(a) and qualified for class treatment under Rule 23(b)(3). (*Id.* at 8-17).

Nothing has transpired since that order requiring the Court to revisit the certification question. To the contrary, the successful class notice program and highly favorable class reaction demonstrate that the Settlement Class is cohesive and shares an interest in the proposed recovery, and no party or Settlement Class Member has objected to the certification of the Settlement Class. Accordingly, there is "no need for the court to repeat the analysis here," and the final certification of the Settlement Class should be granted by the Court. *Taylor*, 2016 WL 6038949, at *2; *see also Ross*, 2015 WL 1046117, at *3 ("No party or class member has objected to certification of the settlement class, and there is nothing before the court to suggest this prior certification was improper."); *Aguilar v. Wawona Frozen Foods*, 2017 WL 2214936, at *2 (E.D. Cal. May 19, 2017) (granting final certification in the absence of any new certification issue since preliminary approval).

## VI.    THE PROPOSED PLAN OF DISTRIBUTION IS FAIR, REASONABLE, AND ADEQUATE

"A district court's 'principal obligation' in approving a plan of allocation 'is simply to ensure that the fund distribution is fair and reasonable as to all participants in the fund.'" *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 2013 WL 12333442, at *77 (N.D. Cal. Jan. 8, 2013) (citations omitted). The plan of distribution in this settlement proposes distributing Net Settlement Funds to Settlement Class Members on a pro rata basis. A Settlement Class Member's pro rata share will be determined by calculating "each Settlement Class Member's percentage of the total amount of Assessments assessed to

Settlement Class Members for the calendar years 2011 through 2022 to determine each Settlement Class Member's pro rata interest in the Settlement Fund." (Doc. 129-1 at ¶¶ 86-87). Such pro rata distributions are "cost-effective, simple, and fundamentally fair." *Perkins v. LinkedIn Corp.*, 2016 WL 613255, at *13 (N.D. Cal. Feb. 16, 2016) (quoting *In re High-Tech Employee Antitrust Litigation*, 2015 WL 5159441, at *8 (N.D. Cal. Sept. 2, 2015). Accordingly, the plan of distribution of the Net Settlement Funds should be approved.

## VII.    CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that the Court (1) enter final approval of the Settlement Agreement with Defendants; (2) enter final certification of the Settlement Class for settlement purposes only; and (3) approve the proposed plan of distribution of the Net Settlement Funds.

Respectfully submitted this 18th day of December, 2023.

*/s/ Jon L. Phelps*
Jon L. Phelps (027152)
Robert M. Moore (013338)
PHELPS & MOORE, PLC
6424 East Greenway Parkway
Suite 100
Scottsdale, AZ 85254
(480) 534-1400
jon@phelpsandmoore.com
rob@phelpsandmoore.com

Edward L. Barry (005856)
2120 Company Street, Third Floor
Christiansted, Virgin Islands 00820
(340) 719-0601
ed.barry.legal@gmail.com
*Counsel for Plaintiffs and the Conditionally Certified Settlement Class*